Drew L. Eyman, OSB No. 163762
deyman@swlaw.com
Jenna M. Teeny, OSB No. 244519
jteeny@swlaw.com
SNELL & WILMER L.L.P.
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
Telephone: 503.624.6800
Facsimile:  503.624.6888

Attorneys for Plaintiff Northwest Success, Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST SUCCESS, INC., an Oregon domestic nonprofit corporation,<br><br>          Plaintiff,<br><br>vs.<br><br>CITY OF PORTLAND, a municipal corporation,<br><br>          Defendant. | Case No. 3:25-cv-970-AR<br><br>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION<br><br>Request for Oral Argument<br>Expedited Hearing Requested |

## <u>LR 7-1 CERTIFICATION</u>

Pursuant to LR 7-1, the parties made a good faith effort through telephone conference to resolve the present dispute and have been unable to do so. Both parties agree to the expedited hearing request.

## <u>MOTION</u>

Pursuant to Federal Rule of Civil Procedure 65, plaintiff Northwest Success, Inc. ("Plaintiff") moves this Court for a preliminary injunction enjoining defendant city of Portland (the "City") from enforcing against Plaintiff the labor peace requirement in ADM 1.09 and, by extension, from allowing Plaintiff's present janitorial contract to expire.

Page 1 – MOTION FOR PRELIMINARY INJUNCTION

This motion is supported by the memorandum below, the declarations of Katy Moreland, Debra Houston, Clifford Davidson, Drew Eyman, and such further evidence and argument as Plaintiff might submit on reply or any hearing on this motion.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

I.    INTRODUCTION ........................................................................................... 1

II.   FACTS ........................................................................................................... 1

      A.  The LPR. ............................................................................................... 1

      B.  The City determined that Plaintiff met the Good Faith Exception and entered into
          the Contract. ......................................................................................... 2

      C.  The City refused to determine whether Plaintiff met the Good Faith Exception
          and the Contract will now expire. ....................................................... 3

III.  LEGAL STANDARD ................................................................................... 4

IV.   ARGUMENT ................................................................................................ 5

      A.  Plaintiff is likely to succeed on the merits. ........................................ 5

          1.  The LPR violates the First Amendment. ...................................... 5

              a.  The First Amendment protects Plaintiff's union-related speech. ........................ 5

              b.  The LPR is a content-based restriction on speech. ............ 6

              c.  The LPR fails strict scrutiny. .......................................... 7

          2.  The NLRA preempts the LPR. ...................................................... 8

              a.  Machinists preemption ...................................................... 8

              b.  Garmon preemption .......................................................... 10

              c.  The market participant exception does not apply. ........... 12

                  (1)  First prong - the LPR goes well beyond what a private business can
                       do in pursuit of efficient procurement. ...................... 13

                  (2)  Second prong – the LPR is policy based. .................. 15

          3.  The LPR is void for vagueness. .................................................. 17

          4.  The LPR imposes an impermissible condition on Oregon Forward
              Contractors. ............................................................................... 19

              a.  The LPR does not govern "labor standards." ................. 20

          5.  The LPR violates article 1, section 20 of the Oregon Constitution. .......................... 22

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

      a.   Factor 1 – the LPR grants a privilege or immunity. ........................................... 23

      b.   Factor 2 – the LPR discriminates against a true class. ..................................... 23

      c.   Factor 3 – There is no rational basis for the distinction. .................................... 24

B.  Plaintiff is likely to suffer imminent, irreparable harm in the absence of a preliminary injunction. ............................................................................................ 25

C.  An injunction against the LPR is in the public interest and the balance of hardships tips sharply in Plaintiff's favor. ...................................................................... 26

D.  The Court should not require a bond. ............................................................................ 27

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aeroground, Inc. v. City and Cty. of San Francisco*,
  170 F. Supp. 2d 950 (N.D. Cal. 2001) ...................................................................8

*Airline Serv. Providers Ass'n v. Los Angeles World Airports*,
  873 F.3d 1074 (9th Cir. 2017) ...............................................12, 13, 15, 16

*Airlines for Am. v. City & Cnty. of San Francisco*,
  78 F.4th 1146 (9th Cir. 2023) .....................................................13, 14, 15

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ...........................................................................4

*Brevard Achievement Ctr., Inc.*,
  342 NLRB 982 (2004) ......................................................................................11

*Building & Construction Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*,
  507 U.S. 218, 226 (1993) ..........................................................................12, 15

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
  29 F.4th 468 (9th Cir. 2022) ............................................................................26

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ...........................................................................26

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford*,
  180 F.3d 686 (5th Cir. 1999) ...............................................................12, 15, 16

*Casala, LLC v. Kotek*,
  3:25-CV-244-SI, 2025 WL 1442792 (D. Or. May 20, 2025) ........................ *passim*

*Chamber of Com. of U.S. v. Brown*,
  554 U.S. 60 (2008) .................................................................9, 11, 16, 17

*Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) .........................................................................17

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022) .......................................................................................6, 7

*City of Salem v. Bruner*,
  299 Or. 262 (1985) .........................................................................................23

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

*Doe v. Harris*,
772 F.3d 563 (9th Cir. 2014) ...........................................................................4

*E. & J. Gallo Winery v. Andina Licores S.A.*,
446 F.3d 984 (9th Cir. 2006) ...........................................................................5

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) .........................................................................25

*Elrod v. Burns*,
427 U.S. 347 (1976)........................................................................................25

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
98 F.4th 1180 (9th Cir. 2024) ..........................................................................4

*Garrison v. Dep't of Rev.*,
345 Or. 544 (2008)..........................................................................................21

*Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*,
598 U.S. 771 (2023)........................................................................................10

*Glomac Plastics, Inc. v. NLRB*,
592 F.2d 94 (2d Cir. 1979)..............................................................................11

*Golden State Transit Corp. v. Los Angeles*,
475 U.S. 608 (1986)....................................................................................9, 10

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)...................................................................................17, 18

*Hubbard v. City of San Diego*,
No. 24-4613, 2025 WL 1572736 (9th Cir. June 4, 2025) .................................7

*Illingworth v. Bushong*,
61 Or. App. 152 (1982)...................................................................................14

*Indep. Contractors Rsch. Inst. v. Dep't of Admin. Servs.*,
207 Or. App. 78 (2006)...................................................................................20

*Interpipe Contracting, Inc.*,
898 F.3d at 887 ..............................................................................................9

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) .......................................................................27

*Johnson v. Rancho Santiago Cmty. Coll. Dist.*,
623 F.3d 1011 (9th Cir. 2010) .......................................................................12

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

*Jorgensen v. Cassiday,*
    320 F.3d 906 (9th Cir. 2003) ................................................27

*Kesterson v. Juhl,*
    157 Or. App. 544 (1998) ................................................14

*Kramer v. City of Lake Oswego,*
    365 Or. 422 (2019) ................................................23, 24

*Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Emp. Rels. Comm'n,*
    427 U.S. 132 (1976) ................................................8, 9

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ................................................25

*Metro. Milwaukee Ass'n of Com. v. Milwaukee Cnty.,*
    325 F.3d 879, 883 (7th Cir. 2003) ................................................10

*Metropolitan Milwaukee Ass'n of Commerce v. Milwaukee County,*
    431 F.3d 277, 282 (2005) ................................................10, 13

*Miller v. Employment Division,*
    290 Or. 285 (1980) ................................................21

*Neon Sign Corp. v. NLRB,*
    602 F.2d 1203 (5th Cir. 1979) ................................................11

*Nilsen v. Davidson Indus., Inc.,*
    226 Or. 164 (1961) ................................................22

*NLRB v. Gen. Elec. Co.,*
    418 F.2d 736 (2d Cir. 1969) (Friendly, J., concurring and dissenting) ................................................9

