# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **NORTHWEST SUCCESS, INC.,** | Case No. 3:25-cv-970-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **CITY OF PORTLAND**, | |
| Defendant. | |

Clifford S. Davidson, Drew L. Eyman, and Jenna M. Teeny, SNELL & WILMER, LLP, 601 SW Second Avenue, Suite 2000, Portland, OR 97204. Of Attorneys for Plaintiff.

Fallon Niedrist de Guzman, Deputy City Attorney; and Daniel Simon, Senior Deputy City Attorney, PORTLAND CITY ATTORNEY'S OFFICE, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Northwest Success, Inc. ("NW Success") has sued the City of Portland (the "City"). NW Success seeks declaratory, injunctive, and monetary relief, including a permanent injunction enjoining the City from enforcing the Labor Peace Requirement ("LPR") contained in the City's Sustainable Procurement Policy. Among other things, NW Success contends that the LPR: (1) is preempted by the National Labor Relations Act ("NLRA") and its enforcement would be in violation of the Supremacy Clause of the United States Constitution (Count One of

Claim One)[1]; (2) imposes an impermissible condition on Oregon Forward Contractors (Count Two of Claim One); (3) violates Article I, section 20 (the "Privileges and Immunities Clause") of the Oregon Constitution (Count Three of Claim One); (4) abridges NW Success' freedom of speech in violation of the First Amendment, as made applicable to the States by the Fourteenth Amendment (Count One of Claim Two); and (5) is void for vagueness in violation of the Due Process Clause of the United States Constitution (Count Two of Claim Two).[2]

Now before the Court are two motions, one filed by each party. The City has filed a partial motion to dismiss for failure to state a claim, relating to Counts One through Three of Claim One and Counts One and Two of Claim Two.[3] NW Success's has moved for a preliminary injunction, asking the Court to enjoin the City from enforcing the LPR against NW Success. The Court heard oral argument on both motions on August 1, 2025. For the reasons explained below, the Court grants the City's partial motion to dismiss and denies NW Success's motion for preliminary injunction.

---

[1] NW Success's First Claim for Relief is styled as a claim for declaratory judgment pursuant to 28 U.S.C. § 2201. The Court notes, however, that it is well-settled that a declaratory judgment is not a separate, stand-alone claim or cause of action; instead, it is merely an equitable remedy that may be ordered for a claim that has been proven. *See Brown v. Transworld Sys., Inc.*, 73 F.4th 1030, 1038 (9th Cir. 2023) (noting that requests for declaratory and injunctive relief are not stand-alone claims); *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878 (9th Cir. 2022) ("[T]he Declaratory Judgment Act does not provide an affirmative cause of action where none otherwise exists.").

[2] NW Success also asserts claims for promissory estoppel and breach of the implied duty of good faith and fair dealing, but these claims are not at issue in the motions currently before the Court.

[3] In its reply brief, the City requests, in the alternative, that the Court consider the City's motion to dismiss Claim One as a motion for summary judgment. The Court denies this request.

**STANDARDS**

**A.  Motion to Dismiss for Failure to State a Claim**

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief.[4] In evaluating the sufficiency of a complaint's factual allegations, a court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party.[5] To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."[6] The Court must draw all reasonable inferences from the factual allegations in favor of the plaintiff.[7] The Court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations.[8]

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."[9] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

---

[4] *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).

[5] *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

[6] *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

[7] *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008).

[8] *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

[9] *Starr*, 652 F.3d at 1216.

defendant is liable for the misconduct alleged."[10] "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."[11]

## B. Preliminary Injunction

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."[12] A plaintiff seeking a preliminary injunction generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest.[13] When a public (or governmental) entity is the defendant, the third and fourth requirements merge.[14]

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test.[15] Under this test, "a preliminary injunction may issue where 'serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor' if the plaintiff 'also shows that there is a likelihood of irreparable injury and

---

[10] *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

[11] *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

[12] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

[13] *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

[14] *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

[15] *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

that the injunction is in the public interest.'"[16] The Ninth Circuit has a "'sliding scale' approach, in which 'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'"[17]

## BACKGROUND[18]

### A. Labor Peace Requirement

In 2003, the Portland City Council ("City Council") adopted a Sustainable Procurement Policy (the "Policy"), codified as ADM-1.09, which provides guidelines for City purchases of goods and services. In 2020, the City Council amended this policy to impose an LPR on contractors for City janitorial, security, and industrial laundry service contracts.[19] The 2020 LPR followed several meetings between the City and the Service Employees International Union Local 49 ("SEIU").[20]

The City again amended the Policy in 2022 to change some phrasing. The current policy states:

> The City has proprietary interests in avoiding picketing, work stoppages, boycotting, strikes, and other economic interference with the performance of contracted janitorial, security, and industrial laundry services because these services are essential to keep the City's other functions operational. Therefore, for janitorial, security, and industrial laundry service contracts, a contractor shall, as a condition of being awarded a contract, provide written documentation of "Labor Peace" with a labor

---

[16] *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024) (quoting *All. for the Wild Rockies*, 632 F.3d at 1135).

[17] *Id.* (quoting *All. for the Wild Rockies*, 632 F.3d at 1131).

[18] In analyzing the City's motion to dismiss, the Court accepts as true all well-pleaded allegations in NW Success's Complaint.

[19] *See* ECF 1-1 at 4-5; ECF 1 ¶ 9.

[20] ECF 1 ¶ 10.

organization that represents employees providing similar services in the states of Oregon or Washington and that represents or seeks to represent any group of the contractor's or subcontractor's employees who are or will be involved in providing such services to carry out a contract with the City.

"Labor Peace" shall be defined as a written provision in an agreement or contract whereby a labor organization (as defined by 29 U.S.C. § 152(5)), for itself and its members, agrees to refrain from engaging in any picketing, work stoppages, boycotting, strikes, or any other economic interference with the contractor's or subcontractor's performance of services. . . . This Labor Peace requirement applies only to the performance of services to carry out the contract with the City.

Nothing in this section requires a contractor or subcontractor to recognize a particular labor organization or to enter into a collective bargaining agreement establishing the substantive terms and conditions of employment. Nor is this section intended to enact or express any generally applicable policy regarding labor/management relations, or to regulate those relations in any way, or to provide a preference for any outcome in the determination of employee preference regarding union representation.

ECF 1-1 at 4. The Policy also sets forth three exceptions under which the City may proceed with

a contract if the contractor does not meet the LPR:

1. **No labor organization response:** The contractor: 1) does not have an exclusive bargaining representative representing its employees who may be performing work on the service contract; 2) gave written notice to any and all labor organizations that represent employees providing similar services in the states of Oregon or Washington or that represent any group of the contractor's or subcontractor's employees who are or will be involved in providing such services of its desire to jointly develop Labor Peace, and the applicable labor organizations failed to respond within three (3) weeks or the applicable labor organizations represented that they are not seeking to become the exclusive representative of the contractor's employees; and 3) certifies that it has no reason to believe a labor dispute will occur for the term of the contract.

2. **Labor organization rejects Labor Peace:** The contractor follows the notification procedures set out in Exception 1 and labor organization(s) respond that they do not wish to negotiate Labor Peace. The contractor must provide the City with written evidence of

the response. The contractor must demonstrate that it has a written plan for continuation of services in the event of economic interference by a labor organization[].

3. **Good faith effort to obtain Labor Peace:** The contractor demonstrates that it followed the notification procedures in Exception 1 and made good faith efforts to obtain Labor Peace with a labor organization but ultimately could not reach an agreement. A contractor's good faith efforts to obtain Labor Peace with a labor organization must include an offer by the contractor to submit its dispute with the labor organization about the terms of Labor Peace to immediate mediation before a neutral mediator and its participation in that mediation and, if the mediation is unsuccessful, an offer by the contractor to submit the dispute about the terms of Labor Peace to prompt resolution thorough binding interest arbitration before a neutral dispute resolution organization, and its participation in that arbitration. The contractor must demonstrate that it has a written plan for continuation of services in the event of economic interference by a labor organization.

