Clifford S. Davidson, OSB No. 125378
csdavidson@swlaw.com
Drew L. Eyman, OSB No. 163762
deyman@swlaw.com
Jenna M. Teeny, OSB No. 244519
jteeny@swlaw.com
SNELL & WILMER L.L.P.
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
Telephone: 503.624.6800
Facsimile:  503.624.6888
Attorneys for Plaintiff Northwest Success, Inc.

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST SUCCESS, INC., an Oregon domestic nonprofit corporation,<br><br>        Plaintiff,<br><br>vs.<br><br>CITY OF PORTLAND, a municipal corporation,<br><br>        Defendant. | Case No. 3:25-CV-970-SI<br><br>RESPONSE TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT |

RESPONSE TO MOTION TO DISMISS FAC

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  NEW FACTS AS ALLEGED IN THE FIRST AMENDED COMPLAINT ........................ 2

    A.   The City led NW Success to believe that it would be eligible to apply for the next procurement, but NW Success was never informed about the procurement prior to its being awarded. ................................................................................ 2

    B.   The Oregon Forward Program is a highly regulated, set-aside market. ................. 3

    C.   The LPR and the City's enforcement of the LPR. .................................................. 4

III. LEGAL STANDARD ......................................................................................... 4

IV. ARGUMENT ..................................................................................................... 5

    A.   Claim 1: NLRA preemption ................................................................................... 5

        1.   The market participant exception does not apply. ......................................... 5

            a.   Prong 1: no efficient procurement – the City is not acting like a private business. ................................................................................... 5

                (1)   No private market ................................................................. 5

                (2)   No proprietary interest ......................................................... 8

                    (a)   The City unlawfully favors SEIU ............................ 8

                (3)   The City has not asserted any proprietary interest relevant to rehabilitative workers. ................................................. 10

            b.   Prong 2: not narrow in scope ................................................. 11

        2.   The FAC states a claim for NLRA Preemption ......................................... 12

            a.   The LPR is preempted under *Garmon*, which protects the NLRB's exclusive domain. .......................................................... 12

            b.   The LPR is also preempted under *Machinists*. ............................. 14

    B.   Claim 2: Unconstitutional vagueness ................................................................... 15

        1.   The Good Faith Exception is vague. ......................................................... 16

        2.   The Rejection Exception is vague. ........................................................... 17

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

C.    Claim 3: Promissory estoppel ............................................................. 19

    1.    Promissory Estoppel in general. ............................................. 19

    2.    Promissory estoppel against a governmental entity. ................................ 22

D.    Claim 4: Good faith and fair dealing .................................................. 25

E.    Leave to amend ........................................................................ 27

V.    CONCLUSION ............................................................................ 28

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arkansas Lighthouse for the Blind v. N.L.R.B.*,
   851 F.2d 180 (8th Cir. 1988) ................................................7

*Arken v. City of Portland*,
   351 Or. 113 (2011)................................................22

*Best v. U.S. Nat. Bank of Oregon*,
   303 Or. 557 (1987)................................................25, 27

*Bixler v. First Nat'l Bank of Or.*,
   49 Or. App. 195 (1980)................................................19

*Brevard Achievement Center, Inc.*,
   342 N.L.R.B. 982 (2004) ................................................10, 13

*Brown v. Portland School Dist. # 1*,
   291 Or. 77 (1981)................................................20

*Building & Construction Trades Council v. Associated Builders & Contractors of
   Mass./R.I., Inc.*,
   507 U.S. 218 (1993)................................................5, 11

*BWK, Inc. v. Dept. of Admin. Servs.*,
   231 Or. App. 214 (2009)................................................6

*Byers v. Wal-Mart Stores, Inc.*,
   No. 3:17-CV-00579-SB, 2017 WL 9049874 (D. Or. Oct. 2, 2017), *report and
   recommendation adopted*, No. 17-CV-579-SB, 2017 WL 6316636 (D. Or.
   Dec. 11, 2017)................................................20

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tex.*,
   180 F.3d 686 (5th Cir. 1999) ................................................11, 12

*Casala, LLC v. Kotek*,
   No. 3:25-CV-244-SI, 2025 WL 1442792 (D. Or. May 20, 2025) ................................................12

*Chamber of Com. of the United States of Am. v. City of Seattle*,
   890 F.3d 769 (9th Cir. 2018) ................................................14, 15

*Conservation Force v. Salazar*,
   646 F.3d 1240 (9th Cir. 2011) ................................................5

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

*Davis Mem'l Goodwill Indus., Inc. v. N.L.R.B.*,
  108 F.3d 406 (D.C. Cir. 1997) ....................................................................................11, 13

*E. Third St. Franklin, In re*,
  234 Or. 91 (1963) .................................................................................................................24

*Elliott v. Tektronix, Inc.*,
  102 Or. App. 388 (1990) .....................................................................................................25

*Ernst & Haas Mgmt. Co., Inc. v. Hiscox, Inc.*,
  23 F.4th 1195 (9th Cir. 2022) .............................................................................................5

*Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*,
  598 U.S. 771 (2023) ...........................................................................................................12

*Golden State Transit Corp. v. City of Los Angeles*,
  475 U.S. 608 (1986) ...........................................................................................................13

*Goodwill Indus. of S. California*,
  231 NLRB 536 (1977) ................................................................................................6, 7, 15

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ...........................................................................................................15

*Gund v. Marion Cnty.*,
  No. 6:24-CV-1448-MC, 2025 WL 1069585 (D. Or. Apr. 9, 2025).................................5

*Hum. Servs. Council of New York v. City of New York*,
  No. 21 CIV. 11149 (PGG), 2024 WL 4792004 (S.D.N.Y. Nov. 14, 2024) .............7

*Indep. Contractors Rsch. Inst. v. Dep't of Admin. Servs.*,
  207 Or. App. 78 (2006).........................................................................................................8

*Kraft v. Arden*,
  No. CV. 07-487-PK, 2008 WL 4866182 (D. Or. Nov. 7, 2008) ................................20, 21, 22

*Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin
  Emp. Rels. Comm'n*,
  427 U.S. 132 (1976)...........................................................................................................14

*Miller v. City of Portland*,
  255 Or. App. 771 (2013), *aff'd in part, rev'd in part*, 356 Or. 402 (2014) ............22

*Navarro v. Block*,
  250 F.3d 729 (9th Cir. 2001) .............................................................................................5

*Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Ltd. P'ship*,
  840 F. Supp. 770, 778-79 (D. Or. 1993), aff'd, 76 F.3d 1003 (9th Cir. 1996).................27

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

*Pilgrim Turkey Packers, Inc. v. Dep't of Revenue*,
    261 Or. 305 (1972)............................................................................................24

*Plan. & Design Sols. v. City of Santa Fe*,
    1994-NMSC-112, 118 N.M. 707, 885 P.2d 628 ............................................26

*Rothe v. Anchor QEA, LLC*,
    No. 3:22-CV-00992-IM, 2023 WL 4975760 (D. Or. Aug. 3, 2023) ....................21

*Ryder Sys.*,
    280 NLRB 1024 (1986), *enforcement granted sub nom. N.L.R.B. v. Ryder
    Sys., Inc.*, 842 F.2d 332 (6th Cir. 1988) .........................................................8

*San Diego Bldg. Trades Council v. Garmon*,
    359 U.S. 236 (1959)........................................................................................13

*San Manuel Indian Bingo & Casino & Hotel Emps. & Rest. Emps. Int'l Union,
    Clc & Commc'ns Workers of Am., Afl-Cio, Cfc, Party in Int. & State of
    Connecticut, Intervenor*,
    345 NLRB 1047 (2005) .....................................................................................8

*Schafer v. Fraser*,
    206 Or. 446 (1955).........................................................................................21

*Servs. Emps. Int'l v. Portland Habilitation Ctr., Inc.*,
    216 Or. App. 492 (2007)...................................................................................8

*Sessions v. Dimaya*,
    584 U.S. 148 (2018)........................................................................................16

*Sinai Hosp. of Baltimore, Inc. v. Nat'l Lab. Rels. Bd.*,
    33 F.4th 715 (4th Cir. 2022) .................................................................11, 13, 15

