# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **NORTHWEST SUCCESS, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**CITY OF PORTLAND**,<br><br>Defendant. | Case No. 3:25-cv-970-SI<br><br>**OPINION AND ORDER** |

Clifford S. Davidson, Drew L. Eyman, and Jenna M. Teeny, SNELL & WILMER LLP, 601 SW Second Avenue, Suite 2000, Portland, OR 97204. Of Attorneys for Plaintiff.

Fallon Niedrist de Guzman, Deputy City Attorney, and Daniel Simon, Senior Deputy City Attorney, PORTLAND CITY ATTORNEY'S OFFICE, 1221 SW Fourth Avenue, Suite 430, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Northwest Success, Inc. ("NW Success") has sued the City of Portland (the "City"). NW Success seeks monetary, declaratory, and injunctive relief enjoining the City from enforcing the Labor Peace Agreement contained in the City's Sustainable Procurement Policy against NW Success and other Oregon Forward Contractors ("OFCs"). The Court previously denied NW Success's motion for preliminary injunction and granted the City's partial motion to dismiss, allowing Plaintiff to replead. *Northwest Success, Inc. v. City of Portland*, 2025

PAGE 1 – OPINION AND ORDER

WL 2379793, at *2-5 (D. Or. Aug. 15, 2025). Now before the Court is the City's motion to dismiss NW Success's First Amended Complaint ("FAC"). For the reasons stated below, the Court grants in part the City's motion to dismiss.

**STANDARDS**

**A.  Motion to Dismiss for Failure to State a Claim**

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, a court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The Court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The Court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

## BACKGROUND

In 2003, the Portland City Council adopted a Sustainable Procurement Policy, codified as ADM-1.09, which provides guidelines for City purchases of goods and services. After several meetings between the City and the Service Employers International Union, Local 49 ("SEIU"), the City amended this policy to impose a Labor Peace Requirement ("LPR") on contractors for all City janitorial, security, and industrial laundry service contracts.

Under Oregon state law, the City's janitorial services, laundry services, and security services also must comply with the Oregon Forward Program ("OFP"). The OFP helps individuals with disabilities achieve gainful employment by requiring public agencies to obtain certain products or services—including, as relevant here, janitorial, laundry, and security services—from qualified nonprofit agencies employing individuals with disabilities. *See* Or. Rev. Stat. ("ORS") § 279.840.

NW Success is an Oregon nonprofit corporation and an OFC that provides janitorial services to the City. In 2023, NW Success unsuccessfully negotiated a labor peace agreement with SEIU. The City nonetheless granted NW Success a contract for comprehensive custodial services through August 31, 2025 (the "Contract"), determining that it met a "Good Faith Exception" to the LPR. NW Success continued to attempt negotiations with SEIU to no avail. Eventually, the City refused to renew the contract. NW Success requested a determination that it

PAGE 3 – OPINION AND ORDER

again met the Good Faith Exception, but the Mayor's Office did not respond. The City has since

awarded the next contract to a different contractor.

## DISCUSSION

NW Success contends that the LPR is preempted by the National Labor Relations Act

("NLRA") and that its terms are unconstitutionally vague in violation of the Due Process Clause.

NW Success also argues that the City violated the implied duty of good faith and fair dealing

("GFFD") in failing to determine whether NW Success satisfied an exception to the LPR and

that the City's representations to NW Success should be enforceable by promissory estoppel.

### A.  NLRA Preemption

NW Success first argues that, by virtue of the Supremacy Clause of the United States

Constitution, the LPR is preempted by the NLRA. The Supremacy Clause provides:

> This Constitution, and the Laws of the United States which shall be
> made in Pursuance thereof; and all Treaties made, or which shall
> be made, under the Authority of the United States, shall be the
> supreme Law of the Land; and the Judges in every State shall be
> bound thereby, any Thing in the Constitution or Laws of any State
> to the Contrary notwithstanding.

U.S. CONST. art. VI, cl. 2.

The NLRA protects workers' "full freedom of association, self-organization, and

designation of representatives of their own choosing, for the purpose of negotiating the terms and

conditions of their employment or other mutual aid or protection." 29 U.S.C. § 151. The law

"supplant[s] state labor *regulation*, not all legitimate state activity that affects labor." *Bldg. &*

*Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I.,*

*Inc.*, 507 U.S. 218, 227 (1993) ("*Boston Harbor*") (emphasis in original). Thus, the Supreme

Court has emphasized that preemption doctrines do not apply when a government entity "acts as a market participant with no interest in setting policy." *Id.* at 229.[1]

If the government is not acting as a market participant, but is instead regulating labor, the NLRA preempts "(1) laws that regulate conduct that is either protected or prohibited by the NLRA . . . , and (2) laws that regulate in an area Congress intended to leave unregulated or 'controlled by the free play of economic forces.'" *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 887 (9th Cir. 2018) (quoting *Chamber of Com. v. Brown*, 554 U.S. 60, 65 (2008)). The first form of preemption is called *Garmon* preemption, and the second is called *Machinists* preemption. *See id.*; *see also San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959); *Lodge 76, Int'l Ass'n of Machinists v. Wisc. Emp. Relations Com.*, 427 U.S. 132 (1976).