*NLRB v. Gissel Packing Co.,*
    395 U.S. 575 (1969) ................................................11

*Pittsburgh, C. C. & St. L. Ry. Co. v. Montgomery,*
    152 Ind. 1, 49 N.E. 582 (1898) ................................................22

*Reed v. Town of Gilbert, Ariz.,*
    576 U.S. 155 (2015) ................................................7

*Republic Steel Corp. v. NLRB,*
    311 U.S. 7 (1940) ................................................15

*SAIF Corp. v. Shipley,*
    326 Or. 557 (1998) ................................................21

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

*San Diego Bldg. Trades Council v. Garmon*,
    359 U.S. 236 (1959)................................................................................10, 11

*San Francisco Unified School District v. Americorps*,
    No. 25-CV-02425-EMC, 2025 WL 1713360 (N.D. Cal. June 18, 2025)...............................18

*Sessions v. Dimaya*,
    584 U.S. 148 (2018)........................................................................................17

*Starlite Aviation Operations Ltd. v. Erickson Inc.*,
    No. 3:15-CV-00497-HZ, 2015 WL 2367998 (D. Or. May 18, 2015) ...................................26

*State v. Clark*,
    291 Or. 231 (1981)........................................................................................23, 24

*State v. Gaines*,
    346 Or. 160 (2009)........................................................................................20

*State v. Meek*,
    266 Or. App. 550 (2014)................................................................................22

*Tanner v. Oregon Health Sciences Univ.*,
    157 Or. App. 502 (1998)................................................................................24

*United Haulers Ass'n v. Oneida–Herkimer Solid Waste Mgmt. Auth.*,
    438 F.3d 150 (2d Cir. 2006), *aff'd*, 550 U.S. 330 (2007)........................................14

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951)........................................................................................11

*Urton v. Hudson*,
    101 Or. App. 147 (1990), *rev den*, 310 Or. 133 (1990) ........................................22

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982)........................................................................................18

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008)..........................................................................................4

*Wis. Dep't of Indus. v. Gould Inc.*,
    475 U.S. 282 (1986)........................................................................................8

**Statutes**

29 U.S.C. § 158(c) ..........................................................................................11

ORS 72.7180(1) ..............................................................................................14

ORS 174.020(1)(a)..........................................................................................22

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

ORS 279.835 .................................................................................................19

ORS 279.840 .................................................................................................15

ORS 279.845(1)(c) ........................................................................................21

ORS 279.850 .................................................................................................20

ORS 279.850(1)(a) ..................................................................................19, 20

ORS 279.850(1)(b) ......................................................................................20

**Other Authorities**

Binding-Interest Arbitration, Black's Law Dictionary (12th ed. 2024).......................18

Fed. R. Civ. P. 65(c) .....................................................................................27

https://ofp.dasapp.oregon.gov/Search .............................................................20

https://www.ilr.cornell.edu/labor-and-employment-law-program/labor-peace-
     agreements-lpa ........................................................................................6

https://www.portlandoregon.gov/citycode/article/24473 .....................................1

Joseph A. Barker, *Keeping Neutrality Agreements Neutral*, MICH. BAR J., August
     2005.......................................................................................................6

OAR 125-055-0040(8)...................................................................................21

Oreg. Const. art 1, § 20 .................................................................................22

S. Rep. No. 573, 74th Cong., 1st Sess., 2 (1935).........................................10

Tentative Agreement Reached, May 23, 2025, available at:
     https://cppwunion.org/#:~:text=The%20union%20represents%20800%20prof
     essional,first%20time%20in%20a%20union ...........................................13

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

<u>**MEMORANDUM**</u>

## I.  INTRODUCTION

The City's labor peace requirement violates federal and state law. Worse still, at the City's urging, Plaintiff spent significant time and money to comply with a codified exception to the labor peace requirement only for the City to ultimately refuse to determine whether Plaintiff even met the exception. Instead, the City led Plaintiff down a path and off a cliff, refusing to extend or amend Plaintiff's contract and banning plaintiff from bidding on the resulting emergency procurement. Plaintiff's contract is set to expire on August 31, 2025. Prior to that date, this Court should enter the requested preliminary injunction to prevent the irreparable harm that would result from the City's constitutional and statutory violations.

## II.  FACTS

### A.  The LPR.

The City has a Sustainable Procurement Policy,[1] which first was enacted in 2003. Eyman Decl., Ex. 1. It is a "Binding City Policy." City Code 1.07.020 defines that term as "statements of the Council, expressed in a resolution or ordinance, that are directed to future decision-making or procedure and have binding effect or serve as mandatory approval criteria." The Sustainable Procurement Policy is known as ADM-1.09.

On March 25, 2020, the Portland City Council adopted Resolution 37483. Among other things, that resolution amended ADM 1.09 to include a "labor peace" requirement for all janitorial, security, and industrial laundry service contracts (the "LPR").

The LPR resulted from several meetings between the City and SEIU Local 49 ("SEIU"). Indeed, SEIU was the only stakeholder involved in creating the LPR. Eyman Decl., Ex. 2. Public records reveal that the City intended the LPR to provide "in roads" to unions representing janitorial, unarmed security, and laundry workers, which includes non-party SEIU. Here is how Derek Bradley, then-Commissioner Hardesty's Policy Director and architect of the LPR, described the policy (while also indicating that its true purpose should not be disclosed):

---

[1] *Available at* https://www.portlandoregon.gov/citycode/article/24473.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

**Here are the notes from Derek's debrief**

Makes it so that when the city contracts out janitorial, laundry, or security , the company must meet 1 of 2 factors

1. Workforce must be unionized
2. Workforce must sign a labor peace agreement with their employer that working conditions and business practices are fair, safe, non-exploitive, fair work week, etc.

Employer and city agrees they will not strike during duration of contract unless working conditions significantly change. Allows unions to build in roads into non-unionized shops with an assurance that employers won't stand in the way of unionization efforts (Don't include in public message). Unions are neutral arbitrator to help non-organized workforce create agreements with their employer. Our office has been deeply engaged in getting this passed. Message from the city is to focus on promoting this as helpful to maintaining critical services.

Davidson Decl., Ex. 1.[2]

In 2022, the City adopted a resolution that professed a propriety interest in labor peace—as opposed to a political interest in bolstering SEIU—and added exceptions to the LPR. Eyman Decl., Ex. 3. Those exceptions include a contractor's good faith effort to obtain a labor peace agreement ("LPA") even if ultimately unsuccessful (the "Good Faith Exception"). *Id.* The LPR vests in the Mayor's Office sole authority to decide whether a contractor meets an exception. *Id.*

### B.  The City determined that Plaintiff met the Good Faith Exception and entered into the Contract.

In 2023, in pursuit of its present contract with the City, Plaintiff engaged in negotiations for an LPA with SEIU. Davidson Decl., Ex. 2. When those negotiations were unsuccessful, Plaintiff offered to mediate pursuant to the LPR. *Id*. SEIU's position was that mediation was "premature." *Id.* at 11. The parties continued to negotiate to no avail. *See generally id.*

Plaintiff informed the City of its negotiations with SEIU, and provided to the City a written plan for continuation of services in the event of economic interference by a labor organization. Houston Decl., Ex. 1; Moreland Decl., ¶ 9. On September 26, 2023, the City determined that Plaintiff met the Good Faith Exception and waived the LPR. Houston Decl., Ex. 2.

As a result, on October 1, 2023, Plaintiff and the City entered into contract no. 30008600 for parks comprehensive custodial services (the "Contract"). Moreland Decl., Ex. 1. The

---

[2] Although someone else drafted these notes, Mr. Bradley ratified their contents by responding to the email, "Looks good to me!" Davidson Decl., Ex. 1.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

Contract was originally set to expire on June 30, 2024. In April 2024, the parties agreed to amend the Contract to extend the term to June 30, 2025. Moreland Decl., Ex. 2. On June 5, 2025, the City approached Plaintiff about their desire to extend the Contract through August 31, 2025, to which Plaintiff agreed. Moreland Decl., Ex. 3.