*Id.* at 4-5. The third exception (the "Good Faith Exception") is at issue here. City Administrator Michael Jordan has currently been delegated authority to determine whether a contractor has satisfied an exception to the LPR.[21] The Policy also provides that "[a]ny failure to comply with this requirement and any service disruption as a result of a labor dispute will subject a contractor to liquidated damages and possible termination of the service contract."[22]

**B. Oregon Forward Program**

In 1997, Oregon enacted the Oregon Forward Program ("OFP") to help individuals with disabilities "achieve maximum personal independence . . . through productive gainful employment."[23] The OFP "assur[es] an expanded and constant market for products and services

---

[21] ECF 19 ¶ 7.

[22] ECF 1-1 at 4.

[23] Or. Rev. Stat. ("O.R.S.") § 279.840.

produced by qualified nonprofit agencies for individuals with disabilities."[24] The OFP thus
requires public agencies[25] procuring certain products or services to obtain those products or
services from a qualified nonprofit agency, in accordance with rules issued by the Oregon
Department of Administrative Services ("DAS"), "provided that the product or service is of the
appropriate specifications."[26] The statute does not define "appropriate specifications."

DAS also administers the regulations governing the OFP. These regulations provide that
public agencies may not develop specifications for the award of contracts that "inhibit or tend to
discourage Public Contracting with [Oregon Forward] providers for the acquisition of Oregon
Forward-produced products or services."[27] No other restrictions are placed on the specifications
that a public agency may adopt. As relevant here, a public agency may procure a product or
service from a person other than a qualified nonprofit agency if "[a]ll of the qualified nonprofit
agencies for individuals with disabilities on the procurement list that applies to the public agency
have a record in the previous three years of repeatedly violating, or are not now in compliance
with, applicable local ordinances or resolutions that govern labor standards."[28] A public agency
also may "require in any agreement with a qualified nonprofit agency for individuals with
disabilities . . . that the qualified nonprofit agency for individuals with disabilities comply with

---

[24] *Id.*

[25] The City is a public agency under this statute. *See* O.R.S. § 279.835(5) ("'Public
agency' or 'public contracting agency' means any agency of the State of Oregon or any political
subdivision thereof authorized by law to enter into public contracts and any public body created
by intergovernmental agreement.").

[26] O.R.S. § 279.850(1)(a).

[27] Or. Admin. R. ("O.A.R.") 125-055-010(1)(a).

[28] O.R.S. § 279.850(1)(b)(A).

applicable local ordinances or resolutions that govern labor standards."[29] DAS is required to establish and maintain a procurement list of the products and services subject to this requirement,[30] which is available online at https://ofp.dasapp.oregon.gov/Search. Janitorial services, laundry services, and security services are included on this list.

## C.  NW Success

NW Success is an Oregon nonprofit corporation and an Oregon Forward contractor that provides janitorial services to the City.[31] In 2023, NW Success was negotiating a contract with the City while also negotiating with SEIU for a labor peace agreement.[32] After both negotiations proved unsuccessful, NW Success offered to mediate.[33] SEIU responded that mediation was "premature" and declined to mediate.[34]

NW Success informed the City that it had tried to obtain a labor peace agreement and provided the City with a written plan for continuation of services in the event of economic interference by a labor organization.[35] On September 26, 2023, the City determined that NW Success met the Good Faith Exception and waived the LPR for NW Success.[36] On October 1, 2023, NW Success and the City entered into a contract for parks comprehensive custodial

---

[29] *Id.* § 279.850(2)(a).

[30] *See* O.R.S. § 279.845.

[31] ECF 1 ¶ 1.

[32] *Id.* ¶ 14; *see also* ECF 12-2.

[33] ECF 1 ¶ 14; *see also* ECF 12-2.

[34] ECF 1 ¶ 14; *see also* ECF 12-2 at 11.

[35] ECF 1 ¶ 15; *see also* ECF 10-1.

[36] ECF 1 ¶ 16; *see also* ECF 10-2.

services (the "Contract").[37] The Contract was originally set to expire on June 30, 2024, and in April 2024, the parties amended the Contract so that it would expire on June 30, 2025.[38] On June 5, 2025, the parties agreed further to extend the Contract, through August 31, 2025.[39]

In late 2024, NW Success and SEIU engaged in unsuccessful mediation after prompting from the City.[40] NW Success offered to submit the matter to arbitration,[41] and on February 3, 2025, SEIU requested a return to mediation rather than arbitration.[42] In April 2025, NW Success again offered arbitration, and SEIU again refused.[43] The City informed NW Success that it had a week and one-half to set an arbitration date, and if no date was scheduled, the Contract would expire.[44] NW Success found an arbitrator and offered unilaterally to select an arbitration date, but on May 1, 2025, the City informed NW Success that because both parties had not provided a date and assurances that arbitration will take place, the City would not renew the Contract.[45] NW Success asked the City for a one-day extension to set an arbitration date, but the City declined.[46]

---

[37] ECF 1 ¶ 17; ECF 1-1 at 6-30.

[38] ECF 1 ¶ 18.

[39] ECF 9 ¶ 5; ECF 9-3.

[40] ECF 1-1 at 31-32; ECF 1 ¶ 21.

[41] ECF 1 ¶ 21; *see also* ECF 12-5.

[42] ECF 1 ¶ 22; *see also* ECF 12-4 at 12.

[43] ECF 1 ¶¶ 23-24; *see also* ECF 12-4 at 11.

[44] ECF 1 ¶ 25; *see also* ECF 12-4 at 9.

[45] ECF 1 ¶¶ 26-27; *see also* ECF 12-4 at 8-13.

[46] ECF 1 ¶¶ 29-30; *see also* ECF 12-4 at 8.

On May 5, 2025, NW Success sent a letter to the Mayor's Office requesting a determination that NW Success met the Good Faith Exception.[47] The Mayor's Office did not respond.[48] The City has since awarded the next contract to a different contractor.[49]

## D.  The Current Litigation

NW Success filed this lawsuit on June 5, 2025. NW Success seeks a declaratory judgment that the LPR is preempted by NLRA, violates Oregon law by placing an "impermissible condition on Oregon Forward contractors," and violates the Privileges and Immunities clause of the Oregon Constitution. NW Success also brings a claim under 42 U.S.C. § 1983, asserting that the LPR violates both the First Amendment by chilling expressive activity and the Due Process Clause of the Fourteenth Amendment because it is impermissibly vague. Finally, NW Success asserts claims for promissory estoppel and breach of the implied covenant of good faith and fair dealing. As noted, the City moved to dismiss NW Success's claims for declaratory judgment and under § 1983 for failing to state a claim, and NW Success moved for a preliminary injunction based on those claims.

## DISCUSSION

## A.  NLRA Preemption

### 1.  Legal Standards

The Supremacy Clause of the United States Constitution provides:

> This Constitution, and the Laws of the United States which shall be
> made in Pursuance thereof; and all Treaties made, or which shall
> be made, under the Authority of the United States, shall be the
> supreme Law of the Land; and the Judges in every State shall be

---

[47] ECF 1-1 at 33-34.

[48] ECF 1 ¶ 31; *see also* ECF 11-4.

[49] ECF 1 ¶ 32; *see also* ECF 11-5.

bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const., art. VI, cl. 2. Thus, federal law preempts state law when the two conflict.

In *San Diego Building Trades Council v. Garmon*[50] and *Lodge 76, International Ass'n of Machinists v. Wisconsin Employment Relations Commission*,[51] the Supreme Court held that the NLRA preempts "(1) laws that regulate conduct that is either protected or prohibited by the NLRA . . . , and (2) laws that regulate in an area Congress intended to leave unregulated or 'controlled by the free play of economic forces.'"[52] The first form of preemption is known as "*Garmon* preemption," and the second is known as "*Machinists* preemption."[53] *Id.* NW Success argues that both forms of preemption apply here. The City argues that neither form of preemption applies because the City is acting as a market participant and the LPR is not a regulation.