*State v. Vandepoll*,
    118 Or. App. 193 (1993)..................................................................................20

*U.S. Nat. Bank of Oregon v. Boge*,
    311 Or. 550 (1991).........................................................................................27

*Uptown Heights Assocs. Ltd. Partnership v. Seafirst Corp.*,
    320 Or. 638 (1995).........................................................................................27

*Vincent Const. & Insulation, Inc. v. Milton-Freewater Orchard Homes, Inc.*,
    No. CIV. 03-1207-BL, 2004 WL 817360 (D. Or. Apr. 12, 2004).........................21

*Wiggins v. Barrett & Associates, Inc.*,
    295 Or. 679 (1983)...............................................................................22, 23, 24

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

**Statutes**

ORS 279.850(1)(a)...........................................................................................................................5

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

# MEMORANDUM

## I.    INTRODUCTION

The City's labor peace requirement ("LPR") exclusively applies to contractors who employ individuals with disabilities through the Oregon Forward Program ("OFP"). The National Labor Relations Board ("NLRB") deems workers with disabilities whose employers provide rehabilitative services—such as ability-appropriate vocational training or coaching—exempt from the NLRA on a case-by-case basis. SEIU Local 49 ("SEIU") thus sought to bypass the case-by-case analysis through "in roads," which the City provided, into Oregon Forward contractors ("OFC"). The City worked closely and exclusively with SEIU to craft the LPR to do just that. But the Supremacy Clause bars the City's interference with the NLRB's reasoned judgment that rehabilitative employees are exempt from the NLRA.

Worse still, the LPR, and codified exceptions thereto, is sufficiently vague to allow for arbitrary and discriminatory enforcement. Here, the City demonstrated how that works in practice – granting NW Success an exception for this contract when SEIU refused to mediate (FAC at ¶ 14) and then, after SEIU complained, refusing to apply any exception when it was time to renew, extend, or put a new contract in place – despite SEIU refusing to arbitrate. But well-established void for vagueness principles of the federal due process clause protect against such arbitrary enforcement.

At the very least, Oregon common law requires recompense for the City's actions. The City's representations reasonably suggested that the City promised to exercise its discretion to apply the Good Faith Exception in good faith; that is, so long as NW Success substantially complied with that exception to the best of its ability. But after NW Success spent a significant amount of time and money complying with the City's requests, the City refused to even respond to NW Success' letter requesting a determination under the Good Faith Exception. Instead, the City unreasonably expected NW Success to schedule a unilateral arbitration despite SEIU's refusal to arbitrate and, when NW Success realized that's what the City wanted – to the surprise of both NW Success and the selected arbitrator – it requested a one-day extension of the City's

Page 1 – RESPONSE TO MOTION TO DISMISS FAC

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

arbitrary deadline to make that happen. The City refused to grant that one-day extension and, as a result, the contract will now expire. The doctrines of promissory estoppel, and the implied duty of good faith and fair dealing, protect against these unfair actions.

NW Success' First Amended Complaint ("FAC") states a claim for relief under the Supremacy Clause and Due Process Clause, and under common law contracting principles. The Court should deny the City's motion to dismiss.

## II.    NEW FACTS AS ALLEGED IN THE FIRST AMENDED COMPLAINT

NW Success hereby incorporates the fact statements of its response to Defendant's first motion to dismiss (ECF 24). Below, Plaintiff Northwest Success , Inc. ("NW Success") outlines several additional facts raised in its FAC.

In addition to an exception for whether a contractor makes a good faith effort to obtain a labor peace agreement (the "Good Faith Exception"), the LPR provides for another exception: when a labor organization rejects labor peace (the "Rejection Exception"). FAC at ¶ 12. After filing this action, NW Success accepted the City's offer to extend its current contract with NW Success (the "Contract") through November 21, 2025. FAC at ¶ 18.

### A.    The City led NW Success to believe that it would be eligible to apply for the next procurement, but NW Success was never informed about the procurement prior to its being awarded.

In an email dated May 28, 2025, the City assured NW Success that it "is eligible to apply for the regular procurement for the ongoing janitorial contract" (ECF 29) – as opposed to the emergency, gap-filling procurement. FAC at ¶ 33. Despite that assurance, in a sworn declaration filed in this case (ECF 19), City Administrator Michael Jordan (the "City Administrator") stated that he "approved running an emergency procurement of services, alongside a regular procurement, to fulfill the City's needs for janitorial services for its Parks." *Id*. The City selected Relay Resources for that emergency procurement, who SEIU represents. *Id*. Meanwhile, according to the City Administrator, "[t]he City simultaneously went through its normal procurement process, which included first seeking qualified contractors through the Oregon Forward program[.]" *Id*.

Page 2 – RESPONSE TO MOTION TO DISMISS FAC

The City Administrator's declaration (filed July 23, 2025) was the first time NW Success learned that regular procurement had occurred. FAC at ¶ 34. It is also the first time that the Oregon Forward Program Coordinator at Oregon's Department of Administrative Services ("DAS") heard of that supposed regular procurement. *Id*. Based on that regular procurement, the City Administrator said "[t]he City entered into an agreement with Relay Resources to begin the janitorial work which had been contracted to Northwest Success." *Id*.

**B.    The Oregon Forward Program is a highly regulated, set-aside market.**

The LPR does not apply to a discrete project but broadly regulates three entire industries for any City contract. FAC at ¶ 40. The City worded the LPR so that prospective City contractors in those three industries must enter into a labor peace agreement with SEIU. *Id*. In fact, public records reveal that the City was responsive to SEIU's request to enact the LPR in time for SEIU to capture an upcoming RFP for a janitorial contract. *Id*. The LPR applies solely to services that fall within the OFP. *Id.* at ¶ 44.

Unlike private parties who may contract as they please, the City's spending power in contracting for janitorial services is limited by the OFP. *Id.* at ¶¶ 41, 43. OFCs provide employment opportunities to workers with disabilities and are highly regulated by DAS. *Id*. These unique non-profits differ from other mission driven non-profits in that they do not employ workers to pursue an external mission (i.e., providing food or shelter to the needy); their workers themselves are the mission. *Id*.

The NLRA does not apply to workers who are in a primarily rehabilitative relationship with their employer. FAC at ¶ 45. According to the NLRB, these rehabilitative workers do not qualify as "employees" under the NLRA and, therefore, their employers have no obligation to bargain with unions. *Id*. The same is true for workers employed by OFCs, which were once called sheltered workshops and qualified rehabilitation facilities. *Id*. The NLRA applies to workers in private, competitive markets, places where rehabilitative workers and their employers do not operate. *Id.* at ¶ 46. Individuals with disabilities who perform janitorial work for non-profit entities operating under government programs are not statutory employees under the

Page 3 – RESPONSE TO MOTION TO DISMISS FAC

NLRA. *Id.* at ¶ 47.

A non-OFP janitorial procurement is more theory than practice. *Id.* at ¶ 48-49. NW Success is unaware of any janitorial procurement where the City has bypassed the OFP in favor of a contractor in the competitive market. *Id.* at ¶ 49. In addition, the LPR contains a codified and untailored liquidated damages provision. *Id.* at ¶ 51. That provision does not specify the basis or amount of damages – only that the liquidated damages "will" be imposed. *Id.* It is not a contract-by-contract liquidated damages provision negotiated based on the needs of the parties. *Id.*

C.    **The LPR and the City's enforcement of the LPR.**

The LPR allows unions to determine unilaterally who may contract with the City by their simple refusal to mediate or arbitrate. *Id.* at ¶ 56. Unions use that leverage to request unreasonable (and even unconstitutional) terms in a labor peace agreement. *Id.* Consequently, there is no way for a contractor to know ahead of time what will satisfy the LPR, including its exceptions, because the City has effectively delegated that authority to the unions. *Id.*

Neither the Rejection Exception nor the Good Faith Exception specifies what terms in a labor peace agreement may be standard or acceptable in the event dispute resolution fails between a contractor and a union. *Id.* at ¶ 57. The Rejection Exception does not specify what constitutes a labor organization's response "that they do not wish to negotiate Labor Peace." *Id.* And there is no guidance on what "good faith" in the Good Faith Exception means. *Id.* at ¶ 58. Further, "arbitration" is not objectively defined within the Good Faith Exception. *Id.* at ¶ 59.