To determine whether a state or local government is acting as a market participant, the Ninth Circuit applies the two-part test from *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*. 180 F.3d 686 (5th Cir. 1999). *See Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1023 (9th Cir. 2010) (applying *Cardinal Towing* test). The first prong asks if the challenged governmental action is taken in pursuit of the "efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar

---

[1] "When a state or local government buys services or manages property as a private party would, it acts as a 'market participant,' not as a regulator, and [courts] presume that its actions are not subject to preemption." *Airline Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074, 1079 (9th Cir. 2017) ("*ASPA*"). "Only if a statute evinces an intent to preempt such proprietary actions by a state or local government is the presumption overcome and the action preempted." *Id*. The Supreme Court has held that the NLRA does not evince such an intent to preempt state or local government actions taken as a market participant. *Boston Harbor*, 507 U.S. at 231-32 ("In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction."). The Ninth Circuit has also held that the presumption is not rebutted by the NLRA. *See ASPA*, 873 F.3d at 1085.

circumstances." *Id.* (quoting *Cardinal Towing*, 180 F.3d at 693). At the second prong, the "narrow scope of the challenged action" must "defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem." *Id.* at 1023-24 (quoting *Cardinal Towing*, 180 F.3d at 693). If either prong is satisfied, the governmental entity is acting as a market participant. *Id.* at 1024. The government bears the burden of showing that the market participant exception applies. *Id.*

The Court has previously dismissed NW Success's NLRA preemption claim, finding that the City met the "market participant" exception to NLRA preemption under either prong of the *Cardinal Towing* test. *Northwest Success, Inc.*, 2025 WL 2379793, at *6-10. In its FAC, NW Success additionally alleges that: (1) the LPR does not apply to a discrete project, but instead "broadly regulates three entire industries for any contract entered into with the City"; (2) SEIU is the "only union" that represents workers in all three industries; (3) the City wanted to pass its LPR before an "RFP" for a janitorial contract went out in order to "capture that contract"; (4) the City must procure services through the OFP, whereas private parties do not; (5) the LPR imposes liquidated damages; and (6) the NLRA does not apply to workers who are in a "primarily rehabilitative relationship" with an employer, and NW Success is one such employer where its employees are not subject to the NLRA. FAC ¶¶ 40-51. These new facts do not assist Plaintiff in stating a claim for NLRA preemption.

The Court first asks whether the challenged governmental action is undertaken in pursuit of the efficient procurement of needed goods and services, as one might expect of a private business in the same situation. *Airline Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074, 1080 (9th Cir. 2017) ("*ASPA*"). In *ASPA*, the City of Los Angeles required businesses at LAX to enter into a labor peace agreement similar to the one at issue here. *Id.* at 1077-78. The

Ninth Circuit emphasized the "inherently competitive and commercial nature of airport operations" in holding that the airport was acting as a market participant under the first *Cardinal Towing* element.[2] *Id.* at 1081-82. Similarly, the City here operates the facilities for which it is procuring services and has "taken action to protect its proprietary interest" in the facilities running smoothly.[3] *Id.* at 1081. In so doing, the City participates in an inherently competitive and commercial market, even if it were only contracting with OFCs. As NW Success's FAC alleges, there are five OFCs certified by the Oregon Department of Administrative Services ("DAS"). FAC ¶ 49. Indeed, the Oregon Forward statutory scheme contemplates a competitive scenario in which more than one OFC is interested in securing the same contract with the City.[4] Therefore, although the initial market from which the City procures services is a smaller, legislatively prescribed pool, NW Success has failed sufficiently to allege facts showing that the OFP creates

---

[2] In *ASPA*, the City of Los Angeles conditioned issuing licenses to service providers on the condition that the providers entered into a "labor peace agreement" with any employee organization that requested one. If the agreement was not finalized within sixty days, the dispute was to be submitted to mediation, and, if unsuccessful, to binding arbitration. The terms of any labor peace agreement had to include "binding and enforceable" provisions preventing picketing, boycotting, stopping work, and any other "economic interference." *ASPA*, 873 F.3d at 1077.

[3] NW Success argues in their response to the City's motion that the City has no proprietary interest in rehabilitative workers because they cannot collectively bargain. ECF 45 at 17. NW Success fails to allege this in their FAC—indeed, they allege facts that indicate the opposite. *See* FAC ¶ 33 ("The City selected Relay Resources [an OFC] for that emergency procurement—who SEIU represents.").