### C. The City refused to determine whether Plaintiff met the Good Faith Exception and the Contract will now expire.

On October 4, 2024, the City communicated to Plaintiff and the Union that it "expect[ed]" the parties to comply with the Good Faith Exception by going to mediation within the next 90 days and, if mediation fails, arbitration within 90 days after that. Davidson Decl., Ex. 3. Plaintiff acted in compliance with this expectation and kept the City apprised each step of the way. Davidson Decl., Ex. 4 at 3-13. Plaintiff went to mediation with SEIU on December 17, 2024 and, when that was unsuccessful, Plaintiff offered, on December 23, 2024, to submit the matter to arbitration pursuant to the Good Faith Exception. Moreland Decl., ¶ 6; Davidson Decl., Ex. 5.

On February 3, 2025, SEIU requested that the parties return to mediation rather than proceed to arbitration. Davidson Decl., Ex. 4 at 12. On April 21, 2025, Plaintiff offered binding interest arbitration (again) before Eric Lindauer and proposed dates for the same. *Id.* at 11. SEIU, however, remained unwilling to submit to binding interest arbitration, stating that it believed arbitration was "premature." *Id.* at 10. Nonetheless, the City gave Plaintiff a week-and-a-half to set an arbitration date, otherwise Plaintiff's Contract would expire. *Id.* at 9. Plaintiff selected an arbitrator and offered to unilaterally set an arbitration date – which the arbitrator found highly irregular, given that arbitration is a process that requires two willing participants. *Id.* at 8-13.

On May 1, 2025, the City informed Plaintiff that, because "the parties have not provided a date for an arbitration and assurances that the parties will, in fact, go through arbitration, NW Success's contract will expire on June 30, and the City will be immediately moving forward with an emergency procurement." Davidson Decl., Ex. 4 at 9. That same day, Plaintiff informed the City that it could have an arbitration date in place by the next day and requested until then to do so. *Id.* at 8. The City declined Plaintiff's one-day extension request. *Id.*

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

Plaintiff sent a letter to the Mayor's office to determine that it met the Good Faith Exception. *Id.* at 1-2. The Mayor's office declined to respond to that letter. Eyman Decl., Ex. 4. As a result, Plaintiff's contract will expire, and the City deemed Plaintiff ineligible for the next contract for these services, which was awarded under an emergency procurement. Eyman Decl., Ex. 5.

## III.    LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 19 (2008). "[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014).

Under the Ninth Circuit's approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker one. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). This Circuit has adopted and applied a version of the sliding scale approach called the "serious questions test" under which a preliminary injunction may issue where the likelihood of success is such that "serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor." *Id.* (citation omitted). Serious questions "need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024). Here, each factor supports injunctive relief in Plaintiff's favor.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

## IV.    ARGUMENT

### A.    Plaintiff is likely to succeed on the merits.

"The irreducible minimum is that the moving party demonstrate a fair chance of success on the merits or questions serious enough to require litigation. No chance of success at all will not suffice." *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 990 (9th Cir. 2006) (internal quotations omitted).

#### 1.    The LPR violates the First Amendment.

##### a.    The First Amendment protects Plaintiff's union-related speech.

Plaintiff has a First Amendment right to communicate its views about unionizing and about any particular union. As this Court recently explained:

> The Supreme Court "has recognized that employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty." *Thomas v. Collins*, 323 U.S. 516, 537 (1945) (citing *NLRB v. Va. Elec. & Power Co.*, 314 U.S. 469 (1941)). "When to this persuasion other things are added which bring about coercion, or give it that character, the limit of the right has been passed. But short of that limit the employer's freedom cannot be impaired." *Id.* at 537-38 (citation omitted). Thus, it is "firmly established" that an employer has a "free speech right to communicate his views to his employees," including "any of his general views about unionism or any of his specific views about a particular union." *Gissel Packing*, 395 U.S. at 617-18. This right must, however, be balanced against "the equal rights of the employees to associate freely." *Id.* at 617. "[S]o long as the communications do not contain a 'threat of reprisal or force or promise of benefit,'" an employer may communicate his views about unions to his employees. *Id.* An employer may therefore "express opinions or predictions, reasonably based in fact, about the possible effects of unionization on its company." *Int'l Union v. NLRB*, 834 F.2d 816, 820 (9th Cir. 1987) (citing *Gissel Packing*, 395 U.S. at 618).

*Casala, LLC v. Kotek*, 3:25-CV-244-SI, 2025 WL 1442792 at *9 (D. Or. May 20, 2025). Plaintiff's ability to communicate with its employees about the effects of unionizing are particularly important because, as an Oregon Forward Contractor, Plaintiff's prices and administrative overhead are heavily regulated by the Oregon Department of Administrative Services ("DAS").

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

**b.**      **The LPR is a content-based restriction on speech.**

The LPR "targets speech based on its communicative content" or, in other words, "it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022). By its terms, the LPR requires non-unionized contractors in the covered industries to obtain an LPA with a union, and to comply with the terms of that agreement, as a condition of contracting with the City. The LPR's text defines "labor peace" solely from the perspective of a union. Eyman Decl., Ex. 1 ("'Labor Peace' shall be defined as a written provision in an agreement or contract whereby a labor organization . . . agrees to refrain from engaging in any picketing, work stoppages, boycotting, strikes, or any other economic interference[.]"). Conspicuously absent from that text is what an LPA requires of the employer in return. An LPA, or neutrality agreement, by definition, requires an employer to remain neutral to unionization efforts; which the City's architect of the LPR acknowledged. *See* Davidson Decl., Ex. 1 (LPR ensures "employers won't stand in the way of unionization efforts"); *Casala, LLC v. Kotek*, No. 3:25-CV-244-SI, 2025 WL 1442792, at *2 (D. Or. May 20, 2025) (state law defines LPA as "an agreement under which, at a minimum, an applicant or licensee agrees to remain neutral with respect to a bona fide labor organization's representatives communicating with the employees of the applicant or the licensee[.]"); Joseph A. Barker, *Keeping Neutrality Agreements Neutral*, MICH. BAR J., August 2005, at 34 ("In its simplest form, a neutrality agreement merely provides that during a labor organization's effort to organize its employees, the employer either agrees not to actively oppose the union's efforts, or it commits to refrain from taking a position for or against the union during the organizing campaign"); Cornell University, School of Industrial and Labor Relations, Labor Peace Agreements (LPA) ("A labor peace agreement (LPA) is a contract between an employer and a union, in which the employer agrees to be neutral during a union organizing campaign and not interfere with union organizing.")[3]. Accordingly, because the text of the LPR singles out a topic or subject matter for differential treatment, it is content based on

---

[3] https://www.ilr.cornell.edu/labor-and-employment-law-program/labor-peace-agreements-lpa.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

its face. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *see, e.g., Hubbard v. City of San Diego*, No. 24-4613, 2025 WL 1572736 (9th Cir. June 4, 2025) ("The City's prohibition on teaching yoga in shoreline parks is content based and fails strict scrutiny.").