The Supreme Court has emphasized that "pre-emption doctrines apply only to state [or local] *regulation*," and not when a state "acts as a market participant with no interest in setting policy."[54] Thus, "[w]hen a state or local government buys services or manages property as a private party would, it acts as a 'market participant,' not as a regulator, and [courts] presume that

---

[50] 359 U.S. 236 (1959).

[51] 427 U.S. 132 (1976).

[52] *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 887 (9th Cir. 2018) (quoting *Chamber of Com. v. Brown*, 554 U.S. 60, 65 (2008)).

[53] *Id.*

[54] *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.* (*Boston Harbor*), 507 U.S. 218, 227, 229 (1993) (emphasis in original).

its actions are not subject to preemption."[55] "Only if a statute evinces an intent to preempt such proprietary actions by a state or local government is the presumption overcome and the action preempted."[56] The Supreme Court has held that the NLRA does not evince such an intent to preempt state or local government actions taken as a market participant.[57]

To determine whether a state or local government is acting as a market participant, the Ninth Circuit applies the two-part test from *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*.[58] The first prong asks if the challenged governmental action is taken in pursuit of the "efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances."[59] At the second prong, the "narrow

---

[55] *Airline Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074, 1079 (9th Cir. 2017) (hereinafter "*ASPA*").

[56] *Id.*

[57] *Boston Harbor*, 507 U.S. at 231-32 ("In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction."); *see also id.* at 227 ("We have held consistently that the NLRA was intended to supplant state labor *regulation*, not all legitimate state activity that affects labor." (emphasis in original)). The Ninth Circuit has also held that such the presumption is not rebutted by the NLRA. *See ASPA*, 873 F.3d at 1085.

[58] 180 F.3d 686 (5th Cir. 1999). *See Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1023 (9th Cir. 2010) (applying *Cardinal Towing* test).

At oral argument, the Court requested supplemental briefing on the phrase "purely proprietary interests" from *Boston Harbor* and whether a governmental entity can act as a market participant when it has mixed motives. The Supreme Court in *Boston Harbor* did not address mixed motives, and the circuit courts, including the Ninth Circuit, have adopted tests that allow for mixed motives. Ninth Circuit "precedent controls unless its reasoning or theory is clearly irreconcilable with the reasoning or theory of intervening higher authority." *Woods v. Kijakazi*, 32 F.4th 785, 790 (9th Cir. 2022) (cleaned up). The Court does not find that the Ninth Circuit's market participant test is "clearly irreconcilable" with *Boston Harbor* and thus applies the Ninth Circuit's *Cardinal Towing* test.

[59] *Johnson*, 623 F.3d at 1023 (quoting *Cardinal Towing*, 180 F.3d at 693).

PAGE 13 – OPINION AND ORDER

scope of the challenged action" must "defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem."[60] If either prong is satisfied, the governmental entity is acting as a market participant.[61] The government bears the burden of showing that the market participant exception applies.[62]

### 2. Application

The City argues that it satisfies the definition of "market participant" under either prong of the *Cardinal Towing* test. The City compares the facts of this case to those in *ASPA*, in which the City of Los Angeles required third-part businesses that refueled and loaded planes, took baggage and tickets, helped passengers with disabilities, and provided similar services to enter into a "labor peace agreement" with any organization that requested one.[63] These labor peace agreements—like the LPR—were required to include "binding and enforceable" provisions that prohibit picketing, boycotting, stopping work, or "any other economic interference."[64] In *ASPA*, the Ninth Circuit held that both prongs of the *Cardinal Towing* test were satisfied, and the City of Los Angeles acted as a market participant in promulgating this policy. The City argues that the LPR is similar to the labor peace agreement in *ASPA*, and thus both prongs are satisfied. NW Success argues that *ASPA* is distinguishable and neither prong is satisfied.[65] The Court addresses each prong in turn.

---

[60] *Id.* at 1023-24 (quoting *Cardinal Towing*, 180 F.3d at 693).

[61] *Id.* at 1024.

[62] *Id.* at 1024.

[63] 873 F.3d at 1077.

[64] *Id.*

[65] NW Success argues that there is an important distinction between the labor peace requirement in *ASPA*, which required a labor peace agreement only when a union requested one,

### a. Efficient Procurement

Like the City of Los Angeles in *ASPA*, the City here is attempting to avoid disruption of its own business activities and operations. The LPR applies only to janitorial, industrial laundry, and security industries, which the City deemed "essential" to keeping City services operational. The City has a compelling proprietary interest in the delivery of critical services, such as sanitation and public security.[66] With NW Success, for example, its contract was to provide custodial services in parks,[67] which includes janitorial services for public restrooms. "If a private entity operated [the City's public facilities], that entity would have a pressing interest in avoiding strikes, picket lines, boycotts, and work stoppages" in the delivery of such services.[68] The City also is directly participating in the market for these services and using the contracted companies for city functions, operations, and services. Thus, the City is acting to ensure the efficient procurement of necessary services.

NW Success argues that the LPR is a "Binding City Policy," and thus the City is not acting as a market participant. In deciding whether a governmental entity is acting as a market participant, courts "contrast official, government-imposed policies prescribing binding standards

---

and the City's LPR, which requires the contractor affirmatively to contact labor unions. But as discussed below, that the LPR may not be a perfect solution is not dispositive of whether its scope is sufficiently narrow.

[66] *See Metro. Milwaukee Ass'n of Com. v. Milwaukee County*, 431 F.3d 277, 282 (7th Cir. 2005) ("The [City] has a legitimate interest in avoiding interruptions in the services it furnishes its residents . . . .").

[67] *See* ECF 1 ¶ 17; ECF 1-1 at 30.

[68] *ASPA*, 873 F.3d at 1080.

of conduct with contractual commitments voluntarily undertaken."[69] But such "binding standards of conduct" refer to those "that operate irrespective of any private agreement."[70] Although the LPR is part of a City "policy," the LPR is not a general policy that regulates all service providers, but is a contractual commitment that applies only to contracted work on City projects. Thus, as discussed below, the LPR is not so broad as to constitute a regulation instead of an action by a market participant.

NW Success also cites the LPR's liquidated damages provision, which states that "[a]ny failure to comply with this requirement and any service disruption as a result of a labor dispute will subject a contractor to liquidated damages and possible termination of the service contract,"[71] as evidence that the City is imposing penalties that a private party could not impose.[72] The City responds that liquidated damages, as defined by Black's Law Dictionary, are "[a]n amount *contractually* stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches."[73] Accordingly, the City argues, this liquidated damages provision is equally available to private parties and is not a civil penalty. The Ninth Circuit in *Airlines for America* confirmed this distinction between civil fines, which may carry the force and effect of law, and liquidated damages, which are a typical breach of contract

---

[69] *See Airlines for Am. v. City & Cnty. of S.F.*, 78 F.4th 1146, 1152 (9th Cir. 2023) (quotation marks omitted).

[70] *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 229 n.5 (1995) (quotation marks omitted).

[71] ECF 1-1 at 4.

[72] *See Airlines for Am.*, 78 F.4th at 1152 ("[A] government's use of civil penalties may amount to the 'force and effect of law' unavailable to private parties.").

[73] *Damages*, *Black's Law Dictionary* (12th ed. 2024) (emphasis added).

remedy that specify a fixed and certain amount of compensation.[74] In *Airlines for America*, the ordinance and program at issue provided for a fine of "$1,000 per violation/employee, per day," and "liquidated damages of up to one hundred dollars ($100) for each one-week pay period").[75] The Ninth Circuit explained that the fine and "liquidated damages" were not true liquidated damages because they did not attempt reasonably to estimate likely future damages intended "to compensate the City for any contract breach but to penalize the offending employer."[76] The LPR here does not impose any fines, but merely provides for a typical breach of contract remedy. Accordingly, this provision is not a civil penalty. Moreover, even if it were a contractual penalty rather than liquidated damages, it would simply be unenforceable under ordinary contract law.[77]

Finally, NW Success argues that the City is not participating in a private market because the services subject to the LPR involve only the City's contracts with Oregon Forward contractors. As the City responds, the LPR does not only apply to Oregon Forward contractors. Although the services are those for which the OFP requires public entities to look first to Oregon Forward contractors, the OFP allows public agencies to do a regular procurement if there is no Oregon Forward contractor who can meet the "appropriate specifications" of the City's needs or if all Oregon Forward contractors are otherwise disqualified.[78] Thus, the City is not acting only in a market with Oregon Forward contractors.