Here, SEIU's refusal to participate in "arbitration" should have triggered either the Rejection Exception or the Good Faith Exception. FAC at ¶ 61. The City arbitrarily has applied the Good Faith Exception to NW Success, first by finding that NW Success met the exception for this same Contract in 2023 and then, in 2024, by refusing to determine whether the exception applied for this same Contract – and later taking the position that it does not apply. *Id.*

III.    **LEGAL STANDARD**

A 12(b)(6) motion merely challenges the sufficiency of the pleadings. *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011). In considering that motion, "all

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

material allegations of the complaint are accepted as true, as well as all reasonable inferences to be drawn from them." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "To survive a Rule 12 (b)(6) motion to dismiss, a complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief." *Gund v. Marion Cnty.*, No. 6:24-CV-1448-MC, 2025 WL 1069585, at *4 (D. Or. Apr. 9, 2025). "It is axiomatic that the motion to dismiss [for failure to state a claim] is viewed with disfavor and is rarely granted." *Ernst & Haas Mgmt. Co., Inc. v. Hiscox, Inc.*, 23 F.4th 1195, 1199 (9th Cir. 2022).

## IV.    ARGUMENT

### A.    Claim 1: NLRA preemption.

#### 1.    The market participant exception does not apply.

To qualify for the market participant exception, a local government must prove it is acting pursuant to a "purely proprietary interest" and that "analogous private conduct would be permitted." *Building & Construction Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 231-32 (1993) ("*Boston Harbor*"). In granting the City's motion to dismiss NW Success' initial complaint, this Court found that the City satisfied the market participant exception to NLRA preemption "under either prong of the *Cardinal Towing* test." ECF 36 at 14. NW Success offers additional argument below and hereby incorporates its arguments from its briefing in response to the City's motion to dismiss (ECF 24).

##### a.    Prong 1: no efficient procurement – the City is not acting like a private business.

###### (1)    No private market

The City is not participating in a private market. Instead, as state law requires, the City procures janitorial services through the OFP. ORS 279.850(1)(a) (procurement mandate). Private parties that seek to procure janitorial services are not subject to the requirements of the OFP. As the procuring party, therefore, the City is not acting like a private party when, like here, it applies the LPR to services it procures under the highly regulated and fundamentally non-competitive OFP. *See BWK, Inc. v. Dept. of Admin. Servs.*, 231 Or. App. 214, 216 (2009) (the OFP "requires

Page 5 – RESPONSE TO MOTION TO DISMISS FAC

public agencies to purchase products and services from a QRF, without procurement through the normal competitive selection process"). The LPR conspicuously applies solely to services within the OFP.

To be sure, the City can procure these three services from private contractors in the competitive market if no Oregon Forward contractor is available and capable of meeting the City's needs. But that hypothetical is more theory than practice. Five OFCs are presently certified by DAS to provide janitorial services to the City. FAC at ¶ 49. For the City to competitively bid a janitorial contract in the standard private market, therefore, all five of those OFCs must be unable or unwilling to meet the City's contracting needs. NW Success is unaware of any janitorial procurement in which the City has bypassed the OFP in favor of a contractor in the private competitive marketplace; NW Success expects discovery will show that either never or rarely has happened. FAC at ¶ 49.

In any event, NW Success' NLRA preemption claim narrowly challenges only the City's application of the LPR to OFCs. FAC at ¶ 48. In previously finding that the City satisfied prong 1, this Court held that "NW Success has not explained why the OFP creates a market that 'differs so markedly from other markets that the City cannot act in a 'proprietary' capacity when it enters into contracts' with Oregon Forward contractors." ECF 36 at 18. To be clear, it is the City's burden alone to satisfy prong 1. ECF 36 at 14 (opinion and order: "The government bears the burden of showing that the market participant exception applies."). Nonetheless, NW Success' FAC plausibly alleges that the OFP is not a private market.

To begin, the NLRB and courts have emphasized that rehabilitative workers are not part of a private market. *See Goodwill Indus. of S. California*, 231 NLRB 536 (1977) ("[Goodwill's] purpose is to provide rehabilitative work experience to persons whose physical, emotional, and social handicaps render them ineligible for work in private competitive industry.") (emphasis added); *Arkansas Lighthouse for the Blind v. N.L.R.B.*, 851 F.2d 180, 183 (8th Cir. 1988) ("The usual employer-employee relationship in our competitive marketplace is not present in these good faith efforts to employ the handicapped nor is the Union's normal objective of securing

Page 6 – RESPONSE TO MOTION TO DISMISS FAC

improved working conditions for the employees either necessary or productive of that objective."). That is why the NLRB has held that rehabilitative workers are not merely exempt from NLRA coverage but exempt from collective bargaining in general. *Id.* at 537–38 ("To permit collective bargaining in this context is to risk a harmful intrusion on the rehabilitative process by the Union's bargaining demands."); *id.* at 538 ("The collective-bargaining process, in short, is likely to distort the unique relationship between Employer and client and impair the Employer's ability to accomplish its salutary objectives."). Here, the City is not acting as a market participant when it applies the LPR to OFCs or to rehabilitative workers more generally. Indeed, the LPR does not contain any carve out for rehabilitative workers in the OFP. Just the opposite, the LPR applies <u>solely</u> to workers within the OFP.

The unique non-profits who provide employment opportunities to workers with disabilities through the OFP are highly regulated by DAS and differ from other mission driven non-profits in that they do not employ workers to pursue an external mission (i.e., providing food or shelter to the needy) but, rather, their workers themselves are the mission. FAC at ¶ 44; *See Arkansas Lighthouse for the Blind v. N.L.R.B.*, 851 F.2d 180, 185 (8th Cir. 1988) ("[T]he Lighthouse continues to operate because its goal is not to gain financially, but to help its employees by giving them a skill and a sense of self-worth."). Those unique facts distinguish cases in which a court has applied the market participant exception in the context of more typical nonprofits pursuing external missions. *See, e.g., Hum. Servs. Council of New York v. City of New York*, No. 21 CIV. 11149 (PGG), 2024 WL 4792004, at *20–21 (S.D.N.Y. Nov. 14, 2024). That is because those typical non-profit workers may very well be participating in private markets, while, in contrast, the entire purpose of the OFP is to create a set-aside, non-competitive market in which workers with disabilities, and the nonprofits who employ them, can participate. *See Servs. Emps. Int'l v. Portland Habilitation Ctr., Inc.*, 216 Or. App. 492, 495 (2007) ("Under the Oregon Products of Disabled Individuals Law (PDIL), contracts between public agencies and [OFCs] need not be based on competitive bids or proposals but, rather, can be entered at prices established by the Oregon Department of Administrative Services."); *Indep. Contractors Rsch.*

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

*Inst. v. Dep't of Admin. Servs.*, 207 Or. App. 78, 85 (2006) ("It was the legislature's policy choice . . . to direct certain state expenditures to [OFCs] instead of to other providers.").

**(2)     No proprietary interest**

**(a)     The City unlawfully favors SEIU**

NW Success alleges that the LPR funnels contractors to SEIU. FAC at ¶ 40. The City argues that this allegation is not relevant to NLRA preemption. ECF 42 at 12. Not so. This allegation, taken as true, shows that the City is not acting like a private company for purposes of the market participant exception. That is because a private company's favoring any one union in particular would constitute unlawful assistance under Section 8(a)(2) of the NLRA. GC Memorandum 20-13 (September 4, 2020) (unlawful assistance is anything "more than ministerial aid"); *Ryder Sys.*, 280 NLRB 1024, 1046 (1986), *enforcement granted sub nom. N.L.R.B. v. Ryder Sys., Inc.*, 842 F.2d 332 (6th Cir. 1988) ("[T]he totality of circumstances, including both prerecognition and postrecognition conduct, must be considered in determining whether an employer has rendered unlawful assistance to a union."); *see, e.g., San Manuel Indian Bingo & Casino & Hotel Emps. & Rest. Emps. Int'l Union, Clc & Commc'ns Workers of Am., Afl-Cio, Cfc, Party in Int. & State of Connecticut, Intervenor*, 345 NLRB 1047, 1048 (2005) ("By rendering aid, assistance, and support to [one union] and denying [a different union] access to its facility and employees on an equal or equivalent basis with the access granted to [the favored union], the Respondent has engaged in unfair labor practices affecting commerce within the meaning of Section 8(a)(2).").