[4] Oregon Administrative Rule ("OAR") 125-055-0040 states, "In cases where more than one Oregan Forward OFC provider has been determined suitable for an Agency's needs, an Agency may choose one of several methods to select an Oregon Forward provider," including a method that allows a public entity to "conduct a competitive procurement for a product or service between two or more OFCs," which may involve "grant[ing] comparative evaluation points, percentages, or values in conducting the *substantial equivalent* of a request for proposals competition." OAR  125-055-0040(5) (emphasis added).

PAGE 7 – OPINION AND ORDER

a market that differs so markedly from other markets that the City cannot act in a *proprietary* capacity when it enters into contracts with OFCs.[5] Thus, the City is a market participant.

The City's actions independently qualify as market participation under *Cardinal Towing*'s second prong.[6] NW Success argues that, because it would constitute unlawful assistance under Section 8(a)(2) of the NLRA for a private employer to condition business on its contractor entering into an agreement with a particular union—and the City is doing "precisely" that here by wording the LPR so that prospective City contractors must enter into a labor peace agreement specifically with SEIU—the City is not a market-participant and is impermissibly regulating labor relations. FAC ¶ 40. In support, NW Success refers to an email sent both to it and SEIU from Derek Bradley, the Policy Director of then-City Commissioner Hardesty, that stated: "We want to make sure Labor Peace comes before council in time to capture that contract." *Id*.

Whether a government actor also has political motives is irrelevant in determining whether the market participant exception applies. The Ninth Circuit has held that "Congress did not intend for the NLRA's . . . preemptive scope to turn on state [or local] officials' subjective reasons for adopting a regulation or agreement. *Johnson*, 623 F.3d at 1026; *see also Engine Mfrs.*

---

[5] The Court has already rejected NW Success's argument that the City is not a market participant because the OFP is not a private market. *See* FAC ¶¶ 47-49. First, this Court found, consistent with the allegations in NW Success's FAC, that the City is not acting only in a market with OFCs. *See Northwest Success, Inc*, 2025 WL 2379793, at *8; *see also* FAC ¶¶ 47-49 ("[I]t is hypothetically possible" that "all five . . . OFCs [are] unable or unwilling to meet the City's contracting needs."). Second, the Court has determined that even if the City were contracting solely with OFCs, it would still be acting as a market participant. *Northwest Success, Inc*, 2025 WL 2379793, at *8.

[6] The Court previously considered and rejected NW Success's argument on the second *Cardinal Towing* prong that the City's LPR is preempted because it serves the policy goal of aiding unions.

PAGE 8 – OPINION AND ORDER

*Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1046 (9th Cir. 2007) ("That a state or local government entity may have policy goals that it seeks to further through its participation in the market does not preclude the [market participant] doctrine's application, so long as the action in question is the state's own market participation."). Because the City's policy does not, on its face, favor a specific union, and specifically states that the LPR does not require any contractor "to recognize a particular labor union," the statements of an individual member of the staff of one of the then-City Commissioners does not remove the City from the market-participant exception. *See N. Ill. Chapter of Associated Builder & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1007 (7th Cir. 2005) ("Federal preemption doctrine evaluates what legislation does, not why legislators voted for it or what political coalition led to its enactment."). Under either *Cardinal Towing* approach, the City is a market participant. Therefore, NLRA preemption does not apply.[7]

---

[7] NW Success's NLRA preemption claim fails for another, independent reason: neither *Garmon* nor *Machinists* preemption is appropriate because the NLRA does not apply to workers who are in a primarily rehabilitative relationship with their employer. NW Success alleges that its employees have this "primarily rehabilitative" relationship, *see* FAC ¶¶ 45-47, and argues that this relationship makes NLRA preemption appropriate because the rehabilitative, not economic, nature of its relationship with the City demonstrates that the City is not a market participant. Even if NW Success is correct that the City is not a market participant, however, that does not mean that the NLRA automatically applies.

Rather, the National Labor Relations Board has determined that it does not have jurisdiction over rehabilitative employees. *See, e.g.*, *Brevard Achievement Ctr., Inc.*, 342 NLRB 982, 983 (2004). Accordingly, federal courts have uniformly held that "primarily rehabilitative" relationships are not covered by the NLRA and thus are not appropriate for *Garmon* preemption. *See, e.g.*, *Greene v. Dayton*, 81 F. Supp. 3d 747, 750-51 (D. Minn. 2015), *aff'd*, 806 F.3d 1146 (8th Cir. 2015); *N.C. Farm Bureau Fed'n, Inc. v. United States*, 781 F. Supp. 3d 455, 481 (E.D.N.C. 2025). The same logic governs *Machinists* preemption. In fact, the Ninth Circuit has already held that it is inappropriate in an analogous situation. *See Chamber of Com. of the United States of Am. v. City of Seattle*, 890 F.3d 769 (9th Cir. 2018). As the court explained:

> [W]here, as here, Congress has chosen not to create a national
> labor policy in a particular field, the states remain free to legislate

## B. Void for Vagueness

NW Success also argues that the terms of the LPR are unconstitutionally vague in violation of the Due Process Clause. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also* U.S. CONST. amend. XIV (providing that no state "shall . . . deprive any person of life, liberty, or property, without due process of law"). The void-for-vagueness doctrine "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Grayned*, 408 U.S. at 108 (noting that vague laws violate the "basic principle of due process," including "fair warning" and "explicit standards for those who apply [the laws]").