Even if the LPR were facially content neutral, it is still a content-based restriction because "there is evidence that an impermissible purpose or justification underpins" the requirement. *City of Austin*, 596 U.S. at 76. Public records show that the City enacted the LPR to "[a]llow[] unions to build in roads into non-unionized shops with an assurance that employers won't stand in the way of unionization efforts (Don't include in public message)." Davidson Decl., Ex. 1. It does this by requiring employers to remain neutral on such efforts – by mandating an LPA. If a contractor fails to obtain an LPA, or fails to comply with it, the City may terminate the contractor's contract with the City. That is a content-based restriction on speech. *See Reed*, 576 U.S. at 164 ("[L]aws that cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message the speech conveys" are also content based). For the reasons that follow, the First Amendment does not tolerate that restriction.

c.    **The LPR fails strict scrutiny.**

"A government, including a municipal government vested with state authority, has no power to restrict expression because of its message, its ideas, its subject matter, or its content. Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163 (internal quotations and citation omitted). The City cannot carry that heavy burden. This Court recently held as much in granting a permanent injunction against a state-level labor peace requirement:

> Defendants do not explain how an employer can remain "neutral" with respect to union representatives communicating with its employees while still being free to express its opinions about unionization. Measure 119 is not limited to restricting only threatening, coercive, false, or misleading speech, but instead prohibits all speech by employers that is not "neutral" toward unionization. Therefore, Measure 119 violates Plaintiffs' First Amendment rights to free speech.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

*Casala*, 2025 WL 1442792 at *9. At the very least, there are serious questions going to the merits of Plaintiff's First Amendment claim, which is all that is required for entry of a preliminary injunction.

### 2. The NLRA preempts the LPR.

In 1935, Congress began regulating the processes of union organizing and collective bargaining when it enacted the National Labor Relations Act ("NLRA"). For the last 30 years, it has been "commonplace that in passing the NLRA Congress largely displaced state regulation of industrial relations," *Wis. Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 286 (1986) – a displacement that applies with equal force to municipalities. *See, e.g.*, *Aeroground, Inc. v. City and Cty. of San Francisco*, 170 F. Supp. 2d 950, 955 (N.D. Cal. 2001) ("[S]tates and municipalities may not set forth standards of conduct that are inconsistent with the substantive requirements or protections of the NLRA."). By mandating contractors enter into an LPA with a labor organization their employees have not chosen, which must include imposed terms otherwise reserved for collective bargaining (such as "no-strike" and mandatory arbitration provisions), the City impermissibly tilts the playing field between labor and management. The City's own officials acknowledged as much. Davidson Decl., Ex. 1.

Two preemption doctrines apply here, neither of which the LPR can survive. This Court recently held the same with respect to a similar state-level labor peace requirement. *Casala*, 3:25-CV-244-SI, 2025 WL 1442792 at *7-8 (holding labor peace requirement preempted under both *Machinists* and *Garmon*).

### a. Machinists preemption

The NLRA preempts state and local regulation concerning conduct that Congress intended to leave "controlled by the free play of economic forces." *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Emp. Rels. Comm'n*, 427 U.S. 132, 140 (1976) ("*Machinists*"). Accordingly, Congress outlawed certain "economic weapons," and its "decision to prohibit certain forms of economic pressure while leaving others unregulated represents an intentional 'balance between the power of management and labor to further their

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

respective interests.'" *Golden State Transit Corp. v. Los Angeles* ("*Golden State I*"), 475 U.S. 608, 614 (1986).

First, "*Machinists* preemption 'bars states from . . . regulating non-coercive labor speech by an employer.'" *Casala*, 2025 WL 1442792 at *7-8 (quoting *Interpipe Contracting, Inc*, 898 F.3d at 887). "This rule reflects Congress's determination that 'the dangers that free expression might entail . . . were a lesser risk than to have the Board police employer or union speech.'" *Id.* (quoting *NLRB v. Gen. Elec. Co.*, 418 F.2d 736, 773 (2d Cir. 1969) (Friendly, J., concurring and dissenting)). As in *Casala*, the LPR "seeks to regulate—and, indeed, forbid—certain truthful, non-deceptive, non-coercive speech about unionization, which conflicts with Congress's intent to allow 'uninhibited, robust, and wide-open debate in labor disputes.'" *Id.* at *8 (quoting *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 68 (2008)). The LPR does this by forcing contractors to enter into an LPA.

Second, "*Machinists* also prohibits state governments from 'introduc[ing] some standard of properly balanced bargaining power.'" *Id.* at *8 (quoting *Golden State*, 475 U.S. at 619). The NLRA does not recognize LPAs. The LPR, however, forces contractors to enter into specific labor terms covering employees with labor organizations as a condition of maintaining or bidding upon a service contract with the City. This mandate changes the balance of power between labor and management, and so is preempted under *Machinists*. *Golden State I*, 475 U.S. at 614; *Machinists*, 427 U.S. at 140.

The Supreme Court's decision in *Golden State I* is on point. There, the City of Los Angeles conditioned renewal of a taxicab company's operating license on its settlement of a strike by its employees. That city claimed it was not dictating actual labor terms, but leaving that for the parties. The Supreme Court rejected that argument, finding that (1) until the City of Los Angeles' intervention, the parties were exercising lawful economic tactics; and (2) at the moment the City conditioned license renewal on settlement of the labor dispute, "the bargaining process was thwarted," rendering the City's requirement preempted under *Machinists*. *Golden State I*, 475 U.S. at 615-17 ("Disputes about wages, hours of work, and other working conditions should

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

continue to be resolved by the play of economic forces…." (citing S. Rep. No. 573, 74th Cong., 1st Sess., 2 (1935))). The Court also rejected the assertion that a state's interest in ensuring uninterrupted transportation service permitted it to prohibit a strike by unionized employees of a private company, or to restrict the employer's ability to resist a strike. *Golden State I*, 475 U.S. at 618.

Accordingly, the City goes too far when its use of municipal authority creates economic pressure on an employer's exercise of its prerogatives under federal labor law. That is what the LPR does here and, as such, it is preempted. *See Casala*, 3:25-CV-244-SI, 2025 WL 1442792 at *8 ("By conditioning license renewal on signing an LPA, Measure 119 seeks to regulate the relationship between unions and employers. This upsets the balance Congress struck in passing the NLRA."); *Metro. Milwaukee Ass'n of Com. v. Milwaukee Cnty.*, 325 F.3d 879, 883 (7th Cir. 2003) ("*Metropolitan I*") ("[T]he presence of a promise to negotiate 'labor peace agreements' with prospective unions fundamentally weakens [the contractors'] positions in the labor market" and "shifts the terms of bargaining in favor of the union." (citations omitted)); *Metropolitan Milwaukee Ass'n of Commerce v. Milwaukee County*, 431 F.3d 277, 282 (2005) ("*Metropolitan II*") (striking down labor peace requirement as merely a "pretext to regulate the labor relations" of the affected companies).

### b. Garmon preemption

"*Garmon* preemption is 'unusual' in its breadth." *Casala*, 2025 WL 1442792 at *4 (quoting *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023)). It provides that states and municipalities may not regulate activity that federal law protects or prohibits, or "arguably" protects or prohibits. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959). This so-called *Garmon* preemption precludes state or municipal interference with the NLRB's interpretation and active enforcement of the integrated scheme of regulation established by the NLRA. *Golden State I*, 475 U.S. at 608, 613. The "arguably protected" prong of *Garmon* preemption demonstrates that the NLRA does more than establish substantive rules of law; it "confide[s] primary interpretation and application of its rules to a

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

specific and specially constituted tribunal"—the NLRB. *Garmon*, 359 U.S. at 242 (citation omitted). Here, the LPR impermissibly interferes with the NLRA, and the NLRB's authority, in three ways and is therefore preempted under *Garmon*.

First, section 8 of the NLRA protects an employer's free speech rights by implementing the First Amendment with respect to an employer's right to communicate its views to its employees.[4] *Casala*, 2025 WL 1442792 at *7 (citing *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969)). The LPR's neutrality obligation, however, "chills one side of the robust debate which has been protected under the NLRA." *Id.* (quoting *Brown*, 554 U.S. at 73). Accordingly, the LPR is preempted.