---

[74] *Airlines for Am.*, 78 F.4th at 1153.

[75] *Id.*

[76] *Id.*

[77] *See generally* Restatement (Second) of Contracts § 356.

[78] *See* ORS § 279.850.

Even if the City, however, were contracting only with Oregon Forward contractors, the City would still be acting as a market participant. The Ninth Circuit in *ASPA* noted that markets "run by or affiliated with a governmental entity" may not be private markets and emphasized the "inherently competitive and commercial nature of airport operations" in holding that the City of Los Angeles was acting like a private party.[79] Because the OFP's purpose is to "assur[e] an expanded and constant market" for goods and services produced or provided by individuals with disabilities,[80] and the Oregon Legislature expressed its intent that public agencies and Oregon Forward contractors "cooperate closely,"[81] NW Success contends that the City is not participating in a private market. But the City and private entities provide similar services: public-facing facilities, with janitorial, security, and laundry requirements. NW Success has not explained why the OFP creates a market that "differs so markedly from other markets that the City cannot act in a 'proprietary' capacity when it enters into contracts" with Oregon Forward contractors.[82] The Court therefore does not find this argument persuasive. Thus, taking all of NW Success's well-pleaded allegations as true, the Court concludes that the City is acting as a market participant under the first prong of the *Cardinal Towing* test.

---

[79] *See* 873 F.3d at 1081-82.

[80] ORS § 279.840.

[81] ORS § 279.850(3).

[82] *See Hum. Servs. Council of N.Y. v. City of New York*, 2024 WL 4792004, at *20-21 (S.D.N.Y. Nov. 14, 2024) (explaining that a governmental entity can act as a market participant in the market for human services, which is made up of many mission-driven non-profits who often begin performance under city contracts before they have been paid).

### b. Narrow Scope

The LPR also is narrowly tied to a "specific proprietary problem"[83]: service disruptions with public facilities managed by the City. The LPR explicitly states that it "applies only to the performance of services to carry out the contract with the City."[84] Nothing in the text of the LPR or in NW Success's allegations suggests that the LPR "will be enforced throughout the rest of the City's jurisdiction or that [it] will hamper service providers' operations elsewhere."[85] Unlike regulations or laws that have been enjoined as preempted, the LPR "is limited to addressing the needs of [the City] and does not announce any sort of regulatory policy, require complicated recordkeeping, or create litigation risks."[86] In fact, the LPR explicitly states that it is *not* "intended to enact or express any generally applicable policy regarding labor/management relations, or to regulate those relations in any way."[87]

NW Success argues that the LPR is a preempted labor regulation because it serves a policy goal of aiding unions—a goal that NW Success alleges the City did not want overtly to acknowledge to the public. In support of this argument, NW Success cites a description of the LPR that it attributes to Derek Bradley, the Policy Director of then-Commissioner Hardesty, described as the "architect of the LPR," as "[a]llow[ing] unions to build inroads into non-unionized shops with an assurance that employers won't stand in the way of unionization efforts

---

[83] *Johnson*, 623 F.3d at 1024 (quoting *Cardinal Towing*, 180 F.3d at 693).

[84] ECF 1-1 at 4.

[85] *ASPA*, 873 F.3d at 1082.

[86] *Id.* at 1083.

[87] ECF 1-1 at 4.

(Don't include in public message)."[88] These statements, NW Success argues, show that the LPR was enacted to set policy and regulate labor relations, not to address the City's proprietary interest.

NW Success cites the Ninth Circuit decision in *United States v. King County*, in which the court considered the county's statements made when issuing an executive order and concluded that the market participant exception did not apply.[89] In *King County*, however, the statements that the Ninth Circuit credited were made by the *county*, not an individual member of the county government or a member of their staff. Here, NW Success cites only an email involving the staff of one of the five then-City Commissioners.[90] Moreover, the Ninth Circuit has held that "Congress did not intend for the NLRA's . . . preemptive scope to turn on state [or local] officials' subjective reasons for adopting a regulation or agreement."[91] "That a state or local governmental entity may have policy goals that it seeks to further through its participation in the market does not preclude the [market participant] doctrine's application, so long as the

---

[88] *See* ECF 1 ¶ 11; ECF 1-1 at 1-2. These statements are taken from notes sent by Commissioner Hardesty's Community Outreach Coordinator, to which Mr. Bradley replied, "Looks good to me!" ECF 1-1 at 1-2.

[89] 122 F.4th 740, 759 (9th Cir. 2024) ("King County has repeatedly stated that it adopted the Executive Order in response to perceived human rights abuses in the federal immigration system. That is the clear substance and tenor of the Executive Order and the County's many comments surrounding it. The County's broad objection to federal immigration policy does not reflect King County acting in the capacity of a market participant.").

[90] The Ninth Circuit in *King County* also relied mainly on the text of the executive order, which repeatedly mentions human rights and has only a brief reference to business. The LPR, on the other hand, refers only to the City's proprietary interests and does not reference any policy goals.

[91] *Johnson,* 623 F.3d at 1026; *see also ASPA*, 873 F.3d at 1084 ("[L]urking political motives are an inevitable part of a public body's actions and are not 'a reason for invalidity.'" (quoting *N. Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1007 (7th Cir. 2005))).

action in question is the state's own market participation."[92] Thus, these statements do not show that the City had a regulatory goal in enacting the LPR.

Second, NW Success argues that the LPR does not promote efficiency. NW Success contends that the LPR would cause "spillover effects" by discouraging Oregon Forward contractors to contract with the City. NW Success also asserts that the requirement that a contractor provide written notice to all relevant unions in Oregon and Washington—a requirement not present in *ASPA*—would invite the unions to fight among themselves for "control" over the contractor, causing further disruptions. In support, NW Success cites *Metropolitan Milwaukee Association of Commerce v. Milwaukee County* ("*Metropolitan Milwaukee II*"), in which the Seventh Circuit held that Milwaukee County was not acting as a market participant and noted that the required labor peace agreements "might well increase the frequency of service interruptions."[93] The ordinance at issue in *Metropolitan Milwaukee II*, however, expressly applied to "the employer's other employees—employees who may never work on a County contract—as well as to the work that is not County-related of the employees who do work part of the time on the County contracts."[94] In contrast, the LPR applies "only to the performance of services to carry out the contract with the City,"[95] and thus is tailored to addressing the City's proprietary interest.[96]

---

[92] *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1046 (9th Cir. 2007).

[93] 431 F.3d 277, 283 (7th Cir. 2005).

[94] *Id.* at 279.

[95] ECF 1-1 at 4.

[96] *See, e.g.*, *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 36 (D.C. Cir. 2002) ("Because the Executive Order does not address the use of [project labor agreements] on projects unrelated to those in which the Government has a proprietary interest, the Executive

The Ninth Circuit in *ASPA* also distinguished *Metropolitan Milwaukee II*, noting that "evidence that an alternative strategy could more effectively or cheaply accomplish the same goals bears only on whether a state or local government made a good business decision, not on whether it was pursuing regulatory, as opposed to proprietary, goals."[97] The court acknowledged that "supposedly proprietary actions" can "become regulatory if enacted or enforced overbroadly," but held that the regulation at issue in *ASPA* was not overbroad.[98] Like the regulation in *ASPA*, the LPR imposes "no state-wide restrictions—or, indeed, city-wide restrictions."[99] "The City has merely imposed a contract term on those who conduct business [with the City], and that contract term serves a cabined purpose."[100] Accepting all of NW Success's well-pleaded allegations as true, the Court finds that the City also is acting as a market participant under the second prong of the *Cardinal Towing* test. NW Success, therefore, fails to state a claim that the LPR is preempted by the NLRA. Accordingly, the Court grants the City's motion to dismiss this claim.