NW Success' allegations and reasonable inferences therefrom plausibly suggest that the City's actions at issue, and the LPR itself, favor SEIU over other unions:

- The Labor Peace Requirement resulted from several meetings between the City and SEIU. Indeed, SEIU was the only stakeholder involved in creating the Labor Peace Requirement. FAC at ¶ 10. It is reasonable to infer from that allegation that the City deliberately favored SEIU alone.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

- SEIU is the only local union that represents workers in all three industries to which the LPR applies. FAC at ¶ 40. It is reasonable to infer from that allegation that the LPR covers those three industries because doing so favors SEIU alone.

- A City policy director was responsive to SEIU's request to enact the LPR in time for SEIU to "capture" an upcoming "RFP" for a janitorial contract. FAC at ¶ 40. It is reasonable to infer from that allegation that the LPR favors SEIU alone.

- A City policy director stated that the LPR "allows unions to build in roads into non-unionized shops with an assurance that employers won't stand in the way of unionization efforts (Don't include in public message)." FAC, Ex. 1. It is reasonable to infer from that allegation that the LPR is designed to make it easier for SEIU to organize workers that it otherwise has a difficult time organizing.

The above allegations, and reasonable inferences therefrom, plausibly suggest that the LPR favors SEIU.

The City says NW Success' allegation that SEIU is the only local union that represents workers in all three industries is not factually accurate. ECF 42 at 6 n. 3. That is because, the City says, "even a cursory search of the Internet [sic] yields that other unions representing workers in these industries have a local Portland branch." *Id.* That is misguided for several reasons. First, the unions that the City points to each represent workers in only <u>one</u> of the three industries covered by the LPR. In contrast, what NW Success alleged is that SEIU is "the only local union that represents workers <u>in all three industries</u>," FAC at ¶ 40 (emphasis added), which matters because it shows the City wanted to help SEIU capture all three.

Second, the City's factual argument is unsupported and impermissible at the pleadings stage. An internet search does not identify these other unions as having a Portland presence in the LPR-covered services: (1) the website for Industrial Workers of the World's Portland branch says nothing about janitorial workers[1], (2) UFCW 3000's website identifies a laundry union

---

[1] https://www.portlandiww.org/

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

presence only in "north-east Oregon"[2] and the other laundry union (Unite Here Local 8) represents laundry workers only in Washington[3], and (3) United Federation LEOS-PBA appears to be a Washington, D.C.-based security union whose Oregon website does not identify any Oregon presence, other than inviting Oregon security workers to contact them to learn more.[4] In any event, this factual issue is appropriate for the summary judgment stage, not the present motion to dismiss stage.

NW Success' allegations, taken as true, state that the LPR conditions contracting with the City on first negotiating an LPA with SEIU. For this additional reason, the City is not acting like a private contractor and, therefore, cannot satisfy its prong 1 burden at this early stage.

(3)    **The City has not asserted any proprietary interest relevant to rehabilitative workers.**

The LPR states that the City has "proprietary interests in avoiding picketing, work stoppages, boycotting, strikes and other economic interference with the performance of" the three covered services. But rehabilitative workers cannot collectively bargain, so none of those concerns would occur with that group of workers. Accordingly, the City's stated proprietary interests have nothing to do with rehabilitative workers that provide janitorial, laundry, or security services.

The vast majority, if not all, of the workers within the OFP likely qualify as rehabilitative workers. *See, e.g., Brevard Achievement Center, Inc.*, 342 N.L.R.B. 982, 982 (2004) ("[W]e conclude . . . that the disabled [janitorial] workers at the Employer's facility are not 'employees' within the meaning of [the NLRA].");  *Davis Mem'l Goodwill Indus., Inc. v. N.L.R.B.*, 108 F.3d 406 (D.C. Cir. 1997) (finding disabled janitorial workers are "in a primarily rehabilitative relationship" with their employer). The City's asserted proprietary interests have nothing to do with Oregon Forward contractors that employ rehabilitative workers. The City points to SEIU's

---

[2] https://ufcw3000.org/laundries-and-textiles-union
[3] https://www.unitehere8.org/food-production-textile-workers/
[4] https://www.securityguardunionoregon.com/building-service-security-union-oregon-united-federation-leos-pba-or

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

representation of Relay Resources as suggesting that not all Oregon Forward contractors have a rehabilitative relationship with their employees. ECF 42 at 9. That is of no consequence because the NLRB determines rehabilitative status on a case-by-case basis and the City offered nothing to suggest the NLRB has even examined Relay Resource's situation. *See Goodwill Indus.*, 108 F.3d at 410 (recognizing that case by case approach is applied to determination of employee status because "in the rehabilitation setting the employer may . . . safeguard employee interests more effectively than a union").

Even if Relay Resources is somehow not in a rehabilitative relationship with its employees, that does not necessarily mean that NW Success is not either. *See Sinai Hosp. of Baltimore, Inc. v. Nat'l Lab. Rels. Bd.*, 33 F.4th 715, 727 (4th Cir. 2022) (Niemeyer, J., concurring) ("I would approach this case — and any case involving disabled workers employed pursuant to the Javits-Wagner-O'Day Act — with a strong presumption that the employees are engaged in a rehabilitative employment relationship with their employer and are therefore not entitled to the NLRA's collective bargaining guarantees."). At the very least, issues of fact remain about the rehabilitative status of OFCs, generally, and NW Success, specifically, which precludes dismissal on the pleadings.

### b.     Prong 2: not narrow in scope

To qualify for the market participant exception, the City must have "no interest in setting policy." *Boston Harbor*, 507 U.S. at 229; *see Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tex.*, 180 F.3d 686, 691 (5th Cir. 1999) (the "law has traditionally recognized a distinction between regulation and actions a state takes in a proprietary capacity—that is to say, actions taken to serve the government's own needs rather than those of society as a whole."). This "proprietary interest" requirement prevents the City from leveraging its procurement power as pretext to serve its broader regulatory interest. *Cardinal Towing*, 180 F.3d at 691 ("When, however, a state attempts to use its spending power in a manner tantamount to regulation, such behavior is still subject to preemption.") (internal quotations omitted).

Page 11 – RESPONSE TO MOTION TO DISMISS FAC

As explained above, because rehabilitative workers have no collective bargaining rights, the City has <u>no proprietary interest</u> in subjecting this group of workers to an LPA. Simply put, applying the LPR to rehabilitative workers does nothing to advance the City's asserted proprietary interests. If the City truly had no interest in setting policy, it could simply include an exception for rehabilitative workers in the LPR, which it did not.

NW Succes' allegations, and reasonable inferences therefrom, plausibly suggest that the LPR does not serve a propriety interest of the City. That is sufficient to get past the market participant exception at the pleadings stage. This Court should then move on to whether NW Success has stated a claim of NLRA preemption under either *Garmon* or *Machinists* – which it has, as explained in the next section.

### 2.    The FAC states a claim for NLRA Preemption

The NLRA establishes an exclusive federal framework for regulating labor relations in the private sector. Through two complementary doctrines—*Garmon* and *Machinists* preemption—Congress and the courts have ensured that the delicate balance between labor and management is not distorted by local experimentation. *Garmon* preemption protects the NLRB's authority to interpret and enforce the Act; *Machinists* preemption safeguards Congress's decision to leave certain conduct wholly unregulated, governed instead by the free play of economic forces. Both doctrines apply here, and either is sufficient to render the City's ordinance invalid. Accordingly, NW Success has stated a claim of NLRA preemption.

### a.    The LPR is preempted under *Garmon*, which protects the NLRB's exclusive domain.

"Garmon preemption is 'unusual' in its breadth." *Casala, LLC v. Kotek*, No. 3:25-CV-244-SI, 2025 WL 1442792, at *4 (D. Or. May 20, 2025) (quoting *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023)). It prohibits states and municipalities from regulating conduct that the NLRA protects, prohibits, or arguably protects or prohibits. *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 613 (1986). The NLRA does more than establish substantive labor rules; it "confide[s] primary interpretation and

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

application of its rules to a specific and specially constituted tribunal"—the NLRB. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 242 (1959) (citation omitted). The doctrine's purpose is to prevent state or local interference with the Board's interpretation and enforcement of the integrated federal scheme. Id. at 243.