To determine whether a statute provides fair notice, a court will consider whether it "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008). When a statute involves only economic regulation, however, courts analyze whether a "*business person* of ordinary intelligence would understand" the conduct prohibited. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 501

---

as they see fit, and may apply their own views of proper public policy to the collective bargaining process insofar as it is subject to their jurisdiction. We find nothing in the National Labor Relations Act to suggest that Congress intended to preempt such state action by legislating for the entire field. Indeed, we draw precisely the opposite inference from Congress's exclusion of agricultural employees from the Act.

*Id*. at 793 (quoting *United Farm Workers of Am. v. Ariz. Agric. Emp't Relations Bd.*, 669 F.2d 1249, 1257 (9th Cir. 1982)). Therefore, neither *Garmon* nor *Machinists* preemption applies.

(1982) (*Hoffman*) (emphasis added).[8] Such is the case for the LPR. As to the avoidance of arbitrary enforcement, the Supreme Court has stated that "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them," and "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis." *Grayned*, 408 U.S. at 108-09.

The Supreme Court and the Ninth Circuit, however, have recognized that "[m]any statutes will have some inherent vagueness" and that a certain quantum of vagueness is permissible—and even necessary. *See Rose v. Locke*, 423 U.S. 48, 49-50 (1975); *McSherry v. Block*, 880 F.2d 1049, 1054 (9th Cir. 1989) (quoting same). Consistent with that recognition, "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *Parker v. Levy*, 417 U.S. 733, 757 (1974) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963) (collecting cases)). Thus, a challenger seeking to invalidate a statute for vagueness carries a heavy burden. A statute is unconstitutionally vague if it "specifie[s]" "no standard of conduct … at all." *United States v. Lucero*, 989 F.3d 1088, 1101 (9th Cir. 2021) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).[9]

---

[8] Courts evaluate the vagueness of a law in light of the sophistication of the persons or entities subject to that law. *See, e.g.*, *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162-63 (1972) (striking down a vagrancy law under the "person of ordinary intelligence" standard, noting that "[t]he poor among us, . . . the average householder[,] are not in business and not alerted to the regulatory schemes of vagrancy laws"); *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) (applying a "doctors of ordinary intelligence" standard to a law prohibiting certain medical procedures (quotation marks omitted)). Thus, here, the ordinary businessperson of ordinary intelligence standard governs.

[9] As explained in the Court's previous Opinion and Order, the standard of review for vagueness varies depending "in part on the nature of the enactment." *See Hoffman*, 455 U.S. at 498 (1982); *accord Kashem v. Barr*, 941 F.3d 358, 370 (9th Cir. 2019) (construing *Hoffman*).

NW Success argues that the LPR is unconstitutionally vague because: (1) the LPR is subject to broad and unreasonable interpretation; (2) the Good Faith Exception and the Rejection Exception lack precision and guidance; and (3) the liquidated damages penalty has no clear standards. The Court previously determined that the Good Faith Exception itself is not unconstitutionally vague. *See Northwest Success, Inc.*, 2025 WL 2379793, at *17-18 (discussing definition of "good faith," LPR's lack of timelines included in terms of Good Faith Exception, and City's failure to grant NW Success Good Faith Exception). The Court therefore focuses its analysis on the Rejection Exception and the allegedly arbitrary enforcement of the arbitration requirement under the Good Faith Exception.

### 1. Rejection Exception

NW Success argues that the Rejection Exception is unconstitutionally vague because it lacks precision and guidance, because it does not specify what constitutes a labor organization's response that they do not wish to negotiate Labor Peace, and because the Rejection Exception did not apply in these circumstances. FAC ¶¶ 57, 61. The Court considers these arguments within the framework of fair notice and arbitrary enforcement.

---

*See also Northwest Success, Inc.*, 2025 WL 2379793, at *17-18 (discussing applicable standard of review).

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Hoffman*, 455 U.S. at 498. In analyzing the statute at issue, a court must consider whether the statute: (1) involves only economic regulation; (2) contains only civil penalties; (3) includes a scienter requirement; and (4) threatens constitutionally protected rights. *See Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) (construing *Hoffman*). Applying those factors here, the LPR regulates only economic activities and imposes only civil penalties. Under what is "perhaps the most important factor," the LPR also does not "threaten[] to inhibit the exercise of constitutionally protected rights." *Hoffman*, 455 U.S. at 499. Thus, the "degree of vagueness that the Constitution tolerates" is greater for an LPR than in other circumstances. *See id.* at 498.