Second, the LPR vests the Mayor's Office with exclusive authority to determine whether a contractor meets an exception, which injects local governmental interference into the NLRB's interpretation and enforcement of the NLRA. For example, the Good Faith Exception requires a contractor to make a "[g]ood faith effort to obtain Labor Peace." Eyman Decl., Ex. 1. This exception requires mediation and, if necessary, arbitration, but it includes no other guidelines as to what "good faith efforts" comprise. In this way, the LPR usurps the NLRB's role as gatekeeper in interpreting core industrial relations concepts, such as good faith bargaining. Decades of precedent recognize the NLRB's expertise in this field. *See, e.g., Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951); *Glomac Plastics, Inc. v. NLRB*, 592 F.2d 94, 98 (2d Cir. 1979); *Neon Sign Corp. v. NLRB*, 602 F.2d 1203, 1204 (5th Cir. 1979). Relevant here, for example, the NLRB has concluded that, "consistent with the overall purpose and aim of the [NLRA]," disabled workers who are in a primarily rehabilitative relationship with their employer are not statutory employees within the meaning of the NLRA. *Brevard Achievement Ctr., Inc.*, 342 NLRB 982 (2004). Accordingly, the card check that SEIU demanded as part of the LPA here would impermissibly bypass an election before the NLRB where the union would encounter several issues blocking their representation, including whether Plaintiff's employees are

---

[4] Section 8 states that it shall not be an unfair labor practice for an employer to express "any views, argument, or opinion," or disseminate such expression, provided that the expression "contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c).

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

excluded under the NLRA as rehabilitative employees. Davidson Decl., Ex. 6. Thus, the LPR constitutes governmental interference in the NLRA's otherwise integrated statutory framework and is preempted under *Garmon*. This Court recently held the same with respect to a state-level labor peace requirement. *Casala*, 2025 WL 1442792 at *7.

**c.     The market participant exception does not apply.**

The City previously has taken the position that it is excepted from NLRA preemption because, in enacting and enforcing the LPR, it is acting as a market participant. To be sure, in *Building & Construction Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 226 (1993) ("*Boston Harbor*"), the Supreme Court carved out a narrow exception to these preemption doctrines when a state or local government acts not as a regulator of labor policy, but as a "market participant." The market participant exception is not, however, a free-floating license for local government to skirt NLRA preemption. Rather, it is a narrow exception with specific limiting principles.

To qualify for the market participant exception, a local government must prove it is acting pursuant to a "purely proprietary interest" and that "analogous private conduct would be permitted." *Id*. at 231-32. To decide whether a state or local government is acting as a market participant, the Ninth Circuit applies a two-prong test first articulated in *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686 (5th Cir. 1999):

> First, is the challenged governmental action undertaken in pursuit of the efficient procurement of needed goods and services, as one might expect of a private business in the same situation? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than [to] address a specific proprietary problem? If the answer to either question is "yes," the governmental entity is acting as a market participant.

*Airline Serv. Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074, 1080 (9th Cir. 2017) ("LAX") (internal citations omitted). The government bears the burden of showing the exception applies. *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1024 (9th Cir. 2010). The City cannot meet its burden on either prong.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

         **(1)**      **First prong - the LPR goes well beyond what a private business can do in pursuit of efficient procurement.**

First, the LPR is a "Binding City Policy," which means "statements of the Council, expressed in a resolution or ordinance, that are directed to future decision-making or procedure and have binding effect or serve as mandatory approval criteria." City Code 1.07.020. In determining whether a government entity is acting as a market participant, courts "contrast official, government-imposed policies prescribing binding standards of conduct with contractual commitments voluntarily undertaken." *Airlines for America*, 78 F.4th at 1152. The LPR is solidly in the former camp.

Second, rather than pursue the efficient procurement of needed services, the LPR invites disruption. Any exception to the LPR requires the contractor to provide written notice to all relevant unions in Oregon and Washington. Eyman Decl., Ex. 1 (first exception). Putting aside whether that is even possible (there is no list), it is not efficient. Contacting all unions in the pacific northwest practically begs those unions to intervene and fight for control. *See Metropolitan II*, 431 F.3d at 282 ("We have seen that [labor peace] agreements might well increase the frequency of service interruptions."). For example: a contractor seeking an LPR exemption notifies unions A, B, and C; all three unions demand different things; union A agrees to a reasonable LPA; but union A isn't the exclusive representative of the employees; so, unions B and C picket and disrupt as they fight for control. That is the opposite of efficiency. In contrast, the labor peace requirements at issue in *LAX* and *Metropolitan* did not require a contractor to contact all unions and affirmatively enter into an LPA, they simply required the contractor to enter into an LPA if and when requested by a union. *LAX*, 873 F.3d at 1082; *Metropolitan II*, 431 F.3d at 278. That distinction highlights the fundamental efficiency problem with the LPR. Moreover, the LPR does not prevent smaller labor organizations from forming and picketing – i.e., if employees create their own union, as the City's own employees did in 2023.[5]

---

[5] Press release, Tentative Agreement Reached, May 23, 2025, available at: https://cppwunion.org/#:~:text=The%20union%20represents%20800%20professional,first%20time%20in%20a%20union.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

Third, the LPR imposes mandatory (but nonspecific) punitive liquidated damages, which a private party could not impose. *See United Haulers Ass'n v. Oneida–Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150, 157 (2d Cir. 2006), *aff'd*, 550 U.S. 330 (2007) ("A governmental entity acts as a market regulator when it employs tools in pursuit of compliance that no private actor could wield, such as the threat of civil fines, criminal fines and incarceration."). The City requires a contractor to agree to liquidated damages for "any service disruption," but does not specify an amount of, or calculation for, liquidated damages. Eyman Decl., Ex. 1. Such a penalty provision is unlawful in the private space and, for that reason alone, the market participant exception does not apply. *Airlines for Am. v. City & Cnty. of San Francisco*, 78 F.4th 1146, 1152 (9th Cir. 2023) ("We hold that civil penalty provisions alone may amount to the force and effect of law rendering a government entity a regulator rather than a market participant."); *see Kesterson v. Juhl*, 157 Or. App. 544, 549 (1998) ("A term fixing unreasonably large liquidated damages is void as a penalty.") (quoting ORS 72.7180(1)).

To ensure that a contract provision for liquidated damages does not operate as an unlawful penalty, it must not set more than "just compensation" for the injured party in the event of a breach. *Illingworth v. Bushong*, 61 Or. App. 152, 155 (1982). The test for ensuring that a liquidated damages provision is not a penalty is "whether (a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation." *Id.* (internal citation and quotation marks omitted). The first requirement necessitates that there be a "genuine pre-estimate of the injury," such that "the parties must make an honest and good faith effort to arrive at an accurate estimate." *Id.* When parties do not undertake such good faith efforts, the liquidated damages provision cannot pass even the first requirement. *Id.* (finding that trial court did not err in refusing to enforce liquidated damages clause on basis that damages were selected "on the basis of a rule of thumb" rather than good-faith efforts).

Nowhere in the LPR is there an amount (let alone a calculation) that suggests there is an honest and good faith effort to "arrive at an accurate estimate" of damages. Accordingly, the

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

LPR's liquidated damages provision could not exist in a contract between private parties, and its presence here demonstrates that it is punitive. *See, e.g., Airlines for America*, 78 F.4th at 1153 ("[B]ecause the Airport Director retains unbridled discretion to increase the fines, the provision is not meant to compensate the City for any contract breach but to penalize the offending employer."); *id.* (intent of liquidated damages provision "appears to be to penalize the employer rather than to estimate liquidated damages"). For that reason alone, the LPR is preempted by the NLRA. That punitive aspect of the LPR also conflicts with the "essentially remedial" regulatory scheme Congress established for labor relations; the NLRB is not generally authorized to impose penalties solely for deterrence or retribution. *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 10–12 (1940).