## B. Impermissible Condition on Oregon Forward Contractors

NW Success contends that the LPR places an "impermissible condition on Oregon Forward contractors" because the LPR is not a local ordinance or resolution that *governs labor*

---

Order establishes no condition that can be characterized as 'regulatory.'"); *Hotel Emps. & Rest. Emps. Union, Loc. 57 v. Sage Hosp. Res., LLC*, 390 F.3d 206, 217-18 (3d Cir. 2004) (declining to find preemption under the NLRA where "the requirement that an employer sign a labor agreement is limited to hotels and hospitality projects receiving [city] funds").

[97] 873 F.3d at 1084 (cleaned up).

[98] *Id.*

[99] *Id.* NW Success argues that the LPR imposes citywide restrictions on three industries, but the LPR applies only to contracts with the City, and is not such a broad-reaching regulation.

[100] *Id.*

*standards.*[101] The City responds that the LPR is a local ordinance that governs labor standards[102] and cites *DePaul Industries, Inc. v. City of Portland*. The City explains that the court in *DePaul* addressed this issue and held that the LPR was a permissible ordinance governing labor standards under the OFP.[103]

The OFP statute does not define "local ordinance or resolution that governs labor standards." Regulations promulgated by DAS, however, define "local ordinances or resolutions that govern labor standards" as those "that regulate employee working conditions."[104] Working conditions are defined as: "(a) Wage rates or salaries; (b) Hours of labor, work days, leave, and workplace safety conditions; (c) Health insurance or health care benefits; (d) Retirement or pension benefits; and (e) Dispute resolution procedures."[105] NW Success argues that the LPR does not fit into any of these categories, but instead governs the relationship between employers and unions. NW Success contends that the legislative history of the labor standards exception confirms that the exception is "focused exclusively on employee and employer-employee issues"[106] and that DAS regulations may not change the meaning of a term beyond that

---

[101] NW Success does not dispute that the LPR is a local ordinance or resolution.

[102] The City also argues that the LPR is an "appropriate specification" under the OFP. For purposes of the City's motion to dismiss, however, the Court considers only the allegations in NW Success's complaint: that the LPR is not a local ordinance or resolution governing labor standards.

[103] 2022 WL 3683799 (D. Or. Aug. 25, 2022). The court in *DePaul Industries* addressed the question from a preemption standpoint and concluded that the OFP neither expressly nor impliedly preempted local governments from requiring labor peace agreements like the one at issue in the LPR.

[104] O.A.R. 125-055-0040(8).

[105] *Id.*

[106] NW Success cites testimony of a lobbyist for a union, stating:

contemplated by the legislature.[107] The City responds that the LPR regulates dispute resolution procedures, as allowed by the DAS regulation.

The Court finds the reasoning in *DePaul* persuasive. The LPR involves labor standards: it sets forth requirements for laborers contracting with the City. Specific to the enumerated working conditions in the DAS regulations, "the term dispute resolution procedures is broad enough to potentially encompass alternative means of preventing labor disputes, such as a labor peace agreement."[108] Further, "[t]he rule broadly allows for ordinances or regulations that govern 'employee working conditions,' which could plausibly include actions such as 'picketing, work stoppages, boycotting, [or] strikes."[109]

NW Success attempts to distinguish *DePaul* by arguing that it was decided on summary judgment, decided under the state preemption standard, and focused mainly on DAS regulations. The Court, however, does not find these distinctions to be material. As to the fact that *DePaul* was decided on a motion for partial summary judgment, the parties agreed that the material facts

---

> Problems arise when the only [Oregon Forward contractor] option may be one that doesn't provide its workers with adequate wages or benefits, or one that has racked up multiple BOLI complaints. The bill allows the non-[Oregon Forward] contractors to contract with the agencies if the other [Oregon Forward contractors] are in violation of local labor laws . . . .

ECF 8 at 29-30 (citing Video recording, Senate Committee on Workforce, H.B. 3248, May 27, 2015, 1:00 pm at 4:21 (testimony of Contract Lobbyist of SEIU Local 49, Andrea Salinas)).

[107] *See Garrison v. Dep't of Rev.*, 345 Or. 544, 548-49 (2008) (holding that an "agency rule that conflicts with a statute is invalid to the extent that it so conflicts and . . . a rule created within a statutory scheme cannot amend, alter, enlarge upon, or limit statutory wording so that it has the effect of undermining the legislative intent").

[108] *DePaul Inds.*, 2022 WL 3683799, at *7.

[109] *Id.* (second alteration in original).

were not in dispute and the decision focused only on questions of law.[110] Here, the parties do not

dispute any facts about the LPR or the OFP but instead argue about statutory interpretation. "The

construction or interpretation of a statute is question of law" that the Court properly can decide

on a motion to dismiss for failure to state a claim.[111] With respect to NW Success's argument

about preemption, NW Success essentially argues that the LPR is impermissible because it is

preempted by the OFP. NW Success contends that the LPR conflicts with the OFP, and thus the

LPR must be invalid. Accordingly, the Court's analysis of this issue is like the preemption

analysis in *DePaul Industries*.

Finally, the DAS regulations also do not conflict with the statutory text or legislative

intent. The statement of a lobbyist in support of a bill does not show the "intent of the

legislature." As discussed, a reasonable interpretation of the term "labor standards" includes

standards such as those found in the LPR that govern labor disputes and employee working

conditions. Thus, the Court finds that NW Success fails to state a claim that the LPR imposes an

impermissible condition on Oregon Forward Contractors and grants the City's motion to dismiss

this claim.

## C. Oregon Constitution's Privileges and Immunities Clause

### 1. Legal Standards

The Oregon Constitution's Privileges and Immunities Clause provides: "No law shall be

passed granting to any citizen or class of citizens privileges, or immunities, which, upon the

same terms, shall not equally belong to all citizens."[112] The Oregon Supreme Court has

---

[110] *See DePaul Inds.*, 2022 WL 3683799, at *2.

[111] *United States v. Cabaccang*, 332 F.3d 622, 624 (9th Cir. 2003) (en banc).

[112] Or. Const. art. I, § 20.

recognized that this clause "permits the legislature to grant privileges or immunities to one citizen or class of citizen as long as similarly situated people are treated the same."[113] "A classification is not valid merely because some differences between the classes exists; those differences must somehow relate to the governmental purpose."[114] To state a claim for a violation of the Privileges and Immunities Clause, NW Success must show: (1) the LPR grants a privilege or immunity; (2) the LPR discriminates against a class that exists apart from the LPR itself; and (3) "the distinction between the classes is either impermissibly based on persons' immutable characteristics, which reflect invidious social or political premises, or has no rational foundation in light of the state's purpose."[115]

Because no suspect class is involved, "the test is whether the classification is rationally related to a legitimate governmental purpose."[116] "Under a rational basis standard, laws are presumed to be valid, and will satisfy Article I, section 20, as long as the classification bears some rational relationship to a legitimate end."[117] To show that no rational relationship exists, NW Success bears the burden "to negative every conceivable basis which might support" the LPR.[118]

---

[113] *State v. Savastano*, 354. Or. 64, 73 (2013) (en banc); *see also State v. Goacher*, 303 Or. App. 783, 789 (2020) ("An Article I, section 20, challenge to a statute on a class-based theory must raise the question of whether defendant, as a member of the class, is denied a 'privilege' or 'immunity' that is granted to members of similarly situated classes.").

[114] *Delta Air Lines, Inc. v. Dep't of Revenue*, 374 Or. 58, 83 (2025) (en banc).

[115] *Urton v. Hudson*, 101 Or. App. 147, 152 (1990) (quotation marks omitted).