The City contends that Garmon preemption is inapplicable because "the NLRA neither protects nor prohibits union activity related to rehabilitative employees." ECF 42 at 14. It cites cases addressing agricultural laborers, domestic workers, and public employees—groups Congress expressly excluded from § 2(3) of the Act. But that reasoning fails for two reasons.

First, unlike those other groups of workers, § 2(3) does not mention "rehabilitative workers." Their status arises not from congressional text but from the NLRB's own interpretation of the Act. The NLRB affirmatively declines to assert jurisdiction over such workers because, as it explained, "in the rehabilitation setting the employer may . . . safeguard employee interests more effectively than a union." *Goodwill Indus.,* 108 F.3d at 410. Whether particular workers are rehabilitative is never presumed, it is adjudicated.[5] *Sinai Hospital of Baltimore, Inc.*, 33 F.4th 715. Thus, the treatment of agricultural, domestic, and public workers—each expressly excluded by Congress—has no bearing here.

Second, the City's LPR directly invades the NLRB's interpretive and enforcement authority. The ordinance (1) regulates all OFCs without regard to whether their workers are rehabilitative, thereby enabling unions to organize a class of workers whom the NLRB has

---

[5] Regarding NW Success, courts and the NLRB have repeatedly found that individuals with disabilities performing janitorial work for non-profit entities operating under government programs are rehabilitative workers. *See, e.g., Brevard Achievement Center, Inc.*, 342 N.L.R.B. at 982 ("[W]e conclude . . . that the disabled [janitorial] workers at the Employer's facility are not 'employees' within the meaning of [the NLRA]."); *Sinai Hospital of Baltimore, Inc.*, 33 F.4th at 727 (Niemeyer, J., concurring) ("The [Javits-Wagner-O'Day Act] and its implementing regulations *mandate* a rehabilitative – not economic – relationship between the employer nonprofit agencies and their disabled employees, requiring that the agencies, for example, deliver the majority of their services through disabled persons unable to participate in 'normal competitive employment[.]'") (emphasis in original); *Davis Mem'l Goodwill Indus., Inc. v. N.L.R.B.*, 108 F.3d 406 (D.C. Cir. 1997) (finding disabled janitorial workers are not statutory employees under the NLRA).

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

deemed best served by rehabilitative—not representational—relationships; and (2) vests the Mayor's Office with exclusive authority to determine whether a contractor qualifies for an exception, injecting local officials into questions reserved for the NLRB. By authorizing City officials to decide what constitutes compliance with labor-peace obligations, the LPR replaces the NLRB's unified regulatory framework with a municipal one. That is precisely what *Garmon* preemption forbids.

        **b.**        **The LPR is also preempted under *Machinists*.**

*Machinists* preemption forbids both the NLRB and the states from regulating conduct that Congress intended to leave unregulated—"to be controlled by the free play of economic forces." *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin Emp. Rels. Comm'n*, 427 U.S. 132, 140 (1976). The City argues that because the NLRB declines jurisdiction over rehabilitative workers, states and municipalities remain free to legislate in that space. It relies on *Chamber of Com. of the United States of Am. v. City of Seattle*, 890 F.3d 769 (9th Cir. 2018) ("*Seattle*"), asserting that the Ninth Circuit "has already determined that *Machinists* preemption does not apply in a nearly identical scenario." That reading of *Seattle* is incorrect.

*Seattle* concerned statutory exclusions, not rehabilitative workers. It addressed independent contractors, a category Congress explicitly excluded from the definition of "employee" in § 2(3). The Ninth Circuit held that "the fact that a group of workers is excluded from the definition of 'employee' in § 152(3), <u>without more</u>, does not compel a finding of *Machinists* preemption." *Id.* at 793 (emphasis added). Citing cases on agricultural laborers—another group expressly excluded—the court reasoned that where Congress itself "has chosen not to create a national labor policy in a particular field, the states remain free to legislate as they see fit." *Id.*

This case is entirely different. NW Success does not rest on a statutory exclusion. The "rehabilitative employee" classification is not found in § 2(3) at all—it arises from the NLRB's case-by-case application of the Act. *Seattle*'s qualifying phrase—"without more"—is pivotal. This case presents the "more."

Page 14 – RESPONSE TO MOTION TO DISMISS FAC

The "more" lies in the NLRB's policy rationale itself. The NLRB has determined that in the rehabilitation setting, introducing collective bargaining can disrupt the therapeutic purpose of the program. *Goodwill Indus. of S. California*, 231 NLRB 536, 537 (1977) ("To permit collective bargaining in this context is to risk a harmful intrusion on the rehabilitative process."); *id.* at 538 ("The collective-bargaining process … is likely to distort the unique relationship between employer and client."); *Sinai Hospital of Baltimore, Inc.*, 33 F.4th at 729 (Niemeyer, J., concurring). When the NLRB declines jurisdiction for that reason, it does not merely abstain—it makes a policy choice: that such relationships should remain free from union interference and governed by the employer's rehabilitative mission. The City's ordinance overturns that choice. By compelling OFCs to enter into labor-peace agreements with unions, it re-regulates precisely the area that federal labor policy deliberately left unregulated.

At this stage, NW Success need only allege a plausible *Machinists* theory, not prove it. Because the Complaint plausibly claims that the LPR intrudes on a field the NLRB has deliberately left free from union interference the motion to dismiss should be denied.

### B.     Claim 2: Unconstitutional vagueness.

In addition to the arguments presented below, NW Success hereby incorporates its arguments from its briefing in response to the City's initial partial motion to dismiss (ECF 24).

The LPR violates the due process clause of the Fourteenth Amendment to the Federal Constitution in that it is unconstitutionally vague. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Vague laws are invalid both because of a lack of fair notice and due to arbitrary and discriminatory enforcement. *Sessions v. Dimaya*, 584 U.S. 148, 155-56 (2018). The LPR can be void for vagueness "if it poses a '*significant* risk' of arbitrary enforcement." ECF 36 at 35 (opinion and order). As the FAC shows, the LPR's codified exceptions are ripe for arbitrary and discriminatory enforcement. The Rejection Exception and the Good Faith Exception, individually and together, lack the precision and guidance necessary

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

to ensure that those enforcing the requirements do not act in an arbitrary or discriminatory manner. Indeed, NW Success alleges such enforcement occurred here.

### 1. The Good Faith Exception is vague.

In its order granting the City's initial motion to dismiss, this Court explained that the Good Faith Exception, standing alone, is not impermissibly vague because it expressly requires participation in arbitration, which NW Success did not do. ECF 42 at 39. That is because the other necessary party to that arbitration, SEIU, refused to arbitrate. FAC at ¶ 80. Accordingly, the City's position was that "arbitration" can mean the participation of fewer than two parties. That renders the term vague and subject to arbitrary application. As the City now acknowledges, when it comes to arbitration, it takes two to tango. *See* ECF 42 at 17 ("the expectation was for the <u>parties</u> to engage in arbitration") (emphasis added). NW Success did everything in its power to comply with the City's "expectation" that it arbitrate with SEIU if mediation failed. Any suggestion the City makes to the contrary is incorrect and, in any event, improper at the pleadings stage where the Court accepts NW Success' factual allegations and reasonable inferences as true. *Compare* ECF 42 at 18 (". . . NW Success simply had not acted upon that notice") *with* FAC ¶¶ 19-26 (outlining the numerous steps NW Success undertook to pursue arbitration with SEIU). The problem is that the LPR and its exceptions are so impermissibly vague, that SEIU can and did control the outcome of the exception process by simply refusing to join the dance.