NW Success argues that the LPR fails to provide fair notice because there is "no way for prospective contractors to know ahead of time what will satisfy the [exception]." *Id*. ¶ 56. The Court is not persuaded. The Rejection Exception provides that when "the contractor follows notification procedures set out in Exception 1, and the labor organization(s) respond that they do not wish to negotiate labor peace," the contractor may be awarded the contract as long as it "provide[s] the City with written evidence of the response" and "demonstrate[s] that it has a written plan for continuation of services in the event of economic interference by a labor organization[]." ECF 38-1 at 4-5. The notification procedures in "Exception 1" are set out as follows:

> The contractor: 1) does not have an exclusive bargaining representative representing its employees who may be performing work on the service contract; 2) gave written notice to any and all labor organizations that represent employees providing similar services in the states of Oregon or Washington or that represent any group of the contractor's or subcontractor's employees who are or will be involved in providing such services of its desire to jointly develop Labor Peace, and the applicable labor organizations failed to respond within three (3) weeks or the applicable labor organizations represented that they are not seeking to become the exclusive representative of the contractor's employees; and 3) certifies that it has no reason to believe a labor dispute will occur for the term of the contract.

*Id.* at 4. Read in conjunction with this text, the statute provides a "business person of ordinary intelligence" fair notice of what is expected under the exception. *Hoffman*, 455 U.S. at 501. The statute is readily understood to mean that, to satisfy the exception, a contractor must provide notice to local labor organizations about the desire to negotiate labor peace as stated above, and the labor organization(s) must respond within three weeks that they do not wish to negotiate labor peace.

Further, NW Success argues that the LPR does not define what constitutes a labor organization's response that it "do[es] not wish to negotiate Labor Peace." Similarly, the text of

the statute provides a businessperson of ordinary intelligence with fair notice as to what is expected. On its face, the statute requires a showing that a labor organization has provided a response to the contractor's written notice indicating that it has no interest in the negotiation of that agreement. Far from specifying "no standard of conduct" at all, the Rejection Exception provides more than enough notice about what is required of contractors to meet its terms. *Lucero*, 989 F.3d at 1101 (quoting *Coates*, 402 U.S. at 614).

A statute also can be void for vagueness under the Due Process Clause if it poses a "significant risk" of arbitrary enforcement. *Skilling v. United States*, 561 U.S. 358, 412 (2010); *see also Stoianoff v. Montana*, 695 F.2d 1214, 1222 (9th Cir. 1983) (rejecting vagueness challenge in absence of a "clear indication" that the challenged law would be enforced arbitrarily). NW Success argues that the Rejection Exception lacks precision and guidance, risking discriminatory application, pointing to the fact that it did not qualify for the Rejection Exception as evidence of arbitrary enforcement. As discussed above, the terms of the Rejection Exception are sufficiently precise to avoid arbitrary enforcement. Moreover, NW Success does not plead facts showing that they have met the Rejection Exception, evincing no indication that the Exception was arbitrarily enforced in these circumstances.[10]

### 2. Good Faith Exception "Arbitration" Requirement

NW Success also argues that the term "arbitration" in the Good Faith Exception is not objectively defined, rendering it vague and subject to arbitrary application. The Court has

---

[10] *See* FAC ¶ 19 ("On October 4, 2024, the City communicated to Plaintiff and the Union that it 'expected the parties to comply with the Good Faith Exception by going to mediation within the next 90 days, and if mediation fails, arbitration within 90 days after that.'" (cleaned up); *see also id*. ¶ 21 "Plaintiff went to mediation with the Union and, when that was unsuccessful, Plaintiff offered, on December 23, 2024, to submit the matter to arbitration pursuant to the Good Faith Exception."). SEIU did not communicate that it did not wish to negotiate labor peace within the three weeks specified by the Rejection Exception.

already rejected the argument that the Good Faith Exception's requirement for "an offer by the contractor to submit the dispute about the terms of Labor Peace to prompt resolution thorough binding interest arbitration before a neutral dispute resolution organization, and its participation in that arbitration" is unconstitutionally vague. *See Northwest Success, Inc.*, 2025 WL 2379793, at *18 (quotation omitted). There, the Court found that "the LPR sets forth a sufficient written standard governing how the Mayor's Office is to determine whether a contractor meets the Good Faith Exception." *Id*. In its FAC, NW Success alleges that the City arbitrarily applied a definition of arbitration to include a one-party arbitration, and arbitrarily applied deadlines for NW Success to engage in that arbitration. FAC ¶ 59. Because the facts in the FAC do not support Plaintiff's argument, the Court finds that the "arbitration" requirement does not render the Good Faith Exception to the LPR unconstitutionally vague.