Fourth, the City is not acting in a competitive space. The LPR applies only to industries in the Oregon Forward Program, which "further[s] the policy of this state to encourage and assist individuals with disabilities . . . through productive gainful employment by assuring an expanded and constant market for products and services" (more on that below). ORS 279.840. In *LAX*, by contrast, the Ninth Circuit emphasized the "inherently competitive and commercial nature of airport operations" in concluding the market participant exception applied. 873 F.3d at 1082 (rejecting appellant's argument that the government was not participating in a private market). Not so here. *See* section (4) below regarding the Oregon Forward Program.

For these reasons, the City cannot satisfy the first prong of the market participant exception. The NLRA preempts the LPR.

### (2)    Second prong – the LPR is policy based.

To qualify for the market participant exception, the City must have "no interest in setting policy." *Boston Harbor*, 507 U.S. at 229; *see also Cardinal Towing*, 180 F.3d at 691 (the "law has traditionally recognized a distinction between regulation and actions a state takes in a proprietary capacity—that is to say, actions taken to serve the government's own needs rather than those of society as a whole."). This "proprietary interest" requirement prevents the City from leveraging its procurement power as pretext to serve its broader regulatory interest.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

*Cardinal Towing*, 180 F.3d at 691 ("When, however, a state attempts to use its spending power in a manner tantamount to regulation, such behavior is still subject to preemption.") (internal quotations omitted).

The LPR does not serve an individualized "propriety interest," it regulates labor relations. Indeed, the LPR is part of a "Binding City Policy[:]" "statements of the Council, expressed in a resolution or ordinance, that are directed to future decision-making or procedure and have binding effect or serve as mandatory approval criteria." City Code 1.07.020 (emphasis added). That legislative action is different from the purely contract-based language at issue in *LAX*. *See* 873 F.3d at 1077 (describing that labor peace requirement as a contract provision). There is also direct evidence of the City's policy-setting agenda here. As Mr. Bradley explained, the LPR "[a]llows unions to build in roads into non-unionized shops with an assurance that employers won't stand in the way of unionization efforts[.]" Eyman Decl., Ex. 1. That is of no propriety interest to the City. Indeed, the instruction "don't include in public message" and direction to focus public messaging, instead, on maintaining critical services, is a tacit admission that the City knew its policy-setting agenda is improper.

Further, spillover effects are inevitable. The application of the LPR is not a contract-by-contract decision; rather, it broadly applies to three industries and without any tailoring. The LPR forces nonprofit Oregon Forward contractors (like Plaintiff) to either: (a) expend their limited resources negotiating, mediating, arbitrating, and otherwise attempting to work with a union, or (b) simply decide that they cannot contract with the City as a general matter. That spillover effect (and Hobson's choice) is both broad and contrary to the Oregon Forward Program that covers all three industries to which the LPR applies. Moreover, the "in roads" that the LPR provides to unions will persist post-contract with the City – that's a feature not a bug. Those "in roads" provided to unions cannot simply be turned off with a flip of a switch at the conclusion of a contract with the City.

The Supreme Court struck down a similarly leaky policy in *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60 (2008), because the California regulation there was neither "specifically

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

tailored to one particular job" nor a "legitimate response to state procurement constraints or to local economic needs." *Id.* at 70. Likewise, in *Boston Harbor*, the government entity there did not seek a general policy in the Commonwealth; it was just trying to operate as if it were an ordinary general contractor whose actions were "specifically tailored to one particular job, the Boston Harbor cleanup project." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1336–37 (D.C. Cir. 1996).

Finally, the City does not require unionized employers to have an agreement with their employees' unions not to disrupt labor. That's further evidence that the LPR is policy-based. If the City's interest was in actually preventing labor stoppages, it would apply the LPR to unionized and non-unionized employers alike. But the City has not done so. That is because, as the City has already expressed, the LPR was enacted for the policy purpose of giving labor unions in-roads into non-unionized contractors. For this additional reason, the City is not acting as a market participant.

For the above reasons, the LPR is preempted by the NLRA. At the very least, Plaintiff has raised serious questions going to the merits.

### 3. The LPR is void for vagueness.

The LPR violates the due process clause of the Fourteenth Amendment to the Federal Constitution in that it is unconstitutionally vague. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Vague laws are invalid both because of a lack of fair notice and due to arbitrary and discriminatory enforcement. *Sessions v. Dimaya*, 584 U.S. 148, 155-56 (2018).

Three aspects of the LPR each individually, and collectively, render it void for vagueness. First, the LPR's definition of a labor peace agreement is subject to broad and unreasonable interpretation and could include anything demanded by a union. In this way, the LPR functionally allows unions to determine who may contract with the City. There is no way for prospective contractors to know ahead of time what will satisfy the LPR, including the Good

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

Faith exception, because the City delegated discretion to the union to demand whatever they want in a labor peace agreement.[6]

This vagueness is likely to chill protected speech about unionization (*see* page 20, above) and, for that reason and due to the lack of a scienter requirement, a more stringent vagueness test applies here. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) ("[A] scienter requirement may mitigate a law's vagueness[.]"); *San Francisco Unified School District v. Americorps*, No. 25-CV-02425-EMC, 2025 WL 1713360, at *22 (N.D. Cal. June 18, 2025) ("[D]ue process violations from vague conditions are particularly grave in the First Amendment context where '[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.'") (quoting *Grayned*, 408 U.S. at 109).

<u>Second</u>, the Good Faith Exception lacks the precision and guidance necessary to ensure that those enforcing the requirement do not act in an arbitrary or discriminatory manner. A law is invalid because it is enforceable on an arbitrary and discriminatory basis where it delegates "basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis[.]" *Grayned*, 408 U.S. at 109. Here, the LPR's exceptions do not provide what terms of a labor peace agreement would be considered standard or acceptable in the event dispute resolution failed between a contractor and a union. By requiring binding interest arbitration,[7] no one determines, from a legal perspective, whether a contractor has complied with the LPR.

Moreover, "good faith" is not objectively defined. There is no guidance on what suffices other than attempting and participating in mediation and arbitration – both of which Plaintiff

---

[6] And, apparently, there is no way to know whether the Mayor's Office will exercise its responsibility "for determining whether a selected contractor meets an exception to this policy." Eyman Decl., Ex. 1.

[7] *See* Binding-Interest Arbitration, Black's Law Dictionary (12th ed. 2024) ("Arbitration that involves settling the terms of a contract being negotiated between the parties; esp., in labor law, arbitration of a dispute concerning what provisions will be included in a new collective-bargaining agreement. When the parties cannot agree on contractual terms, an arbitrator decides. This type of arbitration is most common in public-sector collective bargaining.")

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

offered to SEIU here (the parties did mediate), and yet the City declined to determine whether Plaintiff met the Good Faith Exception. Sole authority to determine whether a contractor meets an exception is vested in the Mayor's Office. There is no written standard for how this decision must be made, which invites discretionary or discriminatory application. Indeed, by its terms, the Labor Peace Requirement provides exclusive, standardless, and uninhibited discretion to the Mayor's Office. Contractors cannot know in advance whether their conduct will satisfy the City's expectations.

Third, the liquidated damages penalty has no clear standards, leaving a contractor without the ability to know in advance what triggers that penalty or how to prevent it. Indeed, much of a union's conduct is out of a contractor's control. Moreover, the term "economic interference," as used therein, is vague and overbroad, which risks discretionary or discriminatory application.

For these reasons, the LPR is void for vagueness. At the very least, Plaintiff has raised serious questions going to the merits.