[116] *Delta Air Lines*, 374 Or. at 77 (citing *Kramer v. City of Lake Oswego*, 365 Or. 422, 456-57 (2019)).

[117] *Wasson v. Fagan*, 328 Or. App. 813, 816 (2023) (cleaned up).

[118] *Id.* (quotation marks omitted).

##### 2.  Application

NW Success argues that the LPR grants a privilege or immunity in two, and possibly

three, types of class distinctions: (a) labor unions over non-labor unions (or, possibly, unionized

contractors over non-unionized contractors); and (b) contractors in industries other than

janitorial, industrial laundry, and security over contractors in those three industries. NW Success

contends that there is no rational basis for either distinction. NW Success also maintains that the

LPR has no rational basis because it does not stop other unions from disrupting work and does

not prevent the contractors' workforce from forming its own union.

Regarding NW Success's claim that the LPR privileges labor unions over non-unions,

NW Success has not pleaded that Oregon Forward contractors and unions are similarly

situated.[119] Contractors such as NW Success enter into agreements to provide goods or services

to the City regularly, under which they agree to various contractual terms. Labor unions, on the

other hand, do not enter such contracts or provide goods or services to the City; instead, they

represent workers and their interests. Thus, the City has a legitimate reason to treat the two

groups (unions and non-unions) differently, and differential treatment is rational.

Regarding NW Success's argument that the LPR privileges unionized contractors over

non-unionized contractors, the City does not dispute that these contractors are similarly situated.

The City contends, however, that these two types of contractors are treated identically and thus

the LPR does not grant a privilege or immunity to one over the other. The Court agrees. The

requirements for both types of contractors are the same: they must provide evidence of a labor

---

[119] The Court acknowledges that "a showing of 'genuine differences' is not a prerequisite
to rational basis review. If there are differences between the classes that are rationally related to a
legitimate governmental purpose, then those differences are 'genuine differences.'" *Delta Air
Lines*, 374 Or. at 86.

peace agreement. Unionized contractors may already have such agreements in place, but not all collective bargaining agreements contain a no-strike provision. Although it may be easier for unionized contractors to reach a labor peace agreement, the LPR itself does not distinguish between the two types of contractors. Thus, NW Success fails to allege that the LPR violates the Privileges and Immunities Clause in this way.

Finally, regarding NW Success's claim that the LPR privileges contractors that do not provide janitorial, industrial laundry, or security services over contractors that do provide those services, the City does not dispute that these types of contractors are similarly situated. Instead, the City argues that it has a rational basis for distinguishing janitorial, industrial laundry, and security services—these three industries are "essential to keep the City's other functions operational." The City adds that these industries are necessary to comply with basic safety requirements. If City facilities were not cleaned, for example, the City would not be able to provide the facilities to the public and would not have employees report to unclean, unsafe working conditions.

NW Success argues that the stated purpose of avoiding work stoppages is pretextual because the City admitted in 2022 that it was not aware of any labor-management conflicts interfering with the provision of services to the City by a contractor during the last ten years.[120] NW Success contends that the Ninth Circuit in *King County* rejected such a justification when "there [was] a lack of evidence of such disruptions."[121] But this lack of evidence was not determinative in that case. The decision in *King County* ultimately was based on the fact that "the County's claimed concerns about protests—which are referenced only obliquely in one

---

[120] ECF 11-2 at 2-3.

[121] 122 F.4th at 759.

small part of the Executive Order—cannot overcome the Order's overwhelming import," which was "King County's view that 'deportations raise deeply troubling human rights concerns which are inconsistent with the values of King County.'"[122] The LPR does not merely reflect the City's values, but emphasizes proprietary interests and economic concerns. The lack of labor-management conflicts does not mean that the City's goal of preventing or at least reducing the risk of work stoppages is pretextual. An entity rationally can decide that a situation poses a threat, even if the situation has not occurred, and take preventative steps to avoid that situation.

NW Success also compares this case to the Oregon Supreme Court case *State v. Savage*, in which the court held unconstitutional a law prohibiting the fishing of salt-water crabs by all people except canneries.[123] The stated purpose for the act in *Savage* was "to provide for the preservation and protection of salt water crabs,"[124] and "the only reason suggested [by the state] for exempting canneries was the desire of the legislature not to cripple an industry."[125] The Oregon Supreme Court explained:

> No good reason is suggested or can be conceived that in the protection of fish a portion of the people should be subject to prosecution and punishment for the catching or transportation for mercantile purposes of salt-water crabs taken in Coos county, while another class of persons operating canneries should have the exclusive privilege of taking and shipping the same kind of fish beyond the limits of the county for the purposes of sale. The act . . . clearly grants a special privilege or monopoly to those engaged in the cannery business without any good reason therefore, and is discriminatory class legislation, and repugnant to article I, § 20, of the Constitution and void.

---

[122] *Id.* (quoting the County's executive order).

[123] 96 Or. 53 (1919).

[124] *Id.* at 56.

[125] *Nilsen v. Davidson Inds., Inc.*, 226 Or. 165, 172 (1961).

*Savage*, 96 Or. at 60. In this case, on the other hand, a good reason has been suggested for the differential treatment: that the three industries are essential to the City's function.

In its reply in support of its motion for preliminary injunction, NW Success also argues that "[s]ervices can be both 'essential' . . . and a pretext for regulating labor relations." NW Success notes that other services could be classified as essential—such as garbage collection, emergency first response, provision of energy and other utilities, and public transportation—but are not subject to the same LPR. According to NW Success, this shows that the "true purpose" of the LPR was to grant a monopoly to SEIU and give unions "inroads." Under the rational basis analysis used in the context of Oregon's Privileges and Immunities Clause, however, "[a] statute does not have to be perfect in order for it to be rational."[126] "A statute may be underinclusive yet still be constitutional, 'as long as the distinction that it makes among classes is reasonably related to a legitimate state interest.'"[127] In this case, although there are arguably other industries that may be essential to the City's functions, the LPR still bears a reasonable relationship to a legitimate interest of the City. The LPR makes it less likely that there will be service disruptions in three critical industries.

Finally, NW Success argues that even if the goal of preventing work stoppages were not pretextual, the relationship between the LPR and this goal is too attenuated to be rational. NW Success cites the requirement that contractors notify all relevant labor organizations in the area as inviting unions to intervene and fight for control, as discussed above. But as also discussed, the fact that a policy might not be perfect in achieving its goal this does not mean that it lacks a

---

[126] *In re Marriage of Crocker*, 157 Or. App. 651, 662 (1998).

[127] *Adams v. Pub. Emps. Ret. Bd.*, 180 Or. App. 59, 71 (2002) (quoting *Crocker*, 157 Or. App. at 662) (holding that a rational basis existed for a law that distinguished between mental health therapists and police officers and firefighters for purposes of retirement benefits).

rational basis. The LPR still bears some rational relationship to this end. Thus, the Court finds that NW Success fails to state a claim for violation of Oregon's Privileges and Immunities Clause and grants the City's motion to dismiss this claim.

## D. First Amendment

### 1. Legal Standards

The Supreme Court has explained that "restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct."[128] "[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."[129] The Supreme Court has set forth three factors that are helpful in distinguishing between a content-based restriction on speech and an economic restriction: (1) whether the restriction imposes any "restraint on the freedom of any producer to communicate any message to any audience"; (2) whether the restriction "compel[s] any person to engage in any actual or symbolic speech"; and (3) whether the restriction compels a person "to endorse or to finance any political or ideological views."[130]

In the context of union-related speech, the Supreme Court "has recognized that employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty."[131] "When to this persuasion other things are added which bring about coercion, or give it that character, the limit of the right has been passed. But short of

---

[128] *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

[129] *Id.*

[130] *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 469-70 (1997).