After NW Success realized that the City was defining "arbitration" as meaning that NW Success needed to schedule arbitration with SEIU regardless of SEIU's participation (to the surprise of both NW Success and the selected arbitrator – FAC at ¶ 26), NW Success requested a one-day extension of the City's self-imposed arbitrary deadline so that it could do just that. FAC at ¶ 29. The City arbitrarily denied that request without explanation and, instead, apparently decided that NW Success failed to comply with Good Faith Exception – or any exception. *Id.* at ¶ 30. The City did so despite the lack of any time limitations in the Good Faith Exception. What's more, despite the City's supposed "crunch time" for NW Success to complete the

exception process, NW Success remains on the Contract to this day, and will continue to work the Contract through November at the City's request. FAC at ¶ 18. A single-day extension, therefore, would not have prejudiced the City in any way; the City's rejection was completely arbitrary.

In sum, the City's imposition of an arbitrary time limit, insistence that a single party can participate in arbitration, and arbitrary denial of NW Success' request to extend that arbitration time limit by a single day demonstrates the City's arbitrary and discriminatory enforcement of the Good Faith Exception. NW Success has stated a due process claim.

## 2.    The Rejection Exception is vague.

Even if NW Success somehow did not qualify for the Good Faith Exception, it should at least have qualified for the Rejection Exception. Put another way, if SEIU's refusal to participate in arbitration doomed the Good Faith Exception, then that refusal should have meant that NW Success met the Rejection Exception. Indeed, in its motion to dismiss, the City did not contend that SEIU's refusal to participate in arbitration wasn't a rejection of labor peace – because unions will rarely, if ever, expressly state that they do not wish to negotiate labor peace. Here, for example, SEIU requested that the parties return to mediation rather than proceed to arbitration. FAC at ¶ 22. The City appears to agree with NW Success that SEIU's refusal to submit to arbitration qualifies as a rejection. *See* ECF 42 at 20 ("[T]he exception is meant to capture the scenario where a labor organization simply has no interest in negotiating such an agreement."). But the City says the Rejection Exception did not apply because (1) NW Success was outside the three-week-from-notification timeline required to qualify for the Rejection Exception and (2) NW Success did not request that specific exception. These arguments themselves demonstrate that the Rejection Exception is vague enough to invite arbitrary or discriminatory enforcement.

First, the City says that because SEIU communicated its rejection more than three weeks after NW Success initially contacted them, the Rejection Exception does not apply. In their words,

> "the Rejection Exception is readily understood to mean that, when a contractor
> provides notice to local labor organizations about the desire to negotiate labor

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

> peace, and the labor organization(s) respond within the three-week timeline that they do not wish to negotiate labor peace, then the Rejection Exception is met. With this understanding in mind, it makes sense why the City did not determine NW Success met the Rejection Exception—NW Success was outside the three-week-from-notification timeline, and therefore, the Rejection Exception was inapplicable to the circumstances."

ECF 42 at 19-20. To begin, the text of the Rejection Exception does not contain any such three-week rejection requirement. To be sure, the Rejection Exception requires the contractor to follow the notification procedures set out in Exception 1, and that exception provides that a Contractor need not obtain an LPA if no labor organization responds within three-weeks of notification. But the Rejection Exception does not incorporate the three-week response requirement. Rather, it expressly incorporates only the "notification procedures" – that is, "written notice to any and all labor organizations that represent employees providing similar services in the states of Oregon or Washington . . . of [the contractor's] desire to jointly develop Labor Peace[.]" FAC, Ex. 2 at 1. Nonetheless, according to the City, if a union responds within three weeks but does not reject labor peace within those three weeks, then the Rejection Exception is off the table. That is completely arbitrary. Indeed, the City does not even attempt to justify that supposed three-week rejection requirement. This further shows that the Rejection Exception is vague enough to be subject to arbitrary and discriminatory enforcement against prospective contractors.

Second, the City refused to even determine whether NW Success met the Good Faith Exception, so it should not be heard to now complain that NW Success did not specifically request the Rejection Exception. NW Success wrote to the Mayor's office requesting a determination that it met the Good Faith Exception. FAC at ¶ 31, Ex. 5. But the Mayor's office declined to respond to that letter. *Id.* That is, the Mayor's office did not even determine whether NW Success satisfied the exception. FAC at ¶ 72. That silence is an arbitrary exercise of discretion. For that reason, the City's attempt to fault NW Success for not also requesting a determination under the Rejection Exception should be rejected. ECF 42 at 19 n. 4. Indeed, nothing in the LPR requires a prospective contractor to affirmatively request any specific exception. The City's motion to dismiss should be denied as to the void for vagueness claim.

Page 18 – RESPONSE TO MOTION TO DISMISS FAC

### C.    Claim 3: Promissory estoppel

NW Success first alleges that the City expressly or impliedly promised that NW Success' Contract would be renewed or extended if it complied with the Good Faith Exception. FAC ¶ 67. But, after NW Success spent many of thousands of dollars pursuant to the City's expressed "expectations" (*id.* at ¶ 67), the City declined to even determine <u>whether</u> NW Success satisfied the Good Faith Exception and, instead, allowed its Contract to lapse. *Id.* at ¶ 72. Second, NW Success further alleges that, once the City determined it would allow NW Success' Contract to expire, it promised NW Success that it "is eligible to apply for the regular procurement for the ongoing janitorial contract[.]" FAC at ¶ 33. The City did not uphold that promise either, instead awarding that regular procurement to a different contractor without any notice to NW Success or, for that matter, to DAS, which runs the OFP. FAC at ¶ 34. These allegations state a claim for promissory estoppel.

### 1.    Promissory Estoppel in general.

The elements of promissory estoppel are: "(1) a promise; (2) which the promisor, as a reasonable person, could foresee would induce conduct of the kind that occurred; (3) actual reliance on the promise; and (4) a substantial change in position by the party seeking to enforce the promise." *Bixler v. First Nat'l Bank of Or.*, 49 Or. App. 195, 199 (1980). Of these four elements, the City takes issue only with the first one, arguing that it never made any promise. As alleged, NW Success relied on the City's representations that, if NW Success complied with the LPR's Good Faith Exception to the best of its ability, NW Success would be eligible to extend its janitorial Contract with the City. FAC at ¶¶ 67-68. At the very least, the City promised to at least determine whether the Good Faith Exception applies, which it declined to do.

For its part, the City argues that "it is obvious the City is not making any 'promise'" when it communicated its "expectation" that NW Success would pursue the Good Faith Exception. ECF 42 at 21. That is certainly the City's position, but that cannot be determined as a matter of law; rather, whether the City communicated a promise is a question of fact inappropriate for the pleadings stage. *See Byers v. Wal-Mart Stores, Inc.*, No. 3:17-CV-00579-

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

SB, 2017 WL 9049874, at *6 (D. Or. Oct. 2, 2017), *report and recommendation adopted,* No. 17-CV-579-SB, 2017 WL 6316636 (D. Or. Dec. 11, 2017) (allegation of resignation based on employer's statement that there was no longer a job available is sufficient to state a claim for promissory estoppel); *Kraft v. Arden*, No. CV. 07-487-PK, 2008 WL 4866182, at *11 (D. Or. Nov. 7, 2008) ("[A] question of fact exists regarding the existence of a promise.").

Moreover, NW Success does not rely on the City's "expectation" letter alone. The City continued to actively oversee NW Success' compliance with each step required to meet the Good Faith Exception. FAC at ¶¶ 67-69. Indeed, the City's need to engage in an <u>emergency</u> procurement, upon declining to renew NW Success' Contract, suggests that all parties understood that the City had promised to renew the Contract if NW Success complied with the Good Faith Exception to the best of its ability. To the extent the City insists that NW Success did not comply with the Good Faith Exception because SEIU refused to arbitrate, that violates the doctrine of substantial compliance. *See State v. Vandepoll*, 118 Or. App. 193, 196 (1993) (quoting *Brown v. Portland School Dist. # 1*, 291 Or. 77, 81 (1981)) ("The doctrine of substantial compliance is used by Oregon courts 'to avoid the harsh results of insisting on literal compliance with statutory notice provisions where the purpose of these requirements has been met.'"). Worse still, the City promised NW Success it could apply for the next contract for janitorial services – that did not happen either. Those allegations sufficiently allege a promise satisfying the first element of promissory estoppel. Whether the alleged representations ultimately constitute a promise is a question of fact inappropriate for the pleadings stage.