### a. Definition of "Arbitration"

NW Success's allegations that the term "arbitration" is not objectively defined and that the City arbitrarily applied a definition of arbitration to include "one-party arbitration" fail to state a Due Process claim. NW Success argues that the LPR does not provide fair notice because the term "arbitration" in the Good Faith Exception is not objectively defined. Statutes, however, are not automatically vague even if "trained lawyers . . . find it necessary to consult dictionaries, treatises, and judicial opinions before they may say with any certainty what [those] statutes may compel or forbid." *Rose*, 423 U.S. at 50. Particularly where, as here, the statute in question pertains only to economic regulation and thus is evaluated under the "business person of ordinary intelligence" standard, the lack of an objective definition of arbitration within the statutory

scheme is not unconstitutionally vague. A businessperson of ordinary intelligence would have familiarity with what an "arbitration" is, and what is required to engage in it.[11]

### b. Timelines

NW Success also argues that the lack of timelines to participate in arbitration to avail itself of the Good Faith Exception makes the LPR unconstitutionally vague. Although the Good Faith Exception itself does not have specific timelines for when parties are expected to engage in mediation and arbitration, it does use the qualifying phrases "immediate" (for mediation) and "prompt resolution" (through binding interest arbitration). *See* ECF 38-1 at 5. This language brings the Good Faith Exception within the category of statutes that require "a party to conform [their] conduct to an imprecise but comprehensible normative standard rather than no standard of conduct specified at all." *Hoffman*, 455 U.S. at 495 n.7 (1982) (cleaned up) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)). Therefore, NW Success fails to meet its heavy

---

[11] Indeed, by its own pleading, NW Success demonstrates that it understands that an "arbitration" requires at least two adverse parties. *See* FAC ¶ 28 ("By definition, an arbitration includes at least two parties."). That an arbitration resolves disputes between adverse parties, however, does not mean that all parties must be present for a proceeding to qualify as an arbitration. Just as a plaintiff files a lawsuit, a party may unilaterally commence arbitration. And just like a default judgment can be entered against an absent party in a lawsuit, an arbitrator may award relief in the absence of one party. *See IFG Leasing Co. v. Snyder*, 77 Or. App. 374, 380 (YEAR) ("[W]hen, as here, the objecting party is not required under the contract to participate in the selection of the arbitrator, the arbitration, otherwise proper, may proceed in the objecting party's absence."). An arbitration, therefore, may proceed without all parties present, but cannot commence without one or more adverse parties contemplated.

Here, however, the problem lies in the fact that NW Success does not plead facts showing that it commenced arbitration proceedings with SEIU within the timeframe given by the City. *See* FAC ¶¶ 19, 27, 29. Nor does NW Success plead facts showing that they sought an order from a court compelling arbitration. *See IFG Leasing Co.*, 77 Or. App. at 380 ("An order compelling arbitration is necessary . . . when one party refuses to participate in the arbitration and the parties have made no provision for arbitration in the face of such refusal."). Rather, NW Success's FAC indicates only that it engaged in informal discussions about the possibility of arbitration and did nothing more during the applicable timeframe. *Id.* ¶¶ 21, 23. This fails to plead "participation" in arbitration as required under the Good Faith Exception.

burden in pleading that the Good Faith Exception's arbitration requirement is unconstitutionally vague.

NW Success also argues that the Good Faith Exception's arbitration requirement is subject to arbitrary application in the establishment of time limitations to engage in arbitration. The facts here, however, do not support that there is a "significant risk" of arbitrary enforcement. As discussed above, the use of the qualifying words "immediate" and "prompt" sufficiently cabins the establishment of the time limitations to avoid arbitrary enforcement. A statute that confers discretion onto a decisionmaker is not automatically vague. *See United States v. Arallenes*, 767 F.2d 1353, 1359 (9th Cir. 1985) (collecting cases). Moreover, the City provided NW Success with additional guidance as to its expectations. The City communicated with NW Success in its October 4, 2024, letter that it "expect[ed] the parties to engage in mediation within the next 90 days. If mediation fail[ed], the City expect[ed] the parties to engage in interest arbitration within 90 days following the failed mediation." ECF 38-1 at 32. This is precisely the "sub-regulatory guidance" and "pre-enforcement inquiry process" that has been found to mitigate potential statutory vagueness. *See, e.g.*, *Or. Ass'n of Hosps. & Health Sys. v. Oregon*, 734 F. Supp. 3d 1139, 1162 (D. Or. 2024), *aff'd*, 2025 WL 1833815 (9th Cir. July 3, 2025) (citing *Hoffman*, 455 U.S. at 498, 502, 504). That the City did not provide a one-day extension after this time elapsed does not indicate a "significant risk" of arbitrary enforcement. In sum, the Court finds that the LPR is not unconstitutionally vague.