### 4. The LPR imposes an impermissible condition on Oregon Forward Contractors.

In Oregon, when a public agency[8] decides to procure goods or services (rather than providing them through the public agency's own personnel), Oregon law requires the agency do so only from Oregon Forward contractors ("OFCs") when those products or services appear on a procurement list established and maintained by DAS (collectively, the "Procurement Mandate"):

> "a public agency that intends to procure a product or service on the procurement list that the Oregon Department of Administrative Services established under ORS 279.845 shall, in accordance with the department's rules, procure the product or service at the price the department establishes from a qualified nonprofit agency for individuals with disabilities, provided that the product or service is of the appropriate specifications and is available within the period the public agency requires."

ORS 279.850(1)(a) (emphasis added).

---

[8] The City is a public agency within the meaning of the Procurement Mandate. *See* ORS 279.835 ("'Public agency' or 'public contracting agency' means any agency of the State of Oregon or any political subdivision thereof authorized by law to enter into public contracts and any public body created by intergovernmental agreement.").

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

Plaintiff is an OFC certified to provide janitorial services in Multnomah County.[9] Eyman Decl., Ex. 6. Accordingly, ORS 279.850(1)(a) requires the City to procure janitorial services from Plaintiff or some other OFC. *Indep. Contractors Rsch. Inst. v. Dep't of Admin. Servs.*, 207 Or. App. 78, 82 (2006).

ORS 279.850(1)(b), however, provides an exception to the Procurement Mandate if an OFC does not comply with "local ordinances . . . that govern labor standards" (the "Labor Standards Exception"). The City has previously taken the position that the LPR is such a local ordinance. Indeed, the City is presently enforcing the LPR against Plaintiff, and Plaintiff expects the City will continue doing so.

### a.    The LPR does not govern "labor standards."

It is axiomatic that labor standards govern the standards for labor – the relationship between employer and employee. In contrast, the LPR governs the relationship between employers and unions. It also does not impose quantitative or qualitative rules—such as minimum wages or rules concerning working conditions. It, therefore, does not fall within the Labor Standards Exception.

As for statutory interpretation in Oregon, the first step is to determine the plain meaning by examining text and context followed by an examination of pertinent legislative history. *State v. Gaines*, 346 Or. 160, 171-72 (2009). Even if the text is unambiguous, "[l]egislative history may be used to confirm seemingly plain meaning and even to illuminate it." *Id.* Here, the legislative history of the bill that added the Labor Standards Exception to ORS 279.850 is telling. The Oregon legislature focused exclusively on employee and employer-employee issues. On the same day that the Senate passed the bill, a lobbyist for SEIU testified regarding the relevant portion of the bill as follows:

> "Regarding the agency opt out, under current statute public agencies are currently required to first attempt to fulfill public contracts from the State's list of QRFs available. If there's an available QRF capable of providing the needs, the needed goods and services. Problems arise when the only QRF option may be one that doesn't provide its workers with adequate wages or benefits, or one that has racked

---

[9] The OFP procurement list is available at https://ofp.dasapp.oregon.gov/Search.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

up multiple BOLI complaints. The bill allows the non-QRF contractors to contract with the agencies if the other QRFs are in violation of local labor laws and the non-QRF contractor agrees to keep the existing workforce . . . ."[10]

Video recording, Senate Committee on Workforce, H.B. 3248, May 27, 2015, 1:00 pm at 4:21 (testimony of Contract Lobbyist of SEIU Local 49, Andrea Salinas). As the above testimony shows, the problems addressed by the bill that added the Labor Standards Exception have nothing to do with labor disruptions or unionizing. Instead, the problems addressed by the bill exclusively concern the employer-employee relationship.

To be sure, the legislature delegated certain duties to DAS, including rulemaking "regarding specifications, time of delivery, and other relevant matters of procedure as shall be necessary to carry out the purposes of [the OFP]." ORS 279.845(1)(c). DAS did so. *See* OAR 125-055-0040(8) (defining "labor standards" as laws that "regulate employee working conditions" and specifying such working conditions). But, as an administrative agency, DAS may only act within its statutory authority. *See SAIF Corp. v. Shipley*, 326 Or. 557, 561 (1998) ("[A]n agency has only those powers that the legislature grants and cannot exercise authority that it does not have."). Accordingly, whether or not DAS is authorized to define the statutory term "local ordinances or resolutions that govern labor standards," DAS may not stretch the meaning of the term beyond that contemplated by the legislature. *See Garrison v. Dep't of Rev.*, 345 Or. 544, 548–49 (2008) (an "agency rule that conflicts with a statute is invalid to the extent that it so conflicts and . . . a rule created within a statutory scheme cannot amend, alter, enlarge upon, or limit statutory wording so that it has the effect of undermining the legislative intent"); *see, e.g., Miller v. Employment Division*, 290 Or. 285, 289 (1980) (holding Employment Division rule invalid because it conflicted with the legislative policy expressed in statute). In other words, whatever qualifying working conditions DAS specifies must at bottom constitute labor standards. Otherwise, DAS would unlawfully expand the statutory exception enacted by the legislature and, to that extent, DAS' rule would be invalid.

---

[10] QRF is the former term for what is now OFC; QRF stood for qualified rehabilitation facility.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

Like all lawmaking, the City's intent in enacting the LPR informs its meaning and, accordingly, whether it governs labor standards. *See* ORS 174.020(1)(a) ("In the construction of a statute, a court shall pursue the intention of the legislature if possible."); *State v. Meek*, 266 Or. App. 550, 555 (2014) ("The legislature's intent is our lodestar."). The City created the LPR to benefit unions, to "allow[] unions to build in roads into non-unionized shops with an assurance that employers won't stand in the way of unionization efforts (Don't include in public message)." Davidson Decl., Ex. 1. That intention shows that the LPR does not govern "labor standards" within the meaning of the Labor Peace Exception to the Purchase Mandate. At the very least, there are serious questions going to the merits.

> **5.      The LPR violates article 1, section 20 of the Oregon Constitution.**

In Oregon, "[n]o law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." OR Const, Art I, sec 20. In evaluating an article 1, section 20 argument, the Court considers:

> "(1) whether the statute grants a privilege or immunity, (2) whether it discriminates against a class that exists apart from the statute itself and, if so, (3) whether the distinction "between the classes is either impermissibly based on persons' immutable characteristics, which reflect 'invidious' social or political premises, or has no rational foundation in light of the state's purpose."

*Urton v. Hudson*, 101 Or. App. 147, 152 (1990), *rev den*, 310 Or. 133 (1990); *see Nilsen v. Davidson Indus., Inc.*, 226 Or. 164, 171 (1961) ("[A] corporation may not be separately classified merely because it is such[.]").[11] Moreover, the legislative purpose of the classification must be legitimate. A preliminary injunction is appropriate on this claim because there are at least serious questions going to the merits of each factor.

---

[11] The Oregon Constitution is based on the Indiana Constitution and the Indiana Supreme Court has held that corporations are citizens for purposes of the Privileges and Immunities Clause. *See Pittsburgh, C. C. & St. L. Ry. Co. v. Montgomery*, 152 Ind. 1, 49 N.E. 582, 585 (1898) ("Railroad corporations are persons and citizens, within the meaning of [the Privileges and Immunities Clause] of [the Indiana] bill of rights[.]").

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

### a. Factor 1 – the LPR grants a privilege or immunity.

"Article 1, section 20, addresses government grants of a privilege or immunity in an unequal manner" to "prevent the government from granting benefits only to a favored few." *Kramer v. City of Lake Oswego*, 365 Or. 422, 452 (2019). The LPR grants a privilege or immunity to two separate classes (1) labor unions over non-labor unions and (2) contractors in industries other than the three industries covered by the requirement over those contractors in the covered industries.