[131] *Thomas v. Collins*, 323 U.S. 516, 537 (1945) (citing *NLRB v. Va. Elec. & Power Co.*, 314 U.S. 469 (1941)).

that limit the employer's freedom cannot be impaired."[132] Thus, it is "firmly established" that an employer has a "free speech right to communicate his views to his employees," including "any of his general views about unionism or any of his specific views about a particular union."[133] This right must, however, be balanced against "the equal rights of the employees to associate freely."[134] "[S]o long as the communications do not contain a 'threat of reprisal or force or promise of benefit,'" an employer may communicate his views about unions to his employees.[135] An employer, therefore, may "express opinions or predictions, reasonably based in fact, about the possible effects of unionization on its company."[136]

### 2. Application

NW Success argues that the LPR is a content-based restriction on speech that requires non-unionized contractors to obtain a labor peace agreement with a union as a condition of contracting with the City. Although NW Success acknowledges that the LPR does not require anything of the employer, it contends that a labor peace agreement "by definition" requires the employer to remain neutral to unionization efforts.[137] The City responds that the actual text of the

---

[132] *Id.* at 537-38 (citation omitted).

[133] *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617-18 (1969).

[134] *Id.* at 617.

[135] *Id.* at 618.

[136] *Int'l Union v. NLRB*, 834 F.2d 816, 820 (9th Cir. 1987) (citing *Gissel Packing*, 395 U.S. at 618). Although caselaw discussing an employer's free speech rights often references § 8 of the NLRA, this section "merely implements the First Amendment." *Gissel Packing*, 395 U.S. at 617. As *Thomas* makes clear, the NLRA does not itself create a free speech right for employers, and therefore this test applies when evaluating restrictions on employer speech about unionization, even when the employer is not subject to the jurisdiction of the NLRB.

[137] NW Success also argues that because the labor peace agreement proposed by the union during negotiations included a neutrality requirement, and the City declined to grant NW Success the Good Faith Exception to avoid this labor peace agreement, the City is requiring

LPR has no neutrality requirement and regulates only the conduct of the City's potential contractors, not their speech.

As noted, the LPR requires only that a labor organization agree to refrain from engaging in picketing, work stoppages, boycotting, strikes, or other economic interference with the contractor's performance of services to carry out the contract with the City.[138] Unlike the labor peace agreement at issue in *Casala, LLC v. Kotek*, where the Court found that the measure at issue violated the First Amendment, the LPR does not explicitly include a neutrality requirement.[139] Instead, the LPR is more like the labor peace agreements at issue in the cases cited by the City, specifically, *Human Services Council of New York v. City of New York*[140] and *MSP Small Business Concessions Alliance v. Metropolitan Airports Commission*,[141] which

───────────────

neutrality in this case. To begin with, NW Success did not allege this in its Complaint, and thus it is not properly considered in deciding a motion to dismiss. Instead, NW Success alleges in its Complaint that the City did not renew NW Success's contract because NW Success did not engage in arbitration, not because NW Success did not agree to a labor peace agreement with a neutrality provision. The labor union's conduct in requiring neutrality cannot be imputed to the City under these alleged facts.

[138] *See* ECF 1-1 at 4.

[139] *See Casala, LLC v. Kotek*, --- F. Supp. 3d ----, 2025 WL 1442792, at *9 (D. Or. May 20, 2025) ("Under Measure 119, Plaintiffs must 'remain neutral with respect to a bona fide labor organization's representatives communicating with the employees of the applicant or the license[e] about the rights afforded to such employees under [Oregon Revised Statutes §] 663.110." (alteration in original)).

[140] *See* 2024 WL 4792004, at *3 (S.D.N.Y. Nov. 14, 2024) (requiring the covered employee and labor organization to "agree to the uninterrupted delivery of services to be rendered pursuant to the city service contract and to refrain from actions intended to or having the effect of interrupting such services" (quotation marks omitted)).

[141] 2025 WL 1295615, at *2 (D. Minn. May 5, 2025) (requiring a concessionaire to negotiate a labor peace agreement upon written notice from a labor organization, and requiring the labor peace agreement to prohibit the labor organization and its members "from engaging in picketing, strikes, work stoppages, boycotts, or any other forms of economic interference" that is related to the provision of goods and services to the municipal corporation or the airport it

merely require that the labor organization agree to the uninterrupted delivery of services. In both cases, the district courts found that the labor peace agreements, which did not contain an explicit neutrality requirement, did not violate the contractors' free speech rights under the First Amendment.[142] To reiterate, the LPR does not prohibit contractors from expressing their views about unions to their employees: "The terms that are mandated by the [LPR]—that employees agree not to picket, strike, engage in work stoppages, boycotts, or other forms of economic interference—do not prevent any [contractor] from speaking about the benefits or drawbacks of worker unionization."[143] Thus, NW Success fails to allege that the LPR violates its First Amendment rights. Accordingly, the Court grants the City's motion to dismiss this claim.

## E.  Void for Vagueness

### 1.  Background Principles

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."[144] The void-for-vagueness doctrine "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is

---

operates). The Court acknowledges that this case was decided on Article III standing grounds, not the merits, but still finds the reasoning persuasive.

[142] *See id.* at *6-7 (rejecting First Amendment claim for lack of standing because of failure to show injury in fact or causation, and noting that the plaintiff did not allege that its members' "speech concerning unionization or other employee organizing activities is currently chilled"); *Hum. Servs. Council of N.Y.*, 2024 WL 4792004, at *25 (rejecting First Amendment claim because the labor peace agreement "does not require a City contractor to maintain 'neutrality' with respect to the unionization of its employees" and "imposes no restriction on a contractor's ability to express its views on unionization—or any other topic—in any forum, by any means, to any party").

[143] *MSP Small Bus. Concessions All.*, 2025 WL 1295615, at *7.

[144] *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also* U.S. Const. amend. XIV (providing that no state "shall . . . deprive any person of life, liberty, or property, without due process of law").

required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."[145]

As to the first concern, fair notice, a court will, in many contexts, consider whether a statute "fails to provide a person of ordinary intelligence fair notice of what is prohibited." As to the second concern, the avoidance of arbitrary enforcement, the Supreme Court has stated that "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them," and that "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis."[146]

The Supreme Court and the Ninth Circuit have recognized that "[m]any statutes will have some inherent vagueness" and that a certain quantum of vagueness is permissible—and even necessary.[147] Consistent with that recognition, "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."[148] Thus, a challenger seeking to invalidate a statute for vagueness carries a heavy burden. A statute is unconstitutionally vague if it "specifie[s]" "no standard of conduct at all."[149]

---

[145] *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Grayned*, 408 U.S. at 108 (noting that vague laws violate the "basic principle of due process," including "fair warning" and "explicit standards for those who apply [the laws]").

[146] *Grayned*, 408 U.S. at 108-09.

[147] *See Rose v. Locke*, 423 U.S. 48, 49-50 (1975); *McSherry v. Block*, 880 F.2d 1049, 1054 (9th Cir. 1989) (quoting *Rose*).

[148] *Parker v. Levy*, 417 U.S. 733, 757 (1974) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963) (collecting cases)).

[149] *United States v. Lucero*, 989 F.3d 1088, 1101 (9th Cir. 2021) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).

### 2. Standard of Review

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."[150] In *Hoffman*, the Supreme Court articulated four factors (the *Hoffman* factors) relevant to whether a statute is unconstitutionally vague. A court must consider whether the statute: (1) involves only economic regulation; (2) contains only civil penalties;[151] (3) includes a scienter requirement; and (4) threatens constitutionally protected rights.[152] The Supreme Court held that the ordinance at issue in *Hoffman*, which made unlawful the unlicensed sale of any "accessory or thing which is designed or marketed for use with illegal . . . drugs," was not impermissibly vague even though only the first and fourth *Hoffman* factors favored a more lenient standard of review.[153]

When a statute involves only economic regulation, courts analyze whether a "*business person* of ordinary intelligence would understand" the conduct prohibited.[154] Relatedly, courts—

---

[150] *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982); *accord Kashem v. Barr*, 941 F.3d 358, 370 (9th Cir. 2019) (construing *Hoffman*).