The City does not dispute that NW Success reasonably and foreseeably relied on the City's representations to its detriment, expending many thousands of dollars on attorney fees and incurring opportunity costs including time away from its nonprofit mission. FAC at ¶¶ 70-71. Those allegations, taken as true, satisfy the third and fourth elements of promissory estoppel. *See Rothe v. Anchor QEA, LLC*, No. 3:22-CV-00992-IM, 2023 WL 4975760, at *7 (D. Or. Aug. 3, 2023) (reliance is a question of fact for the jury) (citing *Schafer v. Fraser*, 206 Or. 446, 481 (1955)). For example, in *Vincent Const. & Insulation, Inc. v. Milton-Freewater Orchard Homes,*

Page 20 – RESPONSE TO MOTION TO DISMISS FAC

*Inc.*, No. CIV. 03-1207-BL, 2004 WL 817360 (D. Or. Apr. 12, 2004), this Court found that, because the plaintiff, a bidder on a construction project, reasonably and foreseeably relied to its detriment on certain "Invitation to Bid" materials published by the defendant, promissory estoppel applied, which required the defendant to evaluate all bids by the criteria stated in the bid documents and the applicable legal requirements. *Id.* at *7. So too here, NW Success reasonably, foreseeably, and detrimentally relied on the City's representations and actions throughout the renewal negotiation process and the published text of the LPR. Those representations and actions communicated that if NW Success complied with the requirements of the Good Faith Exception, then it would be eligible to continue its Contract with the City or to bid on the next contract. NW Success incurred substantial costs complying with the City's requests. All that remained was for SEIU to agree to arbitrate. Despite NW Success' compliance, the City refused to say whether NW Success had met the Good Faith Exception, let NW Success' Contract expire, engaged in an emergency procurement, and prohibited NW Success from bidding on the next contract. That is precisely the scenario to which promissory estoppel applies.

As for the second element, it is reasonably foreseeable that a government entity's communications about expectations for its contractor would induce the contractor to act in accordance with those stated expectations. *See Kraft*, 2008 WL 4866182, at *11 ("Oregon courts have upheld promissory estoppel claims arising from indefinite promises made by employers to their employees," including findings that "employees foreseeably relied on their employers' promises by taking or remaining on the job"). NW Success' reliance on the City's representations was especially reasonable here because NW Success underwent the same process in 2023. FAC at ¶¶ 14-17. It is also reasonably foreseeable because the City set a deadline and established criteria through the LPR. *See cf. Kraft*, 2008 WL 4866182, at *12 (reliance not reasonably foreseeable where alleged promisor "set no criteria or deadline for Kraft Piano to assume an exclusive distributorship"). Given the parties' prior course of performance and course of dealing, NW Success' reliance on both (i) the City's representations throughout their contract renewal negotiations, and (ii) the plain text of the LPR, was reasonable and foreseeable. Further,

Page 21 – RESPONSE TO MOTION TO DISMISS FAC

it was reasonably foreseeable that NW Success (or any other contractor) would expect that its willingness to participate and schedule arbitration would constitute compliance with the Good Faith Exception – regardless of SEIU's intransigence. What is not reasonably foreseeable is that the City would require a contractor to unilaterally set an arbitration date with SEIU despite their refusal to arbitrate and notwithstanding the understandable confusion and hesitation of a would-be arbitrator, sit at an empty table, and wait for SEIU to no-show to qualify for the Good Faith Exception. FAC at ¶¶ 24-28. Accordingly, NW Success has stated a claim for promissory estoppel.

### 2.    Promissory estoppel against a governmental entity.

"[P]romissory estoppel can, in limited circumstances, be applied to governmental entities." *Miller v. City of Portland*, 255 Or. App. 771, 789 (2013), *aff'd in part, rev'd in part*, 356 Or. 402 (2014). When applying it, Oregon courts have evaluated the essential elements of a promissory estoppel claim, discussed above, alongside any relevant apparent authority factors from *Wiggins v. Barrett & Associates, Inc.*, 295 Or. 679 (1983) ("Wiggins"). *Arken v. City of Portland*, 351 Or. 113, 138–39 (2011) (so stating). The City's motion to dismiss seems to suggest that all five of the *Wiggins* factors always apply to every promissory estoppel claim against a government entity. That is incorrect.

*Wiggins* primarily concerned apparent authority. That does not mean, as the City suggests, that the *Wiggins* factors <u>must</u> be applied to promissory estoppel claims against a municipality. In fact, the Oregon Supreme Court has held the opposite. *Arken*, 351 Or. at 139 ("[N]ot every one of the circumstances noted in *Wiggins* will necessarily be required in every case to conclude that promissory estoppel may appropriately be applied to a governmental entity."). The *Wiggins* factors are not mandatory and their application to a given case depends on the underlying facts.

The *Wiggins* factors do not apply here. Courts apply the *Wiggins* factors to determine whether a municipality can "be bound by the promise of its agent acting beyond the scope of his actual authority." *Wiggins*, 295 Or. at 683. But NW Success does not allege that the City's agent

Page 22 – RESPONSE TO MOTION TO DISMISS FAC

(the City Attorney's Office) acted outside the scope of their actual authority. That is, NW Success does not allege that <u>the City Attorney's Office</u> made a promise on which it relied. Instead, NW Success alleges that it relied on promises <u>from the City</u>, which happened to be communicated through the City Attorney's Office. Surely the City Attorney's Office has actual authority to communicate the City's position and directives, nor does the City argue to the contrary.[6] Otherwise, no one could ever rely on the City's position or directives when communicated through the City Attorney's Office. At the very least, a question of fact exists about whether the City Attorney's Office was authorized by the City (including, where necessary, the Mayor's Office or its delegee) to make the communications at issue here about the City's position and directives. That issue of fact defeats the City's motion to dismiss.

In any event, NW Success' allegations satisfy the relevant *Wiggins* factors. First, the City clothed the City Attorney's Office with apparent authority to communicate the City's position on its contracting process and, pursuant to the City's direction, to communicate the practical application of the LPR and its exceptions. Indeed, the City Attorney's Office has been NW Success' principal point of contact with the City for the Good Faith Exception process at issue here. FAC at ¶ 70. Reliance on that apparent authority was reasonable given that the City Attorney's Office is the City's counsel, who presumably has the City's authority.

Second, it is undisputed that the City has the authority to direct and determine the exception process and to decide whether to award exceptions. Again, NW Success does not allege that the City Attorney's Office had authority to enter into a promise to grant the Good Faith Exception, only that the City Attorney's Office, acting as the City's agent, communicated <u>the City's position</u> by seeking approval from the City prior to providing directives to NW Success.

Both apparent authority and promissory estoppel "are employed to prevent one from proving an important fact to be something other than what by act or omission he has led another

---

[6] For this reason, the City's citations to Section 8-104 of the City's Charter and Section 3.06.020 of the City's Code are irrelevant. ECF 42 at 22-23.

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800

party justifiably to believe." *Wiggins*, 295 Or. at 689 ("Both doctrines rest upon principles of good faith and honesty and the notion that one should not be able to take advantage of the falsity of what he has led another to believe to be true."). At the very least, it was not unreasonable for NW Success to presume that the City Attorney's Office had authority to act on the City's behalf throughout the process, up to the point that pens hit paper to execute the final contract. Accordingly, the City should be estopped from denying what it led NW Success to believe to be true: that NW Success' efforts to comply with the Good Faith Exception (1) would result in a final decision and (2) that the City would grant the exception if NW Success complied with the requirements to the best of its ability and under an objectively reasonable standard. FAC at ¶ 72. *See Pilgrim Turkey Packers, Inc. v. Dep't of Revenue*, 261 Or. 305, 310 (1972) (holding that where the taxing authority was responsible for misleading a reasonable taxpayer into relying upon certain forms it should be estopped from denying an exception on that basis).

The City also points to the final *Wiggins* factor, which requires that a municipality has accepted and retained a benefit. That factor is not applicable to the specific circumstances here. As discussed above, the Oregon Supreme Court has explained that not every one of the circumstances noted in *Wiggins* will necessarily be required to conclude promissory estoppel may be applied to a government entity. *See, e.g., E. Third St. Franklin, In re*, 234 Or. 91, 103 (1963) (holding, without considering whether a benefit was conferred upon the city, that the City of Bend was estopped from barring the plaintiff's objections to an assessment due to the city's inconsistent communications about how to file and present objections). Given the foregoing precedent, no benefit to the City is required in this context. Regardless, the City did receive a benefit: compliance (or at least substantial compliance) with its Good Faith Exception that it "expected" NW Success to comply with. NW Success' actions in compliance with the City's "expectation" enabled the City to simply continue contracting with NW Success rather than procure the same services from a different contractor and the attendant costs that go along with that. Unfortunately, the City decided it would no longer determine compliance. If the City did not receive any benefit, that is due to its own decisions. NW Success meets the *Wiggins* factors

Page 24 – RESPONSE TO MOTION TO DISMISS FAC

to the extent they even apply here.

**D.     Claim 4: Good faith and fair dealing**

The City argues that NW Success' claim for breach of the implied duty of good faith and fair dealing (the "Implied Duty") fails as a matter of law for two reasons. First, it argues that, "[b]ecause NW Success was not contractually entitled to any renewal of their contract after June 30, 2025, there is no claim against the City that it failed to act in good faith when it chose to let the contract expire." ECF 42 at 25. That argument fails because the Implied Duty does not depend on the breach of an express contractual provision, though it must be tethered to express contractual terms. *Elliott v. Tektronix, Inc.*, 102 Or. App. 388, 396 (1990) ("[A] party may violate its duty of good faith and fair dealing without also breaching the express provisions of a contract."); *see generally*, *Best v. U.S. Nat. Bank of Oregon*, 303 Or. 557 (1987). The Implied Duty serves to effectuate the objectively reasonable expectations of the parties.

NW Success does not allege that the City was contractually bound to renew its Contract, nor that the City was contractually required to award NW Success a new contract. In other words, NW Success is not attempting to add terms to the Contract as the City suggests. Instead, NW Success alleges that it expected that the City would comply with the LPR procedures in good faith, namely deciding whether NW Success met the Good Faith Exception to be eligible for renewal, extension, or award of a new contract. FAC ¶¶ 31, 84-85. As the City acknowledges, the Contract incorporated the LPR. See ECF 42 at 25 ("[T]he parties' contract incorporates the Labor Peace Requirement as a contractual term[.]"). The City's refusal to make an LPR exception determination, therefore, violated the Implied Duty. FAC ¶ 31 (The mayor's office declined to respond to NW Success' letter requesting a determination under the Good Faith Exception); *see e.g., Plan. & Design Sols. v. City of Santa Fe*, 1994-NMSC-112, 118 N.M. 707, 715 (1994) (holding Implied Duty in a bidding process required city to abide by municipal regulations governing the bidding process). Based on the facts alleged, NW Success has pleaded an objectively reasonable expectation in light of the express terms in the parties' Contract and the text of the LPR incorporated therein.

Page 25 – RESPONSE TO MOTION TO DISMISS FAC

To try to get around that, the City contends that the Implied Duty cannot apply because the LPR only applies to the current Contract. The City does so based on the presence of one word: "this." *See* ECF 42 at 25 ("Contractor shall comply with the City's Labor Peace Agreement policy . . . in providing such services to carry out <u>this</u> contract.") (quoting ECF 38-1, Ex., p. 12; emphasis added). And, since the City determined that the Good Faith Exception applied when it initially awarded NW Success this Contract (FAC ¶ 16), the City says it already completed its contractual obligation. If that is correct, then it goes both ways – NW Success already met the Good Faith Exception for purposes of extension of renewal of this Contract. NW Success suspects the City might argue that is of no consequence because the Contract, by its terms, contains no further extensions or renewals. But NW Success' allegations dispose of that argument too, since the City has in fact extended NW Success' Contract three separate times after it was set to expire by its terms on June 30, 2025. FAC at ¶ 18.

In any event, the LPR requires labor peace compliance for a contractor to be eligible for a contract in the first place and "for the duration of the service contract." ECF 38-1 at 4. The City's argument does not address the latter. The service Contract at issue is ongoing and will not expire until November 21, 2025. The LPR was not merely a condition the City imposed upon NW Success prior to awarding the original Contract; it governs throughout the contractual term, including the period during which NW Success may seek eligibility for Contract renewal, extension, or award of a new contract for the same services. Accordingly, the Implied Duty requires the City to determine in good faith whether NW Success met any exception to the LPR.

While the City certainly has discretion about whether NW Success met an exception to the LPR, it did not have discretion to refuse to decide at all. Indeed, the parties' Contract is silent as to whether the City could exercise its discretion to refuse to make a determination. Therefore, the Implied Duty can be used to fill the gap to determine whether the City's choice not to act violated the Implied Duty. *See Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Ltd. P'ship*, 840 F. Supp. 770, 778–79 (D. Or. 1993), *aff'd*, 76 F.3d 1003 (9th Cir. 1996) (holding that when the contract is silent as to the permissibility of conduct, the covenant of good faith may be

used to fill the gap); *Uptown Heights Assocs. Ltd. Partnership v. Seafirst Corp.*, 320 Or. 638, 646 (1995) (holding that parties normally contemplate discretion will be exercised for particular purposes; if the discretion is exercised outside these purposes, then the party exercising the discretion has performed in bad faith); *Best*, 303 Or. at 563 (party acts in bad faith when it exercises its discretion "for purposes not contemplated by the [original] parties."). If the City takes the position that its refusal to respond to NW Success' letter requesting a decision was itself a denial, then the factual question is whether the City exercised its discretion to deny that Good Faith Exception in good faith – oh, the irony. *See Best*, 303 Or. at 564–65 (Implied Duty attached to bank's discretion to set amount of a certain fee); *U.S. Nat. Bank of Oregon v. Boge*, 311 Or. 550, 567 (1991) (collecting cases regarding application of Implied Duty to discretionary decisions otherwise authorized by contract). Either way, it is up to a factfinder to determine whether the City breached the Implied Duty.

NW Success has sufficiently pled an objectively reasonable expectation that the City would at a minimum exercise its discretion under the Contract in good faith to determine whether NW Success met any exception to the LPR. NW Success alleges that the City failed to do the bare minimum and, in so doing, violated the Implied Duty. *See*, e.g. FAC at ¶ 30 ("The City declined Plaintiff's one-day extension request."). The Court should deny the City's motion to dismiss.

### E.    Leave to amend

If this Court dismisses NW Success' NLRA Preemption claim, NW Success seeks leave to file a second amended complaint realleging a claim for breach of Oregon's Privileges and Immunities Clause. In its present motion to dismiss, the City asserts that, "if SEIU is the only union uniquely 'benefiting' from the Labor Peace Requirement, that is not a relevant fact in the NLRA preemption analysis, but rather, sounds as a Privileges and Immunities Clause claim[.]" ECF 42 at 12. If this Court determines the City is correct, and dismisses NW Success' NLRA preemption claim, it should grant leave to replead a privileges and immunities claim under these new alleged facts and arguments. Such a claim is viable for the same reasons explained in the

Page 27 – RESPONSE TO MOTION TO DISMISS FAC

NLRA Preemption section above; namely that, because rehabilitative workers have no collective bargaining rights, there is <u>no relationship</u> between the City's application of the LPR to NW Success and the LPR's purpose of preventing interruption of services due to collective bargaining.

      If this Court dismisses NW Success' third or fourth claims, it should grant leave to amend because the City's present motion to dismiss is the first motion directed at those claims.

## V.     CONCLUSION

      For the above reasons, the Court should deny the City's motion to dismiss.


Dated: October 21, 2025                        SNELL & WILMER L.L.P.


                                               */s/ Drew L. Eyman*
                                               Clifford S. Davidson, OSB No. 125378
                                               csdavidson@swlaw.com
                                               Drew L. Eyman, OSB No. 163762
                                               deyman@swlaw.com
                                               Jenna M. Teeny, OSB No. 244519
                                               jteeny@swlaw.com

                                               Attorneys for Plaintiff Northwest Success, Inc.

4928-6992-7025

Snell & Wilmer
601 SW 2nd Avenue, Suite 2000
Portland, Oregon 97204-3229
503.624.6800