## C.  Promissory Estoppel

NW Success asserts that the City promised that NW Success would receive a waiver under the Good Faith Exception under certain conditions, that NW Success complied with those conditions, and that the promise should be enforced through promissory estoppel. Promissory estoppel claims require the following elements under Oregon law: "(1) a promise; (2) which the

PAGE 17 – OPINION AND ORDER

promisor could reasonably foresee would induce a conduct of the kind that occurred; (3) actual reliance on the promise; and (4) a substantial change in position by the party seeking to enforce the promise." *Natkin & Co. v. H.D. Fowler Co.*, 128 Or. App. 311, 314 (1994) (citations omitted). Oregon uses the term "promissory estoppel" to refer to two distinct concepts: (1) "actions taken in reliance on a definite promise . . . as a substitute for consideration even though the action was not bargained for by the promissor and was not performed as an agreed exchange for the promise"; and (2) "when a party acts in reliance on an indefinite promise to create a binding obligation." *Staley v. Taylor*, 165 Or. App. 256, 261 n.5 (2000) (citations omitted).

Additionally, "promissory estoppel against a governmental entity . . . can be applied only in limited circumstances." *Arken v. City of Portland*, 351 Or. 113, 138-39 (2011). Those circumstances include:

> [I]f (a) the municipality clothes the agent with apparent authority, (b) the promise is one which the municipality could lawfully make and perform, (c) there is no statute, charter, ordinance, administrative rule, or public record that puts the agent's act beyond his authority, (d) the person asserting the authority has no reason to know of the want of actual authority, and (e) the municipality has accepted and retained the benefit received by the municipality in return for the promise.

*Id.* at 139 (quoting *Wiggins v. Barrett & Assocs., Inc.*, 295 Or. 679, 683 (1983). Not every one of the above listed circumstances must be present for promissory estoppel to apply to a governmental entity; instead, it is looked at as a totality of the circumstances. *See id.* ("[A] comparison of the circumstances present here to the factors identified in *Wiggins* reveals numerous reasons why promissory estoppel is inapplicable here.").

Here, the City stated that it expected NW Success to comply with the Good Faith Exception and engage in mediation within 90 days and, if that failed, arbitration within 90 days

after that. FAC ¶ 67. Additionally, subsequent communications from the City reinforced that alleged "promise," NW Success contends, because the City said that it was at a "crunch time" to either receive assurances from NW Success that it would complete the steps necessary for the Good Faith Exception or to begin an emergency procurement. *Id*. ¶ 68. NW Success argues that because it is reasonably foreseeable that it would rely on a government entity's communications about its expectations and act in accordance with those expectations, and because it relied on the communications and actions to its detriment, the City should be estopped from imposing the LPR on NW Success. For the reasons explained below, the Court disagrees.

NW Success fails plausibly to allege that the City made a promise that NW Success would receive a waiver under the Good Faith Exception. Read in its entirety, the letter in which the City stated their expectation that NW Success would comply with the Good Faith Exception was sent to "assist the parties in meeting the[] requirements by providing additional guidance on the City's expectations under [the Good Faith Exception]." ECF 38-1 at 32.[12] The same is true for the alleged "reinforcement" of the promise in the City's October 4, 2024, email. Read in its entirety, the email clarifies, "[a]t this time, given the parties have not provided a date for an arbitration and assurances that the parties will, in fact, go through arbitration, NW Success's contract will expire on June 30, and the City will be immediately moving forward with an emergency procurement." ECF 38-1 at 41. These communications provide guidance to NW Success of what it *should* do, but there is no indication of what the City will do in response to

---

[12] When deciding a motion to dismiss, courts may rely on undisputed facts that the parties presented to the court in documents referred to in their pleadings. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." (citation omitted)); *see also Curzi v. Oregon State Lottery*, 286 Or. App. 254 (2017).

PAGE 19 – OPINION AND ORDER

those actions—if anything at all. *See Promise*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made; a person's assurance that a person will or will not do something."). Since there is no evidence of a promise made by the City, the Court dismisses NW Success's claim of promissory estoppel. *See BenefitElect, Inc. v. Strategic Benefit Sols. Corp.*, 614 F. Supp. 3d 838, 844 (D. Or. 2022).

Even if the Court construed the above communications as a promise, however, any such promise would be conditional on NW Success's compliance with the requirements of the Good Faith Exception. NW Success argues that the City's promise was that "[NW Success] would receive a waiver under the Good Faith Exception, for purposes of renewal or extension of the Contract, if [NW Success] *acted in accordance with that exception*." FAC ¶ 67 (emphasis added). NW Success, however, did not comply with the requirements of the Good Faith Exception. The City's subsequent communication, rather than "reinforcing" the alleged promise, explicitly states that NW Success's contract will end because it has not complied with the arbitration requirement and the City will go forward with an emergency procurement. ECF 38-1 at 41.

The Oregon Supreme Court has adopted the *Restatement* formulation of promissory estoppel:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Cocchiara v. Lithia Motors, Inc.*, 353 Or. 282, 291 (2013) (quoting *Restatement (Second) of Contracts* § 90(1) (1981)). The fact that NW Success never acted in accordance with the exception (*i.e.*, by arbitrating with SEIU) proves fatal for their claim of promissory estoppel,

PAGE 20 – OPINION AND ORDER

because enforcement of the so-called promise would put NW Success in precisely the situation it finds itself in now.[13]

## D.  Implied Duty of Good Faith and Fair Dealing

Finally, NW Success argues that the City violated the implied duty of GFFD found in every contract in Oregon by declining to grant NW Success a waiver under the Good Faith Exception to the LPR. Under Oregon law, "there is an obligation of good faith in the performance and enforcement of every contract." *Ivanov v. Farmers Ins. Co. of Or.*, 344 Or. 421, 430 (2008). To properly plead a breach of this implied contractual covenant, a plaintiff must allege that the "defendant was given discretion in the performance of the contract," that "the parties anticipated defendant's discretion to be exercised for a specific purpose," and that "defendant exercised that discretion for a purpose contrary to the reasonable contractual expectations of the plaintiffs." *Ewing v. Country Mut. Ins. Co.*, 2012 WL 1758142, at *4 (D. Or. Apr. 25, 2012), *report and recommendation adopted*, 2012 WL 1755675 (D. Or. May 15, 2012), *order amended and superseded*, 2012 WL 2131540 (D. Or. June 12, 2012).

Under this Oregon common-law implied duty, a plaintiff must allege sufficient facts plausibly to render a defendant in breach of the parties' "objectively reasonable expectations" as they relate to the express provisions of the contract. *See Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 445 (2010) ("The common-law implied duty of good faith and fair dealing serves to effectuate the *objectively* reasonable expectations of the parties." (emphasis added)). In determining the objective reasonableness of parties' expectations, Oregon courts note

---

[13] Because the Court finds that NW Success has failed to plead sufficient facts to establish one of the elements of their claim of promissory estoppel (*i.e.*, that there was a promise made by the City), and, even if there was, it was a conditional promise the conditions of which were not fully met, the Court need not reach the issue of whether promissory estoppel can be applied against the City as a governmental entity, under the *Wiggins* factors.

that "[t]he duty 'does not operate in a vacuum,' rather it 'focuses on the agreed common purpose and the justified expectations' of the parties, both of which are intimately related to the parties' manifestation of their purposes and expectations in the express provisions of the contract." *Id*. (quoting *OUS v. OPEU*, 185 Or. App. 506, 515-16 (2002)). Therefore, for a plaintiff to state a claim for a violation of a party's contractual expectation, the plaintiff must allege some common purpose, contractual provision, or other fact that could evidence the objective reasonableness of the expectation.

NW Success asserts that the City violated the implied duty of good faith and fair dealing by declining to grant NW Success a waiver under the Good Faith Exception to the LPR when NW Success participated in the Good Faith Exception process and satisfied it unilaterally to the best of its ability. The City replies that the parties' contract had only one express term governing the renewal of the contract—the initial expiration date was June 30, 2024, "'with the City's option to extend up to 1 additional 1-year period.'" ECF 42 at 24-25 (quoting ECF 38-1 at 6). The City argues that after it extended NW Success's contract to June 30, 2025, it had no further obligations to extend the contract regardless of circumstances. *Id*. at 25. The Court agrees with the NW Success.

NW Success plausibly alleges an objectively reasonable expectation that the City would grant it a waiver under the Good Faith Exception. In 2023, the City granted NW Success a waiver under the Good Faith Exception after negotiations with SEIU were unsuccessful. FAC ¶ 14. The City did so even though the parties did not engage in mediation. *See id.* ("When . . . negotiations were unsuccessful, Plaintiff offered to mediate pursuant to the Labor Peace Requirement. The Union's position was that mediation was 'premature.'"). Here, NW Success did more to comply with the Good Faith Exception than when it was previously awarded the

PAGE 22 – OPINION AND ORDER

exception. NW Success engaged in mediation with SEIU and offered several times to submit the dispute to binding interest arbitration. Once again, SEIU refused to participate because it believed that arbitration was "premature." *Id*. ¶ 24. Once again, NW Success provided updates to the City throughout the Good Faith Exception process. *Id*. ¶ 77. This time, however, the City refused to make a determination that NW Success met the Good Faith Exception. This is enough to render NW Success's expectation that the Mayor's office would use its discretion to determine that NW Success met the Good Faith Exception to the Labor Peace Requirement objectively reasonable. Therefore, NW Success states a claim for breach of GFFD.

## CONCLUSION

The Court GRANTS IN PART the City's motion to dismiss (ECF 42). The Court DISMISSES NW Success's First Claim, without further leave to amend, and DISMISSES NW Success's Second and Third Claims with leave to amend within 14 days if it believes, consistent with Rule 11 of the Federal Rules of Civil Procedure, that it can cure the deficiencies identified in this Opinion and Order.[14] The Court DENIES the City's motion to dismiss with respect to NW Success's Fourth Claim.

**IT IS SO ORDERED**.

DATED this 7th day of April, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

[14] NW Success seeks leave to reallege a claim for breach of Oregon's Privileges and Immunities Clause in their Second Amended Complaint. By failing to replead this claim in their First Amended Complaint, however, NW Success has waived this claim. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012).