It grants a privilege to labor unions by: (1) giving them "in roads" into non-unionized organizations, and (2) effectively delegating City contracting decisions to unions by giving them complete leverage over prospective contractors. And what a privilege it is, that all janitorial, industrial laundry, and security contractors seeking work with the City must either first be unionized or enter into a contract with a union. That's why SEIU, and only SEIU, worked closely with the City to author the LPR. *See id.* at 457 ("[G]rants of monopolies are a matter that is of particular concern in our Article I, section 20[.]"). By its text, the LPR unequally favors unions, implicating Article 1, section 20. *See, e.g., id* at 453 (holding policy allowing only city residents to use lake created a privilege); *City of Salem v. Bruner*, 299 Or. 262, 268-69 (1985) (Article 1, section 20, applies "[w]henever a person is denied some advantage to which he or she would be entitled but for a choice made by a government authority").

In addition, the LPR privileges contractors in industries other than the three industries covered by the requirement. Those privileged contractors need not obtain a labor peace agreement in order to contract with the City. Factor 1 is satisfied.

### b. Factor 2 – the LPR discriminates against a true class.

"Article I, section 20, is addressed to a law's disparate treatment of persons or groups by virtue of characteristics which they have apart from the law in question." *State v. Clark*, 291 Or. 231, 240 (1981). As the Oregon Court of Appeals has explained:

> The standard example of a nontrue class . . . is the classification created by a statute that imposes a filing deadline for filing a petition for review. Such legislation creates two classes of persons: (1) those who timely file petitions for review, and

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

(2) those who do not. Both are "classes" of persons, at least in the colloquial sense of groups having something in common. But in the absence of the statute, they have no identity at all. Legislation that disparately affects such "classes" does not violate Article I, section 20, because of the essentially circular nature of the argument: The legislation cannot disparately affect a class that the legislation itself creates.

*Tanner v. Oregon Health Sciences Univ.*, 157 Or. App. 502, 520-21 (1998) (citing *State v. Clark*, 291 Or. 231, 237 (1981)). The classes at issue here – (1) unionized contractors vs. non-unionized contractors and (2) contractors in the three covered industries vs. all other contractors – exist apart from the LPR itself because the ordinance does not itself create those classes. *Id.* at 521 (cataloguing non-suspect classes that have qualified, such as resident/non-resident or veteran/non-veteran). Factor 2 is satisfied.

      **c.**      **Factor 3 – There is no rational basis for the distinction.**

"[T]he question of whether the differential treatment is rational depends on whether the classification reflects a 'genuine difference' that bears a 'reasonable relationship' to the legitimate legislative purpose." *Kramer*, 365 Or. at 459. Giving labor unions "in roads" into non-unionized organizations and allowing those unions to effectively decide who gets to contract with the City are not legitimate legislative purposes. Because those true legislative purposes are not lawful, no discrimination intended to implement that purpose can be lawful.

In any event, in previous litigation with DePaul Industries, Inc. (3:21-cv-01792-HL) (the "DePaul Litigation"), the City took the position that it rationally could have decided to benefit unions at the expense of other private organizations because labor disputes are more likely to disrupt the performance of City contracts than disputes with other private organizations. Indeed, the LPR itself states that its purpose is to avoid economic interference with services to the City.

But that avoiding-work-stoppages purpose is pretextual. In 2022, the City admitted that it is not aware of any labor-management conflicts interfering with the provision of services to the City by one of its contractors during the last ten years. Eyman Decl., Ex. 2. Regardless, the LPR's relationship to its facially legitimate goal (avoid work stoppages) is so attenuated that it is arbitrary or irrational. The only entity identified in the LPR as a threat to labor peace are labor

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

unions. Rather than addressing that threat directly, the LPR rewards the union's potential threat of harmful conduct by forcing the employers to make concessions and surrender their constitutional rights.

Further, the LPR only requires a prospective contractor to enter into a labor peace agreement with a single union. That does not prevent other unions from swooping in and disrupting work as they fight for control, especially since the contractor must notify any and all unions that represent employees providing similar services in the states of Oregon or Washington to qualify for an exception to the LPR. The LPR also does not—because it cannot, consistent with federal law—prevent the contractor's employees from forming their own union and engaging in picketing and other work stoppages, nor does it require unionized contractors to have an LPA. And, finally, requiring contractors to contact every applicable union increases the chance of labor disruption by essentially inviting unions to intervene. This is not a rational way to avoid work stoppages.

Likewise, there is no reasonable ground to impose the LPR on contractors providing the three covered services but not on contractors providing other services. Factor 3 is satisfied.

## B. Plaintiff is likely to suffer imminent, irreparable harm in the absence of a preliminary injunction.

Plaintiff's constitutional claims cannot later be remedied by monetary damages and, for that reason, constitute irreparable harm. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) ("Irreparable harm is harm for which there is no adequate legal remedy, such as an award for damages.") (internal quotations omitted); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury."); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Unless a preliminary injunction is entered, it is unlikely that the City will contract with Plaintiff in any janitorial capacity while this until this litigation is resolved. *See Casala*, 2025 WL 1442792 at *10 ("If relief is not issued, Plaintiffs face a choice of losing their

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

businesses or complying with an unconstitutional law. That is irreparable harm."). The same goes for plaintiffs' statutory claim under the Oregon Forward Program claim.

Plaintiff is presently working the contract at issue, but that Contract will expire at the end of August 2025. It will be much more difficult, if not impossible, to return the Contract to plaintiff after a new contractor takes over. The Contract, moreover, represents a significant portion of Plaintiff's business. Moreland Decl., ¶ 7. The continuation of the Contract, and the LPR more generally, is an existential problem to Plaintiff's non-profit business and mission (providing employment opportunities to individuals with disabilities). Moreland Decl., Ex. 4. Accordingly, the requested preliminary injunction is appropriate. *See Starlite Aviation Operations Ltd. v. Erickson Inc.*, No. 3:15-CV-00497-HZ, 2015 WL 2367998, at *9 (D. Or. May 18, 2015) (finding irreparable harm and explaining "[l]oss derived from a lost opportunity to compete on a level playing field for a contract has been found sufficient to prove irreparable harm.") (internal quotations omitted).

### C. An injunction against the LPR is in the public interest and the balance of hardships tips sharply in Plaintiff's favor.

When the government is a party, courts "consider the balance of equities and the public interest together." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). "It is always in the public interest to prevent the violation of a party's constitutional rights." *California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022). It is also in the public interest to ensure that municipalities are complying with the Oregon Forward Program, which governs government contracting with Plaintiff and other nonprofits that employ individuals with disabilities.

Enjoining enforcement of the LPR will result in little to no injury to the City. That is because the LPR was created by and for unions, and at least as of a few years ago, the City admitted that there never had been a work stoppage in the three industries within the scope of the LPR. On the other hand, Plaintiff faces existential harm, it stands to lose the Contract, and likely all of the janitorial contracting work with the City that is so significant to its nonprofit business.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

That harm is especially pernicious here where Plaintiffs' contracting work serves the public interest by providing employment opportunities to individuals with disabilities.

**D. The Court should not require a bond.**

Rule 65 of the Federal Rules of Civil Procedure directs that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Federal courts, however, have discretion as to the amount of security and may even dispense with the security requirement altogether. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("'Rule 65(c) invests the district court with discretion as to the amount of security required, if any.'" (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)).

The Court should exercise its discretion to dispense with the bond requirement, or require a bond in a nominal amount. There is no risk that an erroneously issued injunction will cause economic harm to the City, therefore there is no need for a bond.

<u>**REQUESTED INJUNCTION**</u>

The Court should issue a preliminary injunction enjoining the City from enforcing against Plaintiff the LPR and, by extension, from allowing Plaintiff's present janitorial contract to expire.

DATED this 9th day of July, 2025.

SNELL & WILMER L.L.P.

*s/ Drew L. Eyman*
Drew L. Eyman, OSB No. 163762
Jenna M. Teeny, OSB No. 244519
Attorneys for Plaintiff Northwest Success, Inc.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800