[151] "A provision that nominally imposes only civil penalties but nonetheless carries a 'prohibitory and stigmatizing effect'" may also "warrant a 'relatively strict test.'" *Kashem*, 941 F.3d at 370 (quoting *Hoffman*, 455 U.S. at 499). In *Hoffman*, the municipality defending the ordinance at issue conceded that the ordinance was "quasi-criminal" and that "its prohibitory and stigmatizing effect may [have] warrant[ed] a relatively strict test." 455 U.S. at 499.

[152] *See Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) (construing *Hoffman*).

[153] *See* 455 U.S. at 499-500. The ordinance at issue in *Hoffman* regulated only economic activity; the village conceded that the ordinance was 'quasi-criminal' (and the Court found the ordinance sufficiently clear as applied, even under a test "appropriate to either a quasi-criminal or a criminal law"); the ordinance did not include a scienter requirement; and the ordinance did not threaten the exercise of constitutionally protected rights. *See* 455 U.S. at 492, 499-500.

[154] *Hoffman*, 455 U.S. at 501 (emphasis added).

including the Supreme Court—consistently evaluate the vagueness of a law in light of the sophistication of the persons or entities subject to that law.[155] Based on the *Hoffman* factors and their application, a lenient standard of review applies here. Three of the four *Hoffman* factors favor leniency. First, the considerations that dictate a more lenient standard of review for laws that regulate only economic activity apply here. The LPR is directed to businesses that have specialized knowledge regarding the issues involved. Second, the LPR imposes only civil penalties. Third, under what is "perhaps the most important factor," the LPR does not "threaten[] to inhibit the exercise of constitutionally protected rights," as discussed above.[156]

### 3.  Application

NW Success argues that the LPR is void because: (1) the definition of a labor peace agreement is subject to broad and unreasonable interpretation; (2) the Good Faith Exception lacks precision and guidance; and (3) the liquidated damages penalty has no clear standards. The Court considers these arguments within the framework of fair notice and arbitrary enforcement.

### a.  Fair Notice

As to fair notice, NW Success argues that the LPR fails to provide fair notice because it does not sufficiently define a labor peace agreement, "economic interference," the Good Faith Exception, or what triggers the liquidated damages provision.

---

[155] *See, e.g.*, *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162-63 (1972) (striking down a vagrancy law under the "person of ordinary intelligence" standard, noting that "[t]he poor among us, . . . the average householder[,] are not in business and not alerted to the regulatory schemes of vagrancy laws"); *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) (applying a "doctors of ordinary intelligence" standard to a law prohibiting certain medical procedures (quotation marks omitted)).

[156] *See Hoffman*, 455 U.S. at 499.

### i. Labor Peace Agreement and "Economic Interference"

The LPR defines a labor peace agreement as an agreement with a labor union "to refrain from engaging in any picketing, work stoppages, boycotting, strikes, or any other economic interference with the contractor's or subcontractor's performance of services."[157] This is a clear definition of what is required from contractors. NW Success argues that this definition could include anything demanded by a union and that the City "delegated discretion to the union to demand whatever they want in a labor peace agreement." But the LPR makes clear that the only requirement for a labor peace agreement is that the labor organization refrains from the stated economic interference. That a labor union may require other conditions in exchange for agreeing to the labor peace agreement does not mean that the LPR itself is vague.

Further, although the phrase "economic interference" is not defined, it is a general term that follows a list of specific terms. Under the interpretive canon of *ejusdem generis*, "when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration."[158] With this guidance, "economic interference" is intended as a catch-all term to refer to activities similar to picketing, work stoppages, boycotts, or strikes. The term also is limited to encompass only economic interference with the performance of services under the contract, which clarifies what activities may not occur. Thus, the LPR gives contractors fair notice of what is required for an acceptable labor peace agreement.

---

[157] ECF 1-1 at 4.

[158] *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223 (2008) (quotation marks omitted).

### ii. Good Faith Exception

NW Success argues that it did everything the City asked of it and the City did not grant the Good Faith Exception. Thus, according to NW Success, the exception does not provide fair notice because a contractor might do everything that the City required of it but still fail to be granted that exception. The City responds that NW Success admits that it did not engage in binding interest arbitration by the deadline provided by the City,[159] as required under the LPR. Therefore, the City argues, the Good Faith Exception provides fair notice.

Although the Good Faith Exception does not explicitly define "good faith," the LPR describes in detail the steps needed to meet that exception.[160] Included in these required steps is "an offer by the contractor to submit the dispute about the terms of Labor Peace to prompt resolution thorough binding interest arbitration before a neutral dispute resolution organization, and its participation in that arbitration."[161] Indeed, NW Success followed most of these steps in attempting to meet the exception.[162] As noted, however, NW Success did not participate in arbitration because the union NW Success had approached allegedly refused to do so.[163]

---

[159] ECF 1 ¶ 27.

[160] *See* ECF 1-1 at 4.

[161] *Id.* at 5.

[162] *See* ECF 1 ¶¶ 21-24.

[163] NW Success alleges that it was ready and willing to participate in arbitration, but the labor union refused to participate. *See* ECF 1 ¶¶ 23-28. Although NW Success might allege that this requirement is unfair because it gives labor unions the power to decide who gets to contract with the City, this does not mean that the Good Faith Exception does not provide notice of what is required of a contractor to qualify for the exception. Accordingly, this argument does not support a claim asserting "void for vagueness."

Accordingly, the Good Faith Exception provides adequate notice of what is needed for that exception.

### iii.  Liquidated Damages Provision

The liquidated damages provision states that it will be triggered by "any failure to comply with this requirement and any service disruption as a result of a labor dispute."[164] NW Success argues that much of a union's conduct is out of a contractor's control, such that the contractor does not have fair notice of what will lead to liquidated damages. The provision is clear: in essence, it provides that if there is a failure to comply with the LPR and if service disruptions due to labor disputes result, that will trigger a liquidated damages provision, if the contract contains one. A contractor has control over its compliance with the LPR, and merely because the contractor may not be able to prevent its employees from striking, boycotting, or causing other service disputes does not mean that the contractor is not provided with clear notice of what conduct will cause liquidated damages. Therefore, this provision provides adequate notice.

### b.  Arbitrary Enforcement

A statute also can be void for vagueness under the Due Process Clause if it poses a "*significant* risk" of arbitrary enforcement.[165] As to the danger of arbitrary enforcement, NW Success argues that the Good Faith Exception lacks sufficient guidance and that the phrase "economic interference" is vague and overbroad, risking discriminatory application. As discussed above, "economic interference" is sufficiently clear and cabined to avoid arbitrary enforcement. Moreover, as discussed, the LPR sets forth a sufficient written standard governing

---

[164] ECF 1-1 at 4.

[165] *Skilling v. United States*, 561 U.S. 358, 412 (2010) (emphasis added); *see also Stoianoff v. Montana*, 695 F.2d 1214, 1222 (9th Cir. 1983) (rejecting vagueness challenge in absence of a "clear indication" that the challenged law would be enforced arbitrarily).

how the Mayor's Office is to determine whether a contractor meets the Good Faith Exception. NW Success emphasized in oral argument that the City's changed position—from granting the Good Faith Exception in 2023 to denying it in 2025—evidences the risk of arbitrary enforcement. Based on the facts currently alleged, however, the Court does not find that this change shows that the LPR poses a significant risk of arbitrary enforcement. Accordingly, NW Success fails to allege that the LPR is void for vagueness, and the Court grants the City's motion to dismiss this claim.

## CONCLUSION

The Court GRANTS the City's partial motion to dismiss (ECF 6). NW Success has leave to file an Amended Complaint within 14 days if it believes, consistent with Rule 11 of the Federal Rules of Civil Procedure, that it can cure the deficiencies identified in this Opinion and Order. The Court DENIES NW Success's Motion for Preliminary Injunction (ECF 8) because NW Success has not shown a likelihood of success on merits on the claims on which that motion is based, which are the same claims that are the subject of the City's partial motion to dismiss.

**IT IS SO ORDERED**.

DATED this 15th day of August, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge